UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| DEKALB COUNTY PENSION FUND, Individually and on Behalf of All Others Similarly Situated, <br><br>        Plaintiff, <br><br>    v. <br><br> METHODE ELECTRONICS, INC., DONALD W. DUDA, and RONALD L.G. TSOUMAS <br><br>        Defendants. | Case No. 24 Civ. 7696 <br><br> CLASS ACTION <br><br> **AMENDED CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................ 1

JURISDICTION AND VENUE .......................................................................................... 6

PARTIES ............................................................................................................................ 7

CONFIDENTIAL WITNESSES ........................................................................................ 8

SUBSTANTIVE ALLEGATIONS .................................................................................... 9

I.     BACKGROUND ...................................................................................................... 9

     A.     Background of Methode's Automotive Segment ................................. 10

     B.     Methode's Automotive Segment's Transition Away From Traditional Center Console Production ........................................................................ 11

     C.     Material Operational Inefficiencies Plagued The Automotive Segment ............. 14

II.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS IN 2021-2022 ......................................... 17

     A.     December 2, 2021 Statements ............................................................. 17

     B.     March 3, 2022 Statements .................................................................. 20

     C.     June 2022 Statements ......................................................................... 22

     D.     August 2022 Statements ..................................................................... 25

     E.     September 2022 Statements ................................................................ 29

     F.     December 2022 Statements ................................................................. 31

III.     PARTIAL CORRECTIVE DISCLOSURES INCREMENTALLY REVEALED THE FRAUD WHILE DEFENDANTS CONTINUED TO MAKE FALSE AND MISLEADING STATEMENTS ......................................... 34

     A.     March 2023 Statements And Disclosures ........................................... 34

     B.     June – August 2023 Statements And Disclosures ................................ 38

     C.     September 2023 Statements And Disclosures ..................................... 45

     D.     December 2023 Statements And Disclosures ...................................... 49

IV.     THE TRUTH IS FINALLY DISCLOSED TO INVESTORS ......................... 52

V.     POST-CLASS PERIOD EVENTS ....................................................................... 54

i

VI.     ADDITIONAL FACTS PROBATIVE OF SCIENTER.................................................... 59

    A.    *Respondeat Superior* and Agency Principles Apply............................................... 60

    B.    Individual Defendants' Admissions Demonstrate Scienter ................................. 60

    C.    The Fraud Implicated Methode's Core Operations ............................................. 62

    D.    Suspicious Individual Defendants' Departures Evidence Scienter...................... 64

    E.    Defendants' Financial and Business Experience .................................................. 65

    F.    The Individual Defendants' Incentive Compensation Supports Scienter ............. 66

VII.    NO SAFE HARBOR ................................................................................................. 67

VIII.    LOSS CAUSATION/ECONOMIC LOSS ................................................................. 68

IX.    CLASS ACTION ALLEGATIONS ......................................................................... 70

X.    CONTROL PERSON LIABILITY............................................................................ 72

XI.    PRESUMPTION OF RELIANCE ............................................................................ 73

XII.    CAUSES OF ACTION ............................................................................................. 74

COUNT I ............................................................................................................................ 74

COUNT II ........................................................................................................................... 78

PRAYER FOR RELIEF ...................................................................................................... 80

JURY TRIAL DEMAND .................................................................................................... 80

Lead Plaintiff DeKalb County Pension Fund ("Lead Plaintiff" or "Plaintiff"), individually and on behalf of all others similarly situated, by their undersigned attorneys, alleges the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included a review of Defendants'[1] public statements and publicly available documents, conference calls and announcements, SEC filings, wire and press releases published by and regarding Methode Electronics Inc. ("Methode" or the "Company"), analysts' reports and advisories and other press coverage about Methode, Methode's stock chart, Methode's corporate website, data obtained through news services such as Bloomberg and Yahoo! Finance, interviews with certain confidential witnesses ("CWs") who were former employees of Methode, and information readily obtainable through publicly available sources and on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a federal securities class action brought on behalf of a class consisting of all persons and entities who purchased or otherwise acquired the common stock of Methode (NYSE: "MEI") between December 2, 2021 and March 6, 2024, both dates inclusive ("Class Period"), seeking to pursue remedies against Methode and certain of its officers and/or directors named as Defendants herein for violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

---

[1]      "Defendants" is defined *infra* at ¶ 23.

2.     Methode designs, engineers, and manufactures custom-engineered solutions for original equipment manufacturers ("OEMs"), automobile manufacturers and other companies.  A significant portion of the Company's manufacturing operations take place in Monterrey, Mexico, where many of the Company's Automotive, Industrial, and Interface products are manufactured.

3.     Methode's Automotive Segment generates the majority of the Company's revenues.  In November 2010, Methode received a significant boost when its Automotive Segment landed a major General Motors ("GM") center console contract which was projected to add $100 million in revenue per year.  The Company's center console production was substantially done out of its Monterrey, Mexico facility.

4.     For some time, auto manufacturers like GM had been transitioning away from center control units with their traditional buttons and knobs ("integrated center stack units"), and moving to digital displays featuring touch screens integrating many of the car's control functions into the display itself.  By 2020, Methode was transitioning away traditional integrated center stack units.  This transition meant that Methode was shifting its production away from the process of producing a low variety of products in large quantities (referred to as low mix, high volume production) for center consoles for a few manufacturers to producing a high variety of products in low quantities per batch (high mix, low volume production) in order to produce specialized components for use in a wider variety of vehicles, including electric vehicles ("EVs") from various manufacturers.

5.     Although the change would initially result in lower unit sales, Defendants assured the market that these lost sales would be offset by higher margins on the more

specialized components sold by the Company, as well as contract awards from other OEMs that would secure a place for Methode in the EV space.

6.     Leading up to and during the Class Period, Defendants touted Methode's successful transition into new business opportunities, particularly its transition into the electric vehicles ("EV") space, and away from its legacy center console business, which included the retooling of its Monterrey, Mexico facility to support the transition to building new, more specialized components and to service new EV program awards.  As a result of the purported success of this transition, Defendants claimed that Methode was on track to achieve a 3-year compound annual growth rate ("CAGR") of 6%, taking into account relevant program roll-offs (*i.e.*, prior award programs that have been completed).

7.     Unbeknownst to investors, however, Methode's operations, including its transition into new business opportunities, were plagued with major problems.  Indeed, as a former employee noted, Methode had "no idea what to do to stay at that level" of business that the GM console business had provided.  In reality, the Company's Monterrey facility was suffering from major setbacks during the transition caused by high personnel turnover, poor operational decisions, vendor issues, and supplier changes that had led to production planning deficiencies, inventory shortages, and, ultimately, botched execution of the Company's strategic plans.  The Company also suffered ballooning costs and delayed program launch dates as it attempted to retool the Monterrey facility to offer a broader mix of more specialized components and phase out the GM center console program.  As a result, Methode was clearly going to miss its 3-year 6% CAGR projection that had been represented to investors.

8.     As Defendant Donald W. Duda ("Duda") would later admit, all of these issues were exposed by Methode's own internal "early warning system," but the Company failed to properly address and mitigate them.  *See* Sept. 7, 2023 Earnings Call (Methode's "early warning system detected" Monterrey's "operating inefficiencies," but "we failed to mitigate").  Defendant Duda even clarified during the same earnings call that this was not an issue with the Company being subject to the whims of the market, like having fewer sales than anticipated; rather, it was "an execution issue, that is internal, we did it to ourselves. . . ."  Nonetheless, the full truth did not come out until March 7, 2024, when the Company finally withdrew all previous financial guidance, including the 3-year 6% organic sales CAGR represented to investors.

9.     When the truth emerged through this series of corrective disclosures, Methode's stock went into a tailspin, wiping out hundreds of millions of dollars in market capitalization and injuring hundreds of thousands of investors.

10.     Methode's high-profile executives, including the Individual Defendants, left Methode during and soon after the Class Period.  Defendant Duda, Methode's President and Chief Executive Officer ("CEO"), resigned in January 2024 and subsequently retired in April 2024.  Defendant Ronald L.G. Tsoumas ("Tsoumas"), Methode's Chief Financial Officer ("CFO"), retired in April 2024.  Chief Operating Officer Joseph El Khoury ("Khoury"), was fired by the Board in December 2023.

11.     Avinash Avula ("Avula") replaced Defendant Duda at the end of January 2024.  Shockingly, Avula, who was only the third CEO in Methode's 77-year history, resigned less than four months on the job.

4

12.     Indeed, after Avula quit, he sued Methode, claiming that while they recruited him for the CEO position starting in September 2023, the Company lied to him about numerous wide-ranging[2] deficiencies and possibly illegal practices that were withheld from investors.  Notably, the allegations in Avula's complaint are consistent with the allegations herein.  Both complaints allege a lack of a reasonable basis for the Company's guidance and failure to disclose material information during the Class Period. The material misrepresentations alleged by Avula included that Methode's assurances to him that the Company's legal and regulatory houses were in order.  Once he accepted the position of CEO, he discovered serious problems that had not been disclosed that the Board had actual knowledge of, or would have been grossly derelict in their responsibilities if they did not.  Avula alleged the following (some of which was disclosed to him by Defendant Duda):

- extreme financial and accounting system deficiencies, including a lack of necessary controls, oversight, and security measures that materially and negatively influenced the accuracy of Methode's profit projections;

- potential violations of U.S. securities and other domestic and foreign laws and regulations;

- misappropriated and misallocated corporate funds in international ventures;

---

[2]     The Complaint filed in *Avula v. Methode Electronics, Inc.*, No. 24-CIV-05348 (Cal. Super., San Mateo Cnty. Aug. 28, 2024) is attached as Exhibit A.

- inaccurate booking and reporting sales in a manner intended to, or which had the foreseeable effect of, distorting an accurate picture of the Company's finances and/or justifying select employees' compensation;

- inadequate record-keeping processes, including a multi-million undocumented intercompany transfer loan; and

- an ongoing decline in profitability misrepresented to shareholders.

Ex. A ¶¶ 20-21.

13.     Avula presented his findings to the Board during his short tenure as CEO and tendered his resignation on May 1, 2024.  *Id.* ¶ 23.

14.     Then on December 5, 2024, Methode announced that it received "a subpoena from the SEC dated November 1, 2024 seeking documents and information relating to, among other things, the Company's operations in certain foreign countries, certain financial and accounting matters relating thereto, compliance with the Foreign Corrupt Practices Act and other anti-corruption laws, and material weaknesses in the Company's internal control over financial reporting previously reported in its public filings."

**JURISDICTION AND VENUE**

15.     Plaintiff's claims arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5 and 17 C.F.R. § 240.10b-5.

16.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

17.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because Methode is headquartered in this District and many of the acts and conduct that constitute the violations of law complained of herein, including the dissemination to the public of materially false and misleading information, occurred in this District.

18.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

19.     Lead Plaintiff DeKalb County Pension Fund, as set forth in the Certification previously submitted to the Court (Doc. 22-2), acquired Methode securities at artificially inflated prices during the Class Period and was damaged upon revelation of the alleged corrective disclosures.

20.     Defendant Methode is a Delaware corporation with its principal executive offices at 8750 West Bryn Mawr Avenue, Suite 1000, Chicago, Illinois 60631-3518. Methode's common stock trades on the New York Stock Exchange under the ticker symbol "MEI."

21.     Defendant Duda joined the Company in 2000 as Vice President of Interconnect Products then in 2001 became President of Methode and a member of the Board.  Defendant Duda was appointed as Methode's CEO in 2004, and served as President, CEO, and a Board member until his resignation, effective January 29, 2024.

22.     Defendant Tsoumas served as Methode's CFO from March 2018 until July 2024.

23.     Defendants Duda and Tsoumas are collectively referred to herein as the "Individual Defendants."  The Individual Defendants, together with Methode, are referred to herein as "Defendants."

24.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Methode's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  Each Individual Defendant was provided with copies of the Company's reports alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, both of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and/or were being concealed from the public, and that the positive representations that were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

## CONFIDENTIAL WITNESSES

25.     Confidential witness one ("CW1") worked for Methode from March 2016 to July 2022.  During CW1's tenure at Methode, they held leadership positions at Methode's Sensor & Power and Methode's Sales, North America Automotive and Pacific Insight.  Methode's Sales, North America Automotive and Pacific Insight, included the Automotive and Lighting segments, which covered essentially anything that was

produced by Methode's Monterrey, Mexico facility. In that role, CW1 was responsible for $730 million of Methode's annual revenues. CW1 reported to VP of North America Kevin Martin, who, in turn, reported to former Chief Operating Officer Khoury. CW1 worked in Methode's facility in Southfield, MI. Methode's Southfield site handles sales, engineering, and project management related to the Automotive business.

26.     CW2 worked for Methode from February 2022 to March 2023 as a project engineer in launch and cost estimation in Methode's Power Solutions Group ("PSG"). CW2's duties included creating quotes and budgets for new products, and also ensuring that products were being produced. This latter function included sometimes dealing with the supply chain if, for instance, a given material was needed and ensuring that the material was being procured by the supply chain organization. CW2 worked on almost every one of the PSG projects Methode had underway (there were typically about 20 PSG projects), while also developing estimates for new prospective projects. Due to high turnover at Methode, CW2 reported to a Senior Project Manager, a Director of Operations, and a VP of Sales. CW2 worked in Methode's Arlington Heights, IL location.

**SUBSTANTIVE ALLEGATIONS**

**I.     BACKGROUND**

27.     As noted above, Methode designs, engineers, and manufactures custom-engineered solutions for original equipment manufacturers, or OEMs.

28.     The Company breaks its operating results into four reportable segments: (i) Automotive; (ii) Industrial; (iii) Interface; and (iv) Medical. The Automotive Segment supplies electronic and electro-mechanical devices and related products–such as integrated center consoles, hidden switches, ergonomic switches,

9

transmission lead-frames, LED-based lighting, and sensors – to automobile OEMs or their suppliers.

### A. Background of Methode's Automotive Segment

29.     The Automotive Segment has historically generated the majority of the Company's total revenue and net sales.  This is largely because it was awarded the GM center console program in November 2010.  The program was an old style "integrated center stack program for multiple General Motors vehicle platforms."  *See* https://ir.methode.com/news/news-details/2010/Methode-Electronics-Awarded-Integrated-Center-Stack-Program-from-General-Motors/default.aspx.

30.     Starting in 2014, the program was projected to add $100 million in revenue per year.  The GM center console program award made clear the critical importance of center console production to the Company's business, revenue, and prospects.  For example, for fiscal year 2016 (the year that the GM award achieved full production) sales to GM represented approximately 50% of the Company's consolidated net sales ($400.5 million of Methode's $809.1 million in sales), which consisted primarily of sales to GM of integrated center consoles for use in trucks and SUVs.  For fiscal year 2017, sales to GM represented approximately 46.9% of the Company's consolidated net sales ($382.94 million of Methode's $816.5 million in sales); for fiscal year 2018, 43.3% ($393.29 million of Methode's $908.3 million in sales); for fiscal year 2019, 35.5% ($355.11 million of Methode's $1,000.3 million in sales); for fiscal year 2020, 26.8% ($274.41 million of Methode's $1,023.9 million in sales); for fiscal year 2021, 27.5% ($299.2 million of Methode's $1,088.00 million in sales); for fiscal year 2022, 23.3% ($271.12 million of Methode's $1,163.60 million in sales).

**B.      Methode's Automotive Segment's Transition Away From Traditional Center Console Production**

31.      By 2020, however, Methode began transitioning away from its reliance on traditional integrated center stack units due to changes in automotive trends and technologies.  Specifically, car manufacturers had begun using fewer designs featuring traditional buttons and knobs and instead used displays with control functions integrated into the display itself, such as touchscreen infotainment applications.  As a result, over the next several quarters, the Company shifted its Automotive Segment production away from a relatively low mix, high volume production of relatively standardized center consoles for a few vehicle manufacturers such as GM, to a high mix, low volume production of more specialized components.  This allowed the Company to produce components for a wider variety of vehicle manufacturers, in particular manufacturers of electric vehicles, or EV.

32.      The architecture of an EV is generally divided into two parts, the "top hat" and the "skateboard."  The top hat is essentially the body of the vehicle and varies from model to model.  The skateboard is the chassis or framework of the vehicle.  Methode's production programs for EVs included power, lighting, and sensor products for both the top hat and the skateboard portion of an EV.

33.      Such products included busbars, high current connectors, and battery disconnect units.

34.      Although the change from making traditional center consoles would initially result in lower unit sales, Defendants claimed that these lost sales would be offset by higher margins on the more specialized components sold by the Company, as well as other OEM awards secured by the Company in the EV space.  Defendants also

praised the strategy shift as lowering concentration risk because it allowed Methode to diversify away from its dependence on GM.  Thus, awards secured in the EV space were of paramount importance to the Company.  It was critical that the transition into the new high mix, low volume production in the Automotive segment go well.

35.     To that end, leading up to and during the Class Period, Defendants continued to represent the transition into the EV space and away from its legacy center console business as a success.  This transition included the retooling of its Monterrey facility to build new, more specialized components and to service new EV program awards.  Revenue from such awards was, of course, dependent on actually producing the products.

36.     On the first day of the Class Period, during a December 2, 2021 earnings call, Defendant Duda touted the "diversity of awards across key applications" and stated that "business awards over the last couple of years have put us *on track* in [the] aggregate to replace the sales from the roll off of this truck [center console] program," in particular in higher margin EV categories.  In fact, Defendant Duda also explained to investors during the same earnings call that the Individual Defendants "expect that . . . as that [center console program] rolls off and other programs roll on, that our margins would improve."

37.     Throughout the Class Period, Defendants repeatedly assured investors that Methode's Automotive Segment was growing and acquiring new business, but failed to disclose that Methode was not adequately meeting its customers' needs because the Company was saddled by operational inefficiencies in North America, including planning deficiencies, inventory shortages, and shipping delays.

38.     However, investors were not informed of the serious problems the Company was experiencing.  To the contrary, during the June 23, 2022 earnings call, in connection with the announcement of the Company's fourth quarter and full fiscal year 2022 financial results, Defendant Duda announced the Company's "three-year organic sales compounded annual growth rate [("CAGR")] target of 6%," which "demonstrates that our business model is not just healthy, but as prospering from the strategic step that we have taken to grow the business."

39.     CAGR is one way of measuring growth over a given time period.  It is essentially a number that describes the rate at which a value would have grown if it had grown at the same rate every year.  It is sometimes called a "smoothed" rate of return because it measures the growth of an investment as if it had grown at a steady rate on an annually compounded basis.

40.     When the company announced their new 3-year goal of a 6% CAGR, this implied they would reach ~$1.385B in sales for fiscal year 2025 (the base year for this goal, fiscal year 2022, had sales of $1.164B).  Notably, this goal was for organic growth only, meaning that it would come from increased sales, new products, or market penetration rather than mergers or acquisitions.

41.     Similarly, during an August 10, 2022 conference call, Defendant Duda stated that the launch of new EV programs in North America was being effectively implemented at the Monterrey facility, highlighting the Company's "manufacturing system" as having "the same quality system" across its operations, which allowed the Company to keep its "cost of quality . . . low."  Defendant Tsoumas added, "[s]o we really feel good about . . . how we're structured to manufacture all of our products,"

which at the time included most prominently new EV product launches.  Tsoumas also explained that Methode was "investing a lot of capital to increase [its] capabilities and capacity . . . in all . . . geographic [regions]," signaling to investors that Methode's manufacturing facilities would be able to effectively produce the Company's new, in-demand, high-margin products pursuant to Methode's various business program awards. As a result of the purported success of this transition, Defendants claimed that Methode was on track to achieve the 6% 3-year sales CAGR, even taking into account relevant program roll-offs.

> C.     **Material Operational Inefficiencies Plagued The Automotive Segment**

42.     Unbeknownst to investors, however, Defendants' representations during the Class Period were materially false and misleading when made, as Defendants knew or recklessly disregarded that the Company's transition away from its lucrative and dependable GM center console business and into a more competitive and diversified mix of product lines had been plagued with operational, logistical, and personnel challenges ("operational inefficiencies") that were negatively impacting the Company's business and revenue growth.

43.     Specifically, the Company's Monterrey facility was suffering from major setbacks during the transition caused by personnel turnover in the wake of the COVID-19 ("COVID") pandemic, poor operational decisions, vendor issues, and supplier changes that had led to production planning deficiencies, inventory shortages, and, ultimately, botched execution of the Company's strategic plans.

44.     As Defendants would later admit, the Company's operational inefficiencies "probably existed prior to" fiscal year 2024, when "a certain amount of knowledge [] probably got lost at the end of COVID."  Duda explained that personnel

turnover caused, among other things, a mismatch between Methode's various systems when, somewhat amazingly, "[the] [e]ngineering changes weren't recorded properly[.]"

45.     Former employees confirm that this salaried personnel turnover began in earnest well before fiscal year 2024.  As CW1 explained, there were high levels of turnover amongst leadership at the Monterrey facility while CW1 was at Methode (which he left in July 2022), which increased when Philip Farrugia was appointed to oversee the Monterrey facilities.  According to his LinkedIn, Farrugia became Vice President of Operations at Methode in February 2021 and previously worked for Methode in Malta.

46.     The high turnover was also felt in other areas of the Company.  Though not in the Automotive Segment, CW2 described significant turnover and short-staffing in the PSG segment (from February 2022 to March 2023), which, among other things, created busbar prototypes for Methode's EV business.  CW2 reported that they were basically tasked with performing two separate jobs in PSG that should have been done by two employees.  CW2's duties included creating quotes and budgets for new products, and also ensuring that products were being produced.  This latter function included sometimes dealing with supply chain issues if, for instance, a given material was needed and ensuring that the material was being procured by the supply chain organization.  According to CW2, the PSG was short-staffed by six quality engineers.  CW2 stated that the high turnover included CW2's reporting chain.  At first, CW2 reported to a Senior Project Manager, but that person was transferred to a supply chain role.  CW2 then reported to a Director of Operations, but that person quit.  CW2 next reported to a VP of Sales, but was then switched to someone based in Malta.  CW2 said the PSG had challenges during CW2's tenure, particularly in how overworked CW2 had been, which

reflected that there had been a lot of personnel turnover and short-staffing in PSG during CW2's tenure. According to CW2, PSG's Quality group, Estimating, and Project Management were short-staffed. PSG assembly line personnel, including supervision, were also short-staffed.

47.     Defendants would also later acknowledge that the Company's "high labor turnover" led to inventory shortages that caused Methode to spend a significant amount on freight costs. That is, inventory shortages lead to delays that "can ultimately generate significant costs in the form of premium freight and spot buying" which are "necessary to immediately address material shortages and maintain customer delivery integrity. . . . [O]nce you start to air freight product, the costs go up dramatically."

48.     For example, the Company's new systems failed to accurately estimate delivery times for necessary raw materials, forcing the Company to scramble to buy replacement materials at higher spot prices and to pay premium freight charges for rushed deliveries. At times, engineering changes were not properly recorded in the Company's systems so products manufactured in China and shipped to Monterrey did not match worker expectations. An example of this, Duda would later explain, was that Methode "had some lead times in the system at 2 weeks when it probably should have been closer to 2 months." In addition, abrupt scheduling changes put stress on the Company's quality controls and systems, and leaner inventory exposed operational deficiencies.

49.     Defendants' failure to disclose to investors the adverse facts detailed herein regarding problems at the Company's Automotive Segment and efforts to transition away from the GM center console program caused Methode stock to trade at artificially inflated prices during the Class Period. Following a series of corrective

16

disclosures, the price of Methode stock dropped precipitously from a Class Period high of over $50 per share to less than $10 per share by mid-June 2024 – *a decline of more than 80%* – causing Class members (defined herein) to suffer hundreds of millions of dollars in financial losses and economic damages under the federal securities laws.

## II. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS IN 2021-2022[3]

### A. December 2, 2021 Statements

50.     The Class Period begins on December 2, 2021. On that date, Methode issued a press release announcing the Company's financial results for its second fiscal quarter of 2022 (the "2Q22 Release"). The release stated that the Automotive Segment had $196 million in net sales and $23.6 million in income from operations for the quarter. The release also stated that "[e]lectric and hybrid vehicle applications were 16 percent of net sales, a record in dollars". The release updated the Company's fiscal 2022 guidance to an EPS range of $3.00 to $3.20. Defendant Duda was quoted in the release as stating, *"[w]hile our businesses continued to be impacted by the ongoing supply chain and logistics disruptions, our mitigation efforts helped support solid sales, including a strong performance in the Industrial segment and a record for EV applications.*" The 2Q22 Release was also filed with the SEC on Methode's December 2, 2021 Form 8-K, signed by Defendant Tsoumas.

51.     That same day, Methode held an earnings call with analysts and investors to discuss Methode's second fiscal quarter 2022 results hosted by Defendants Duda and Tsoumas. In his prepared remarks, Defendant Duda stated:

---

[3]     In this section, only those statements that are bolded and italicized are alleged to be false and/or misleading.

> *[W]e were encouraged by the diversity of awards across key applications*. In addition to our traditional automotive market, we secured awards in cloud computing, commercial vehicle and *EV applications*. . . . *Our EV activity is being fueled by growth in our power distribution offerings where we leverage over 40 years of expertise to supply power products to various EV OEMs.*

***

> As I've mentioned in recent quarters, *our business awards over the last couple of years have put us on track in aggregate to replace the sales from the roll off of [our largest truck center console program].*

***

> *Methode had another solid quarter of business awards.* . . . In EV, we won awards for switch, lighting and power distribution programs. Overall, our business awards are delivering on our strategic priority to drive customer, product and geographic diversity. To conclude, despite the ongoing demand fluctuations and supply chain challenges, we are still in a position to deliver solid organic growth sales for fiscal 2022 while generating positive free cash flow.

***

> I can now share with you a little more detail on our largest truck center console program. We expect a small portion of the sales from this program to start to roll off late this fiscal year, which was included in our original full year guidance. Then in fiscal 2023, we expect the bulk of the remaining truck program sales to roll off in the range of $90 million to $100 million. *The fiscal 2024 impact is negligible. As I've mentioned in recent quarters, our business awards over the last couple of years have put us on track in aggregate to replace the sales from the roll off of this truck program.*

52. When asked about the impact of the roll-off of "the existing large truck center console program," Defendant Duda replied:

> That's been a very good program for us. And I think we've said this in the past, it's not the highest margin program, *and it is being replaced by higher margin EV program. So we would expect, without getting into the exact timing of it, we would expect that our margins as that rolls off and other programs roll on, that our margins would improve.* In terms of overhead and the associated cost of that, we're pretty good at looking at programs and how rolling off, how do we adjust the factory overhead accordingly, what are we bringing in, we look at floor space, we look at indirect because we look at labor and that will -- those are all being put in place now as we start to see the roll off of that program. Inventory is

18

another area that we look at. You don't really want to have a whole lot of inventory left as the program goes end of life, but there's also a service that we have to provide for three to five years at a minimum. So we'll take that into account. But I would say that we're on top of that. *We've had other programs roll off and other ones roll on, and you adjust your factory accordingly*.

53. When asked about the Company's strength and content gains on the EV side and whether the Company is winning new programs, Defendant Duda replied: "*Yes. And I think it's important to point out that it's -- some of it is some of the start-ups and also the traditional OEMs as well. So we've been very pleased with the bookings we've had there and that supports our growth going forward.*"

54. The statements referenced in ¶¶ 50-53 were materially false and misleading when made because Defendants failed to disclose and/or misrepresented that:

(a)    the Company had lost many highly skilled and experienced employees during the COVID-19 pandemic who were necessary to successfully complete the Company's transition from its traditional low mix, high volume production model to a much more sophisticated high mix, low production model at its Monterrey facility;

(b)    the Company's attempts to replace its GM center console production with more diversified, specialized products for a wider array of vehicle manufacturers and OEMs, in particular in the EV space, had been plagued by production planning deficiencies, inventory shortages, and vendor and supplier problems;

(c)    the Company's manufacturing systems at its critical Monterrey facility suffered from a variety of logistical defects, such as improper system coding, shipping errors, erroneous delivery times, deficient quality control

systems, and failures to timely and efficiently procure necessary raw materials;

(d)     That Methode had fallen substantially behind on the launch of new EV programs out of its Monterrey facility, preventing the Company from timely receiving revenue from new EV program awards; and

(e)     as a result of the foregoing, Defendants' representations about its business, operations, and excessively optimistic predictions about its prospects, including that it was currently "on track" to replace the sales from the GM center console program or was able to "adjust" its "factory accordingly" were materially false and misleading and/or lacked a reasonable basis.

**B.      March 3, 2022 Statements**

55.     On March 3, 2022, Methode issued a press release announcing the Company's financial results for its third fiscal quarter of 2022 (the "3Q22 Release").  The release stated that the Automotive Segment had $195.4 million in net sales and $24.5 million in income from operations for the quarter.  The release also stated that the "***Company was awarded new programs with expected annual sales of over $100 million with approximately 70% of the expected sales in electric and hybrid vehicle applications.***"  The release updated the Company's fiscal 2022 guidance to a diluted EPS range of $3.05 to $3.15.  Defendant Duda was quoted in the release as stating:

> Despite the significant demand headwind in auto, particularly in Europe, and the ongoing supply chain challenges, ***our mitigation efforts in the quarter helped to deliver solid sales***, which were driven by a strong performance in our Industrial segment and yet ***another record for EV application sales***.  ***Even more encouraging was our strong award bookings of over $100 million, which were mostly driven by EV programs.***  In addition, we continued to execute on our balanced capital allocation strategy with over $21 million in shares purchased in the quarter.

The 3Q22 Release was also filed on Methode's March 3, 2022 Form 8-K, signed

by Defendant Tsoumas.

56.     On March 3, 2022, Methode held an earnings call with analysts and

investors to discuss Methode's third fiscal quarter 2022 results hosted by Defendants

Duda and Tsoumas.  In his prepared remarks, Defendant Duda stated:

> *We have worked relentlessly with our customers to share the absorption*
> *of [the] increased costs, particularly with the premium freight*.
>
> ***
>
> On the order front, *we had a very strong quarter with over $100 million*
> *of new program awards.  Of these new awards, approximately 70% were*
> *for EV applications*, and of the EV awards, a large majority were for
> power distribution products.  I will provide more color on our new awards
> in a moment.  Focusing on EV.  Last quarter, we reported that sales into
> EV applications were 16% of consolidated sales.  This quarter EV sales
> grew to 19% of consolidated sales, a record for Methode.  Given our year-
> to-date performance with EV sales, we now expect that percentage will be
> in the high teens for the full fiscal year, up from our previous mid-teen
> guidance.  Our EV activity continues to be fueled by growth in power
> distribution, where we leverage over 40 years of expertise to supply power
> products to various EV OEMs.
>
> ***
>
> *Methode had a very strong quarter of business awards.*  The awards
> identified here represent some of the key business wins in the quarter and
> represent over $100 million in annual sales at full production.  As a
> reminder, the full launch timing of some these programs could be
> anywhere in the range of 1 to 3 years from now.  *As you can see, the list is*
> *dominated by EV programs, representing 3/4 of the dollar value.*

57.     The statements referenced in ¶¶ 55-56 were materially false and

misleading when made because Defendants failed to disclose that:

      (a)     the Company had lost highly skilled and experienced employees during

              the COVID-19 pandemic who were necessary to successfully complete the

Company's transition from its historic low mix, high volume production model to a high mix, low production model at its Monterrey facility;

(b) the Company's attempts to replace its GM center console production with more diversified, specialized products for a wider array of vehicle manufacturers and OEMs, in particular in the EV space, had been plagued by production planning deficiencies, inventory shortages, and vendor and supplier problems;

(c) the Company's manufacturing systems at its critical Monterrey facility suffered from a variety of logistical defects, such as improper system coding, shipping errors, erroneous delivery times, deficient quality control systems, and failures to timely and efficiently procure necessary raw materials;

(d) That Methode had fallen substantially behind on the launch of new EV programs out of its Monterrey facility, preventing the Company from timely receiving revenue from new EV program awards; and

(e) as a result of the foregoing, Defendants' representations about its business, operations, and excessively optimistic predictions about its prospects, including its ability to timely receive revenue from the EV program awards, were materially false and misleading and/or lacked a reasonable basis.

**C.    June 2022 Statements**

58.    On June 23, 2022, Methode issued a press release announcing the Company's financial results for its fourth fiscal quarter and full year 2022 (the "4Q22 Release").  The release stated that the Automotive Segment had $194.3 million in net

22

sales and $17.2 million in income from operations for the quarter. For fiscal 2022, the release stated that the Company had $1.16 billion in consolidated net sales and $102.2 million in net income. The release **reaffirmed the Company's fiscal 2023 guidance of a diluted EPS range of $2.70 to $3.10**. The release further announced a 6% 3-year organic sales CAGR. Defendant Duda was quoted in the release as stating, "**we booked another quarter of awards with over $100 million in annual sales, with approximately 90% in EV applications, and delivered record sales for the full year.**" He continued, "**we expect continued sales growth as well as renewed earnings growth in fiscal 2023. This [6% CAGR sales] target is enabled by our strong run of program awards over the past two years, particularly with electric vehicles.**" The 4Q22 Release was also filed on Methode's June 23, 2022 Form 8-K, signed by Defendant Tsoumas.

59.     On that same day, Methode held an earnings call with analysts and investors to discuss Methode's fourth fiscal quarter and full year 2022 results hosted by Defendants Duda and Tsoumas. In his prepared remarks, Defendant Duda stated that the Company "**had another very strong quarter with over $100 million in program awards," with 90% being for EV applications.** Defendant Duda added that the awards are with "**7 different auto OEMs, and they are in our 3 main geographic regions: Europe, the U.S., and Asia. The EV market growth trend and our exposure to continues to be robust. . . . Overall, it was a very successful quarter for awards that will drive organic growth in future years.**"

60.     Most significantly, Defendant Duda announced the ambitious 3-year CAGR target of 6%, despite the supply chain challenges and market disruptions the industry faced, stating:

With the strong award pipeline for the past 2 years and the effort Methode has made to diversify its product portfolio further into lighting, power and sensors, ***we are now confident to announce a 3-year organic sales compounded annual growth rate target of 6%. This target demonstrates that our business model is not just healthy, but as prospering from the strategic step that we have taken to grow the business.***

*    *    *

To conclude, it was a challenging year and a year plagued by ongoing demand headwinds and supply chain challenges. However, our worldwide team still delivered organic sales growth through the year. ***Moving forward, I am confident with the team's experience and operational expertise that Methode is positioned to mitigate these pressures and deliver sales and earnings growth for fiscal 2023*. *Looking beyond 2023, we are confident in our strategy and our award pipeline continues to be robust. This firmly puts Methode on a path to deliver on our 6% compounded annual sales growth target over the next 3 years***.

61.     Defendant Tsoumas made similar statements during the earnings call, stating that ***the 6% 3-year sales CAGR was "based on the strong bookings we have realized over the past 2 fiscal years, much of which is for the EV market" and "takes into account the anticipated roll-off of the relevant programs and reinforces our organic growth strategy is putting the company on a nice future organic growth trajectory."***

62.     The statements referenced in ¶¶ 58-61 were materially false and misleading when made because Defendants failed to disclose and/or misrepresented that:

(a)     the Company had lost highly skilled and experienced employees during the COVID-19 pandemic who were necessary to successfully complete the Company's transition from its historic low mix, high volume production model to a much more sophisticated high mix, low production model at its Monterrey facility;

(b)    the Company's attempts to replace its GM center console production with more diversified, specialized products for a wider array of vehicle manufacturers and OEMs, in particular in the EV space, had been plagued by production planning deficiencies, inventory shortages, vendor and supplier problems;

(c)    the Company's manufacturing systems at its critical Monterrey facility suffered from a variety of logistical defects, such as improper system coding, shipping errors, erroneous delivery times, deficient quality control systems, and failures to timely and efficiently procure necessary raw materials;

(d)    that Methode had fallen substantially behind on the launch of new EV programs out of its Monterrey facility, preventing the Company from timely receiving revenue from new EV program awards; and

(e)    as a result of the foregoing, Defendants' representations about its business, operations, and prospects, including that the Company was on track to achieve the 2023 diluted EPS guidance or the 3-year 6% organic sales CAGR represented to investors, were materially false and/or misleading and such estimates lacked a reasonable factual basis.

**D.    August 2022 Statements**

63.    On August 10, 2022, Defendants Duda and Tsoumas participated in the JPMorgan Auto Conference.  During his prepared remarks to investors, Defendant Duda restated the Company's previous guidance which "***provided a 3-year annual growth rate of 6%***" and emphasized that Methode's recent growth despite various challenges was "directly related to a strong order pipeline over the past several years as well ***as***

25

*significant exposure to the growing EV market.*"  Defendant Duda also highlighted Methode's "vertically integrated manufacturing locations in North America," and elsewhere, which purportedly provided a "*cost-effective footprint* . . . strategically located in proximity to key customers."  He praised the Company's "*vertically integrated manufacturing with world-class quality[,]*" and continued:

> We grow by capitalizing on EV and other market growth trends, leveraging our technologies across the customer base, utilizing our product portfolio to drive an increased vehicle content and pursuing acquisitions that build on our successful business model and skill set. ***This formula has given us the confidence to guide to a 3-year annual growth rate target of 6%,*** as I had previously mentioned.

64.     Defendant Duda also singled out the Company's transition from the GM center console business to its launch of new EV applications, highlighting that its "***content in EV can be more than double our content on an internal combustion vehicle***" as "***EV is a definite organic growth tailwind for Methode***" and that, "***[i]n addition to driving growth, our EV as well as our commercial vehicle businesses have helped further our customer diversification.***"

65.     When asked what provided the Company's "confidence" in its 3-year 6% sales CAGR, Defendant Duda replied, "***we have had strong bookings, there are written contracts that are executed gives us a high confidence in that. And we're not done booking yet.***"

66.     In a follow-up question, when asked how the Company planned to continue growing sales through EV content, Defendant Tsoumas replied:

> Regarding the EV proliferation all over the globe, ***we were investing a lot of capital to increase our capabilities and capacity at – in all of the – our geographic [regions]*** that they serve as a lot of our customers prefer suppliers, especially now with supply chain to be closer to the customer. So the combination of all those things gives us confidence that we're

making the right investments to reap as much growth as we can on a go-forward basis.

67.     Later during the conference, the Individual Defendants elaborated on the purportedly high-quality output offered by the Company's manufacturing facilities. Defendant Duda stated: "We have – in North America, we have our manufacturing campus in Monterrey, Mexico," as well as two other manufacturing facilities with the same high quality controls in place.   He continued by highlighting the purportedly "low" cost of ensuring quality at Company facilities, stating in pertinent part:

> *I think this is very important.   We employ the same manufacturing system in the same quality system.   The language may change on the storyboard, but the system is the same*.
>
> So a customer that wants that maybe starts purchasing from us in the United States and then wants an overseas supply, they have audit facility, but they'll see the same thing that they see in the United States.   *And I think that's been part of our success.   And if your cost of quality is low, you throw them more to the bottom line*.

68.     Defendant Tsoumas added, **"auto is 67%, 68% of our business. With those campuses that are – have all the rigor and auto hardened, we also manufacture the rest of our products for the most part there as well,"** which "**kind of get a free ride from a quality and then you get into the utilization of the facility and all that."** Defendant Tsoumas further stated: "**So we really feel good about our geographic footprint and then within that footprint, how we're structured to manufacture all of our products**[,]" which included, most notably, the Company's purported growth driver: new EV program awards.

69.     During the question-and-answer session, Defendant Duda also stated that Methode "*diligently*" passes costs to the customers.

70. The statements referenced in ¶¶ 63-69 were materially false and misleading when made because Defendants failed to disclose and/or misrepresented that:

(a) the Company had lost highly skilled and experienced employees during the COVID-19 pandemic who were necessary to successfully complete the Company's transition from its historic low mix, high volume production model to a much more sophisticated high mix, low production model at its Monterrey facility;

(b) the Company's attempts to replace its GM center console production with more diversified, specialized products for a wider array of vehicle manufacturers and OEMs, in particular in the EV space, had been plagued by production planning deficiencies, inventory shortages, vendor and supplier problems;

(c) the Company's manufacturing systems at its critical Monterrey facility suffered from a variety of logistical defects, such as improper system coding, shipping errors, erroneous delivery times, deficient quality control systems, and failures to timely and efficiently procure necessary raw materials;

(d) that Methode had fallen substantially behind on the launch of new EV programs out of its Monterrey facility, preventing the Company from timely receiving revenue from new EV program awards; and

(e) as a result of the foregoing, Defendants' representations about its business, operations, and prospects were materially false and misleading and/or

28

lacked a reasonable basis, including that the 3-year 6% organic sales

CAGR represented to investors lacked a reasonable factual basis.

**E.  September 2022 Statements**

71.     A few weeks later, on September 1, 2022, Methode issued a press release announcing the Company's financial results for its first fiscal quarter of 2023 (the "1Q23 Release").  The release stated that the Automotive Segment had $176.6 million in net sales and $14.7 million in income from operations for the quarter.  The release *reaffirmed the Company's fiscal 2023 guidance of a diluted EPS range of $2.70 to $3.10*.  Defendant Duda was quoted in the release as stating: "Our sales into electric vehicle applications continued to be impacted by events in China but are still poised to reach a record milestone of 20% of total sales in fiscal 2023.  *Overall, we remain on track to deliver our sales and earnings guidance for fiscal 2023*."  The 1Q23 Release was also filed with the SEC on Methode's September 1, 2022 Form 8-K, signed by Defendant Tsoumas.

72.     On that same day, Methode held an earnings call with analysts and investors to discuss Methode's first fiscal quarter 2023 results hosted by Defendants Duda and Tsoumas. In his prepared remarks, Defendant Duda stated: "*Methode had another very strong quarter of business awards.  The awards identified here represent some of the key wins in the quarter and represent over $90 million in annual sales at full production. . . . At the top of the list, our EV programs representing over 40% of the total dollar value.  The awards are mostly for power products and are from all of the additional big 3 U.S. automakers.  The EV growth engine rolls on and our exposure to it continues to be robust. . . . Overall, it was a very successful quarter for awards that will drive organic sales growth in future years.*"  Defendant Duda finished

his remarks and reiterated the Company's confidence in its guidance by adding that Methode was positioned to mitigate pressures and "**deliver sales and earnings growth for fiscal 2023.**"

73.     Defendant Tsoumas also stated that "**based on the strong bookings we realized over the past 2 fiscal years, much of which is for the EV market, we announced a 3-year organic compounded annual growth rate of approximately 6%,**" and he assured investors that this CAGR "**considers the anticipated roll-off of relevant programs and reinforces that our organic growth strategy is putting the company on a solid future growth trajectory**."

74.     When asked about the impact of the major customer roll-off on margins in the auto segment, Defendant Duda replied: "**[w]hen I look at the rollout of the program, which we've anticipated for quite some time, I don't put a whole lot of weight to that as we'd several years ago, we booked EV programs that we saw from revenue that replaced that.**" During his prepared remarks, as he did during prior presentations, Defendant Duda had again assured investors that Methode was still working "**relentlessly**" and "**diligently to mitigate**" ongoing supply-chain challenges.

75.     The statements referenced in ¶¶ 71-74 were materially false and misleading when made because Defendants failed to disclose and/or misrepresented that:

(a)     the Company had lost highly skilled and experienced employees during the COVID-19 pandemic who were necessary to successfully complete the Company's transition from its historic low mix, high volume production model to a much more sophisticated high mix, low production model at its Monterrey facility;

30

(b)    the Company's attempts to replace its GM center console production with more diversified, specialized products for a wider array of vehicle manufacturers and OEMs, in particular in the EV space, had been plagued by production planning deficiencies, inventory shortages, vendor and supplier problems;

(c)    the Company's manufacturing systems at its critical Monterrey facility suffered from a variety of logistical defects, such as improper system coding, shipping errors, erroneous delivery times, deficient quality control systems, and failures to timely and efficiently procure necessary raw materials;

(d)    that Methode had fallen substantially behind on the launch of new EV programs out of its Monterrey facility, preventing the Company from timely receiving revenue from new EV program awards; and

(e)    as a result of the foregoing, Defendants' representations about its business, operations, and excessively optimistic predictions about its prospects, including that it was on track to achieve the 2023 diluted EPS guidance or the 3-year 6% organic sales CAGR represented to investors were materially false and misleading and/or lacked a reasonable basis.

## F.    December 2022 Statements

76.    On December 1, 2022, Methode issued a press release announcing the Company's financial results for its second fiscal quarter of 2023 (the "2Q23 Release"). The release stated that the Automotive Segment had $196.9 million in net sales and $23.4 million in income from operations for the quarter. ***The release updated the Company's fiscal 2023 guidance to a diluted EPS range of $2.70 to $2.90.*** Defendant Duda was

quoted in the release as stating: "Methode delivered sequential earnings improvement over the first quarter and ***booked another strong quarter of EV program awards.***"  The 2Q23 Release was also filed with the SEC on Methode's December 1, 2022 Form 8-K, signed by Defendant Tsoumas.

77.     On that same day, Methode held an earnings call with analysts and investors to discuss Methode's second fiscal quarter 2023 results hosted by Defendants Duda and Tsoumas.  In his prepared remarks, Defendant Duda stated that the Company "***had another solid quarter for business awards***" that would "***represent $66 million in annual sales at full production***" as "***EV continues to be a solid growth engine for Methode***," with "***EV programs representing most of the dollar value.***"  Defendant Duda further stated: "***the pipeline of future awards remains robust.***"  Defendant Duda also reaffirmed the 3-year organic sales CAGR target of 6%, asserting that "***[t]his target demonstrates that our business model is not just healthy, but as prospering from the strategic steps that we have taken to grow the business.***"

78.     In his opening remarks, Defendant Tsoumas similarly stated that, "***based on the strong bookings we have realized over the past 2 fiscal years, much of which is for the EV market, we previously announced a 3-year organic sales compounded annual growth rate target of 6%,***" which "***considers the anticipated roll-off of all relevant programs and reinforces that our organic growth strategy is putting the company on a solid sales trajectory.***"

79.     When asked whether Methode is gaining market share in the EV space, Defendant Duda replied: "***So are we gaining market share? Yes.***"  Similarly, Defendant Tsoumas replied:

*I think the team has done a great job in capitalizing on being, I guess, early mover within the space because we have such a rich history. We have the capacity in the manufacturing systems and everything on 3 continents to support all of the EV in a more local manner. So we're in a good spot. . . . So we've been getting some good looks with our existing relationships with the OEMs, the automotive OEMs, and we've done a good job at closing business.*

80.     The statements referenced in ¶¶ 76-79 were materially false and

misleading when made because Defendants failed to disclose and/or misrepresented that:

(a)     the Company had lost highly skilled and experienced employees during

the COVID-19 pandemic who were necessary to successfully complete the

Company's transition from its historic low mix, high volume production

model to a much more sophisticated high mix, low production model at its

Monterrey facility;

(b)     the Company's attempts to replace its GM center console production with

more diversified, specialized products for a wider array of vehicle

manufacturers and OEMs, in particular in the EV space, had been plagued

by production planning deficiencies, inventory shortages, vendor and

supplier problems;

(c)     the Company's manufacturing systems at its critical Monterrey facility

suffered from a variety of logistical defects, such as improper system

coding, shipping errors, erroneous delivery times, deficient quality control

systems, and failures to timely and efficiently procure necessary raw

materials;

(d)     Methode had fallen substantially behind on the launch of new EV programs out of its Monterrey facility, preventing the Company from timely receiving revenue from new EV program awards; and

(e)     as a result of the foregoing, Defendants' representations about its business, operations, and prospects, including that the Company was on track to achieve the revised 2023 diluted EPS guidance or the 3-year 6% organic sales CAGR represented to investors, were materially false and misleading and/or lacked a reasonable basis.

## III.   PARTIAL CORRECTIVE DISCLOSURES INCREMENTALLY REVEALED THE FRAUD WHILE DEFENDANTS CONTINUED TO MAKE FALSE AND MISLEADING STATEMENTS[4]

### A.   March 2023 Statements And Disclosures

81.     Investors first began to learn some of the truth about the significant problems in Methode's Automotive Segment on March 9, 2023, when the Company announced its third quarter fiscal year 2023 financial results in its press release (the "3Q23 Release"). As stated in the release, Methode reported a 3.9% year-over-year decrease to the Company's net sales, which was largely driven by a nearly 10% decline in quarterly Automotive net sales. The Company also lowered its fiscal year 2023 financial guidance, expecting net sales between $1.155 billion and $1.180 billion (down from a range between $1.170 billion and $1.2 billion) and ***diluted EPS between $2.50 per share and $2.60 per share*** (down from a range between $2.70 per share and $2.90 per share). The 3Q23 Release further stated that the Automotive Segment achieved $176.5 million in net sales and $18.7 million in income from operations for the quarter. A March 10, 2023

---

[4]     In this section, only those statements bolded and italicized are alleged to be false and/or misleading.

Jefferies analyst report blamed the miss in part on "likely EV pushouts," stating that "customer production ramp delays will likely weigh on timing of sales contribution."

82.     On March 9, 2023, Methode held an earnings call with analysts and investors to discuss Methode's third fiscal quarter 2023 results hosted by Defendants Duda and Tsoumas.  In his opening remarks, Defendant Duda misled investors by stating that the Company had "*a very strong pipeline in front of us*" and "*again reaffirmed our 3-year organic sales compound annual growth rate of 6%, demonstrating that we are on track to organically grow the business*."  Although he acknowledged near-term challenges, Defendant Duda did not disclose the issues facing the Monterrey facility and claimed that the "*path to [the 6% sales CAGR] target will not be linear,*" thereby indicating that the Company would make up for lost time and the miss in subsequent quarters.  Defendant Duda further misleadingly stated that new EV program awards received by the Company will "*not only replace the sunsetting center console business, but to grow the business at the [6% sales CAGR] that we have targeted.*"

83.     In particular, Defendant Duda highlighted the revamping of the Company's manufacturing facilities, which included the Monterrey facility.  He stated that:

> *To support these new and diverse set of customer programs, many of which are for EV applications, we will be making investments and launching over 20 new programs in fiscal 2024. These investments include significant tooling and increased staffing. While this activity is expected to support our organic growth target for fiscal 2025, the timing will result in flat organic growth in fiscal 2024.*

84.     As an analyst from Jefferies noted, Methode's reaffirmation of its CAGR target was questioned Methode about how they could meet their CAGR target given that Methode "expects next year to be flat," and noted that "this implies a pretty meaningful

step-up in fiscal year '25." In response, Duda said his confidence comes from having "***firm contracts, which detail the timing of the launch and the volumes***[.]"

85. In his prepared remarks, Defendant Tsoumas similarly stated that the 3-year organic sales CAGR target of 6% "***will mainly occur in fiscal year 2025***." Further, Defendant Tsoumas asserted that Methode's "***strong pipeline of awards. . . . will enable us not to only replace the center console programs, but grow the business at the 6% rate we have targeted***" and "support our organic growth target for fiscal year '25[.]" Later, in response to an analyst question about the Company's EV backlog, Defendant Tsoumas stated: "***[W]e're investing for this organic growth in all 3 major locations . . . to support the OEMs in different locations. So in a lot of ways, that's a really good thing for us to have that [capability].***" Defendant Duda added: "***And [that's] one of the factors on why we're booking business.***"

86. In response to the disappointing results, the price of Methode common stock declined $6.25 per share, or more than 13% over multiple trading sessions, from a close of $47.61 per share on March 8, 2023, to close at $41.36 per share on March 13, 2023, on abnormally heavy volume. Defendants, however, continued to conceal the full truth about the problems the Company was then experiencing at the Monterrey facility, among other issues. As a result, the price of Methode common stock remained artificially inflated.

87. Specifically, the bolded and italicized statements referenced in ¶¶ 81-85 were materially false and misleading when made because Defendants continued to fail to disclose and/or misrepresented that:

(a)     the Company had lost highly skilled and experienced employees during
        the COVID-19 pandemic who were necessary to successfully complete the
        Company's transition from its traditional low mix, high volume
        production model to a much more sophisticated high mix, low production
        model at its Monterrey facility;

(b)     the Company's attempts to replace its GM center console production with
        more diversified, specialized products for a wider array of vehicle
        manufacturers and OEMs, in particular in the EV space, had been plagued
        by production planning deficiencies, inventory shortages, vendor and
        supplier problems;

(c)     the Company's manufacturing systems at its critical Monterrey facility
        suffered from a variety of logistical defects, such as improper system
        coding, shipping errors, erroneous delivery times, deficient quality control
        systems, and failures to timely and efficiently procure necessary raw
        materials;

(d)     that Methode had fallen substantially behind on the launch of new EV
        programs out of its Monterrey facility, preventing the Company from
        timely receiving revenue from new EV program awards; and

(e)     as a result of the forgoing, Defendants' representations about its business,
        operations, and excessively optimistic predictions about its prospects,
        including that the Company was on track to achieve the 2023 diluted EPS
        guidance or the 3-year 6% organic sales CAGR represented to investors,
        and were materially false and misleading and/or lacked a reasonable basis.

37

**B.** **June – August 2023 Statements And Disclosures**

88.     On June 12, 2023, Methode issued a press release announcing preliminary 2023 financial results, including that it "expects to report record net sales of approximately $1,183 million for fiscal 2023[.]".  The release stated that the Company expected to report below-range annual diluted EPS of just $2.10 to $2.14 (compared to guidance of $2.50 to $2.60, which had already been lowered from initial projections).  The release also provided preliminary fiscal 2024 net sales guidance of $1.15 billion to $1.2 billion and diluted EPS of $1.55 to $1.75, signaling continued deterioration "due to additional costs to support new program launches and the impact from program roll offs," among other factors.  The release further provided preliminary 2025 net sales guidance of $1.25 billion to $1.35 billion, which was well below the Company's recently reaffirmed 6% 3-year sales CAGR "***primarily due to the unexpected early sunsetting of an EV program in fiscal 2024 due to a change in technology by the customer***."

89.     On this news, the price of Methode common stock plummeted $8.17 per share, or more than 18%, from a close of $45.07 per share on June 12, 2023, to close at $36.90 per share on June 13, 2023.

90.     Ten days later, on June 22, 2023, Methode issued a press release announcing the Company's financial results for its fourth fiscal quarter and full year 2023 (the "4Q23 Release").  The release stated that the Company had actually achieved only $1.1796 billion in net sales–below the preliminary results provided just ten days before– and diluted EPS of only $2.10, the bottom of the preliminary range.  Again, the release blamed the poor results and dismal guidance in substantial part on adverse impacts from program roll-offs and new program launches.

38

91.    The 4Q23 Release stated that the Automotive Segment achieved $186.2 million in net sales and $10.2 million in income from operations for the quarter.   For fiscal 2023, the release stated that the Company achieved $1.18 billion in consolidated net sales and $77.1 million in net income.   The release also provided fiscal 2024 net sales guidance of $1.15 billion to $1.2 billion and diluted EPS of $1.55 to $1.75, and fiscal 2025 net sales guidance of $1.25 billion to $1.35 billion, with 2025 income from operations in a range of 11% to 12% of net sales.   Defendant Duda was quoted in the release as stating: "***The main highlight of the quarter was new awards of over $250 million, with over 80% being in EV applications.   We have now won $600 million in EV awards over the past three years.***"   He continued in pertinent part:

> As our business continues to transition away from user interface towards more lighting and power solutions, ***our fiscal 2024 will see significant investment to support over 20 new program launches.***   This transition investment combined with the impact of legacy program roll offs will cause us to see lower earnings in fiscal 2024.   ***However, the strong award pipeline along with an expected rebound in the commercial vehicle, data center and e-bike markets will position us to deliver significant organic sales and earnings growth in fiscal 2025 over fiscal 2024***.

92.    On the same day, Methode held an earnings call with analysts and investors to discuss Methode's fourth fiscal quarter and full year 2023 results hosted by Defendants Duda and Tsoumas. In his opening remarks, Defendant Duda stated that Methode ***had a "very strong quarter with over $250 million in annual program awards," dominated by EV programs***.   He further elaborated that ***"[t]he strength of our bookings*** gives me confidence that . . . we will achieve the margin expansion that supports our guidance for fiscal 2025."   He also stated that while "the net of program roll-offs and program launches is a sales headwind in fiscal 2024," it will be a sales

tailwind by fiscal 2025, with the net result being "an 11% organic sales growth rate from fiscal 2024 to fiscal 2025." Defendant Duda continued:

> With the strong award pipeline for the past 3 years and the effort Methode has made to transition its product portfolio . . . , this fiscal 2025 guidance demonstrates that *our business model is healthy and is positioned to prosper from the strategic steps that we've taken to grow the business.*

93.     Defendant Duda added that Methode was "*making significant investments and launching over 20 new programs,*" which, "*along with multiple years of strong awards, will enable us not only to replace the sunsetting programs, but to organically grow the business 11% from fiscal 2024 to [f]iscal 2025.*"

94.     Later during the call, the Individual Defendants were asked to describe the costs of the new product launches and efforts underway to retool the Company's factories. Defendant Duda responded that the costs had already been factored into guidance and indicated upgrades were proceeding according to plan, stating in pertinent part:

> It is equipment, it is people, it is prototyping costs that we're starting to incur and we'll continue to incur throughout fiscal 2024. As we get into the end of '24, those costs will start to be absorbed into the product launches. *So factored into the guidance, and we will – we are starting – we've been hiring. We've been procuring equipment. The plant is probably 30% complete from an equipment standpoint.* So that will continue throughout the year, and then we will be launching a lower volume at the end of the year. That's not a significant amount, but it will start to absorb the costs.

95.     A June 22, 2023 Baird analyst report stated: "continued price/cost headwinds were a significant factor in the 4QF23 miss, with management characterizing obtaining related recoveries from customers as a 'persistent challenge.'" The report also stated that "related roll-off sales headwinds are steeper than we originally modeled, also reflected in our newly lower estimates."

96.     In response to the disappointing quarterly results on program delays, the greater than previously disclosed adverse effects of program roll-offs, and the surprising increase in Methode's costs, the price of Methode common stock declined $4.75 per share, or nearly 13% over multiple trading sessions, from a close of $37.52 per share on June 21, 2023, to close at $32.77 per share on June 23, 2023, on abnormally heavy volume.  Defendants, however, continued to conceal the full truth about the problems the Company was then experiencing at the Monterrey facility, among other issues.  As a result, the price of Methode common stock remained artificially inflated.

97.     Specifically, the bolded and italicized statements referenced in ¶¶ 88, 91-94 were materially false and misleading when made because Defendants continued to fail to disclose and/or misrepresented that:

(a)     the Company had lost highly skilled and experienced employees during the COVID-19 pandemic who were necessary to successfully complete the Company's transition from its traditional low mix, high volume production model to a much more sophisticated high mix, low production model at its Monterrey facility;

(b)     the Company's attempts to replace its GM center console production with more diversified, specialized products for a wider array of vehicle manufacturers and OEMS, in particular in the EV space, had been plagued by production planning deficiencies, inventory shortages, vendor and supplier problems;

(c)     the Company's manufacturing systems at its critical Monterrey facility suffered from a variety of logistical defects, such as improper system

coding, shipping errors, erroneous delivery times, deficient quality control

systems, and failures to timely and efficiently procure necessary raw

materials;

(d)     That Methode had fallen substantially behind on the launch of new EV

programs out of its Monterrey facility, preventing the Company from

timely receiving revenue from new EV program awards; and

(e)     as a result of the forgoing, Defendants' representations about its business,

operations, and excessively optimistic predictions about its prospects were

materially false and misleading and/or lacked a reasonable basis.

98.     On June 27, 2023, the Company reported in its 10-K for the fiscal year

ending April 29, 2023 that:

> … our Chief Executive Officer and Chief Financial Officer have
> concluded **_that our disclosure controls and procedures were not effective_**
> **_at the reasonable assurance level as of April 29, 2023 due to a material_**
> **_weakness in internal control over financial reporting_**, as described
> below.
>
> *          *          *
>
> A material weakness is a deficiency, or a combination of deficiencies, in
> internal control over financial reporting, such that there is a reasonable
> possibility that a material misstatement of the Company's annual or
> interim financial statements will not be prevented or detected on a timely
> basis.
>
> **_Management identified a material weakness in its control environment_**
> **_related to revenue at a business unit in our Automotive segment._**
> **_Specifically, we did not maintain effective review, approval and_**
> **_validation controls over pricing data entered into the business unit's_**
> **_financial system and non-standard contract terms._** This control
> deficiency did not result in a material misstatement to our consolidated
> financial statements as of and for the year ended April 29, 2023. However,
> this control deficiency could have resulted in a material misstatement to
> our annual or interim consolidated financial statements that would not be
> prevented or detected. Accordingly, our management has determined that
> this control deficiency constitutes a material weakness.

***Because of this material weakness, management concluded that we did not maintain effective internal control over financial reporting as of April 29, 2023.***

\*     \*     \*

**Remediation Plan for Material Weakness in Internal Control over Financial Reporting**

We and our Board of Directors treat the controls surrounding, and the integrity of, our financial statements with the utmost priority. Management is committed to the planning and implementation of remediation efforts to address control deficiencies and any other identified areas of risk. These remediation efforts are intended to both address the identified material weakness and to enhance our overall financial control environment. We will not consider the material weakness remediated until the enhanced controls are operational for a sufficient period of time and tested, enabling us to conclude that the enhanced controls are operating effectively.

We are committed to maintaining a strong internal control environment. Our remediation efforts will include, among other items, (1) enhancing the design and operating effectiveness of internal controls over the review, approval and validation of customer pricing data and non-standard contract terms; and (2) developing and deploying additional training programs around the operation and importance of internal controls. As we continue to evaluate and work to improve our internal control over financial reporting, management may determine to take additional measures to strengthen controls or to modify the remediation plan described above.

99.     The foregoing statements in ¶ 98 were materially false or misleading when made because Defendants failed to disclose and/or misrepresented that:

(a)     the Company had lost highly skilled and experienced employees during the COVID-19 pandemic who were necessary to successfully complete the Company's transition from its historic low mix, high volume production model to a high mix, low production model at its Monterrey facility;

(b)     the Company's attempts to replace its GM center console production with more diversified, specialized products for a wider array of vehicle

manufacturers and OEMs, in particular in the EV space, had been plagued by production planning deficiencies, inventory shortages, vendor and supplier problems;

(c)     the Company's manufacturing systems at its critical Monterrey facility suffered from a variety of logistical defects, such as improper system coding, shipping errors, erroneous delivery times, deficient quality control systems, and failures to timely and efficiently procure necessary raw materials;

(d)     Methode had fallen substantially behind on the launch of new EV programs out of its Monterrey facility, preventing the Company from timely receiving revenue from new EV program awards; and

(e)     as a result of the foregoing, Defendants' representations that the material weaknesses discussed in ¶ 98 were the only ones that existed were materially false and misleading and/or lacked a reasonable basis.

100.    On July 14, 2023, the Company announced that "[o]n July 10, 2023, Joseph Khoury was placed on leave from his position as Chief Operating Officer . . . , and his powers, authority and duties as such officer of the Company were suspended."

101.    On this news, the price of Methode common stock declined $0.53 per share, or nearly 2%, from a close of $33.80 per share on July 13, 2023, to close at $33.27 per share on July 14, 2023.

102.    On August 31, 2023, Methode announced that Defendant Duda would be retiring from his positions as the director, President, and CEO.

C.     September 2023 Statements And Disclosures

103.   The Company finally explicitly acknowledged some of its operational challenges on September 7, 2023, when Methode issued a press release announcing the Company's financial results for its first fiscal quarter of 2024 (the "1Q24 Release"). The release stated that "operational inefficiencies" in the Company's North American operations and accelerated expenses related to new program launches had negatively impacted earnings for the quarter and were expected to linger into the second quarter. The operational issues included both labor and vendor problems and had led to planning deficiencies, inventory shortages, unrecoverable spot purchases, premium freight costs, and delayed shipments. The release also lowered expected 2024 net sales to a range of $1.14 billion to $1.18 billion (down from $1.15 billion to $1.2 billion) and slashed expected diluted EPS to a range of $0.80 to $1 (down from $1.55 to $1.75).

104.   On the same day, Methode held an earnings call with analysts and investors to discuss Methode's first fiscal quarter 2024 results hosted by Defendants Duda and Tsoumas. Defendant Duda explained that the operational challenges in Methode's North American Automotive Segment started with "salary personnel turnover, poor operational decisions and vendor issues," which then "had a domino effect" that led to many other issues. Defendant Duda further explained:

> Our Monterrey operation has historically manufactured with a low mix and a high volume of product. Recently, the operation has transitioned into a mode of higher mix and lower volume. This transition, combined with the aforementioned issues, led to exposure of latent operating inefficiencies that our early warning detected but we failed to mitigate, also very un-Methode.
>
> In the lean manufacturing environment, a delay in visibility of a problem can ultimately generate significant costs in the form of premium freight and spot buying, both necessary to immediately address material shortages and maintain customer delivery integrity. In auto, delivery in addition to

45

quality is absolutely paramount to both maintaining and obtaining new business.   These operational challenges had an approximately $0.15 impact on our first quarter earnings relative to our expectations.   We also had accelerated expenses related to the numerous program launches. . . .

However, the residual effects are expected to impact our second quarter to approximately the same degree, and along with a significant weakening in the e-bike market are the primary drivers to our lowering earnings guidance for the full year.

105.    The 1Q24 Release stated that the Automotive Segment generated $158.3 million in net sales and a $2.8 million loss from operations for the quarter.  The release also provided fiscal 2025 net sales guidance of $1.25 billion to $1.35 billion, with 2025 income from operations in a range of 11% to 12% of net sales.  Defendant Duda was quoted in the release as stating that the operational challenges suffered at the Monterrey facility "'have been identified and corrective action plans are already in place.'"  He continued in pertinent part:

> [W]e remain on track with the 20-plus new program launches that we previously announced.  In addition, the award pipeline along with an expected rebound in the commercial vehicle, data center and e-bike markets continue to position us for significant organic sales and earnings growth in fiscal 2025 over fiscal 2024, and our guidance for fiscal 2025 remains unchanged.

106.    In his opening remarks on the September 7, 2023 earnings call, Defendant Duda stated that the operational challenges in the Monterrey facility "***have been identified and corrective action plans are already in place***[.]"  He also assured investors that Methode's "view on fiscal 2025 has not changed" and that he "ha[s] been and will continue to be personally involved with the efforts to correct the situation" and that investors "have [his] personal commitment as the CEO and as a shareholder, we will fix this."

46

107.     Defendant Duda also stated that the Company "will be making significant investments in launching over 20 new programs," which "include significant tooling and increased staffing to ensure a successful 2025" and "is expected to enable us to not only replace the sunsetting programs, but to organically grow the business 12% from fiscal 2024 to fiscal 2025."  He concluded in his opening remarks: "I am extremely confident that the company will continue to flourish given the exceptional team in place and a solid strategy that is positioned for growth."

108.     During the question-and-answer session, Defendant Duda stated that he was "***very confident that they're going to see an uptick in their business***" and claimed that the Monterrey plant "***will have more volume through it than it had even in the center console days***."  Defendant Duda also stated that the transition away from reliance on GM had made the Company more secure and in an answer to a follow-up question represented that the Company's sales had "not at all" been impacted by the operational issues.

109.     Still, Defendant Tsoumas relayed to investors that Methode was reducing its full-year profitability guidance—slashing the Company's diluted EPS guidance almost in half— "predominantly related to the operational inefficiencies in North American auto" and a slowdown in the Company's sensor business.

110.     Amazingly, Methode's Form 10-Q filed on September 7, 2023, signed by Duda and Tsoumas, stated that only the same material weaknesses identified in ¶ 98 still existed for the period ended July 29, 2023.

111.    A September 7, 2023 Baird analyst report stated "unexpected near-term operating issues in Automotive . . . compounded already subdued F2024 expectations . . . ." The report further stated:

> New today, Auto segment labor and vendor issues created significant operating inefficiencies, both driving a significant 1QF24 miss and contributing to sharply reduced F2024 guidance [.]  Operating headwinds are concentrated in MEI's Monterrey, Mexico facility which is transitioning from high-volume center console business to ramping EV awards.  The 1QF24 miss/reduced guidance relates to outright cost overruns from elevated premium freight/spot buys needed to maintain plant integrity which should be shorter-term in nature, but latent operating inefficiencies were also exposed.

112.    As a result of this news, the price of Methode common stock dropped $6.67 per share, or more than 22%, from a close of $30.00 per share on September 6, 2023, to close at $23.33 per share on September 7, 2023, on abnormally heavy volume. Defendants, however, continued to conceal the full truth about the problems the Company was then experiencing at the Monterrey facility, among other issues.  As a result, the price of Methode common stock remained artificially inflated.

113.    Specifically, the bold and italicized statements made on September 7, 2023 in ¶¶ 106, 108 were materially false and/or misleading because Defendants failed to disclose and/or misrepresented that the problems facing the Company were even worse than let on and that they had presented an "overly optimistic" version of events. Specifically, they failed to disclose the information that former CEO Avula uncovered after he started at the Company that existed in September 2023 when he was being recruited, namely: extreme financial and accounting system deficiencies, including a lack of necessary controls, oversight, and security measures that materially and negatively influenced the accuracy of Methode's profit projections;  potential violations of U.S.

securities and other domestic and foreign laws and regulations;  misappropriated and misallocated corporate funds in international ventures; inaccurate booking and reporting sales in a manner intended to, or which had the foreseeable effect of, distorting an accurate picture of the Company's finances and/or justifying select employees' compensation; inadequate record-keeping processes, including a multi-million undocumented intercompany transfer loan; and an ongoing decline in profitability misrepresented to shareholders.  As a result, Defendants' statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis.

### D.     December 2023 Statements And Disclosures

114.    Then, on December 7, 2023, Methode issued a press release announcing the Company's financial results for its second fiscal quarter of 2024 (the "2Q24 Release").  Methode reported a nearly 9% year-over-year decrease in net sales (including a nearly 22% decline in Methode's Automotive net sales) and a $51.3 million quarterly loss from operations due to the goodwill impairment resulting from operational inefficiencies in its Automotive Segments.

115.    The 2Q24 release revealed that the Automotive Segment had generated only $154.3 million in net sales and suffered a $61.5 million loss from operations during the quarter.  The release also lowered the Company's 2024 diluted EPS guidance to a range of negative $1.40 to negative $1.14 (down from $0.80 to $1).  The release similarly lowered Methode's 2025 revenue guidance to $1.15 billion to $1.25 billion (down from $1.25 billion to $1.35 billion) and its expected 2025 income from operations to a range of 6% to 8% as a percentage of net sales (down from the prior range of 11% to 12%).  The release further revealed that the operational challenges at the Company's Monterrey

facility were far greater than previously reported and expected to impact the second half of the fiscal year, as the Company's vaunted EV awards suffered launch setbacks and significant cost overruns. The release also disclosed a $56.5 million goodwill impairment in the Company's North American and European Automotive Reporting Units.

116. On the same day, Methode held an earnings call with analysts and investors to discuss Methode's second fiscal quarter 2024 results hosted by Defendants Duda and Tsoumas. Defendant Duda admitted that the operational deficiencies "probably existed prior to this fiscal year" and indeed extended back to the "end of COVID" when "a certain amount of knowledge" had departed the Company with personnel turnover. He described the issues in pertinent part:

> I was overly optimistic. There, it is taking us longer to go through the various routings and part numbers and make corrective actions. To give you more color around that, these issues probably existed prior to this fiscal year, but they were masked by very high inventory in certain areas.
>
> And we took, as normally we do, when we try to lean out our operations, we brought inventory down. And one of the analogy is that the lean expert sometimes uses the pond and you lower the pond, you find the rocks, but we found boulders. And it took us much longer, it is taking much longer to correct.
>
> They're all, as I said, all fixable, but it's a mismatch between our various systems. We do manufacture product in Dongguan, China and that's shipped to Monterrey. The engineering changes weren't recorded properly, and we have said, a lot of that was due to salary personnel turnover, that there was a certain amount of knowledge here that probably got lost at the end of COVID.
>
> So it's really dealing with routings, MRP, and lead time. And we have some lead times in the system at two weeks when it probably should have been closer to two months. Also, there – we saw changing. And then I don't know if this is a COVID leftover, but we're seeing some tremendous changes in schedule, something that we have not seen much in the past and that also puts a stress on the system.

*     *     *

> There was probably a lag on some of the invoicing, you don't get invoiced
> next week for premium shipments and there's probably some of that
> occurred in the first quarter that carried over in the second quarter.
> Again, all fixable. It's as we underestimated the amount of time.

117. During his prepared remarks on the December 7, 2023 earnings call, Defendant Duda stated: "[W]e are decisively making the investments in fiscal '24 to ensure profitable growth in fiscal '25" and "*firmly believe that our business model is healthy and is positioned to prosper from the strategic direction that we have taken in the lighting and power solutions to grow the business*."

118. Methode's Form 10-Q filed on December 7, 2023, signed by Duda and Tsoumas, also stated that only the same material weaknesses identified in ¶ 98 still existed for the period ended October 28, 2023.

119. Also on December 7, 2023, Methode disclosed that Khoury had been terminated and is no longer associated with the Company, stating that "the Company has eliminated the position of Chief Operating Officer for the present time. . . ."

120. As a result of this news, the price of Methode common stock dropped $2.87 over multiple trading sessions from $24.39 per share when the market closed on December 6, 2023 to $21.52 per share when the market closed on December 8, 2023, a nearly 12% decline, on abnormally heavy volume. Defendants, however, continued to conceal the full truth about the problems the Company was then experiencing at the Monterrey facility, among other issues. As a result, the price of Methode common stock remained artificially inflated.

121. Specifically, the bold and italicized statements made on December 7, 2023 in ¶¶ 117-18 were materially false and/or misleading because Defendants failed to disclose and/or misrepresented that the problems facing the Company were even worse

than let on and that they had presented an "overly optimistic" version of events. Specifically, they failed to disclose the information that former CEO Avula uncovered after he started at the Company that existed in September 2023 when he was being recruited, namely: extreme financial and accounting system deficiencies, including a lack of necessary controls, oversight, and security measures that materially and negatively influenced the accuracy of Methode's profit projections;  potential violations of U.S. securities and other domestic and foreign laws and regulations;  misappropriated and misallocated corporate funds in international ventures; inaccurate booking and reporting sales in a manner intended to, or which had the foreseeable effect of, distorting an accurate picture of the Company's finances and/or justifying select employees' compensation; inadequate record-keeping processes, including a multi-million undocumented intercompany transfer loan; and an ongoing decline in profitability misrepresented to shareholders.  As a result, Defendants' statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis.

## IV. THE TRUTH IS FINALLY DISCLOSED TO INVESTORS

122.    Investors finally learned the full extent of Methode's operational challenges on March 7, 2024, when the Company issued its third quarter 2024 financial results.  The press release announced that the Automotive Segment generated only $139.7 million in net sales for the quarter and suffered an $11 million loss from operations.  The release withdrew all of Methode's prior guidance due in substantial part to the "operational challenges" and stated that Defendants' prior statements regarding the guidance and the three-year growth outlook should no longer be relied upon.  The release

further announced urgent actions being taken by the Company to reduce costs, such as reducing headcount and discretionary expenses and disposing of non-critical assets.

123.    On the same day, Methode held an earnings call with analysts and investors hosted by new CEO Avinash Avula ("Avula"), who had replaced Defendant Duda, and Defendant Tsoumas.  In his opening remarks, Avula stated that sales for the quarter were down $21 million year-over-year "entirely [attributable to] our Auto segment."  Avula further stated that the "lower sales, along with the continued operational inefficiencies in our North American auto operations drove the net loss in the quarter."  Avula also stated that Methode "continue[d] to see increased costs related to [its] numerous new program launches, [and] some of these costs are driven by a lack of absorption due to customer program delays."  During the question-and-answer session, Defendant Tsoumas similarly noted a litany of issues still negatively impacting the Company's Monterrey facility, including "high labor turnover, planning issues, leading to inventory shortages, leading to expedited incoming freight, and sometimes outgoing freight, some . . . short shipping premium freight, inbound and spot purchases where our planning isn't fully vetted."

124.    As a result of this news, the price of Methode common stock dropped from $21.04 per share when the market closed on March 6, 2024 to $14.49 per share when the market closed on March 7, 2024, a 31% decline, on abnormally heavy volume.

125.    Notably, analysts expressed surprise at the March revelations.   For example, an analyst from Baird reported that day, "[a]lthough auto segment operational inefficiencies first surfaced 1Q24, with additional knock-on effects in 2QF24, new this

quarter it was revealed that known issues are still more challenging than previously understood."

126.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Methode's securities, Plaintiff and other Class members have suffered significant losses and damages.

## V.    POST-CLASS PERIOD EVENTS

127.    On April 8, 2024, the Company announced that Defendant Tsoumas was retiring from his role as the Company's CFO effective July 12, 2024.

128.    Furthermore, on May 6, 2024, despite only becoming Methode's CEO on January 29, 2024, the Company announced that Avula, Methode's third CEO in its 77-year history, had resigned.  Kevin Nystrom was appointed interim CEO, after holding management roles and advising companies on "a wide range of turnaround and reorganization situations."

129.    By mid-June 2024, the price of Methode stock had fallen to less than $10 per share, more than 80% below its Class Period high.

130.    On July 11, 2024, Methode announced its financial results for the fourth fiscal quarter and full year ended April 27, 2024.  During the quarter, the Company suffered a $57.3 million net loss and took a $49.4 million goodwill impairment in its North American Automotive reporting unit.  The Company cited ongoing operational inefficiencies in its Automotive Segment, which were being driven by continued labor turnover and higher costs, among other issues.

131.    That day, Methode also reported in its July 11, 2024 Form 10-K that it identified new material weaknesses in its internal control over financial reporting:

Management identified a material weakness in its internal control over financial reporting associated with ineffective information technology general controls (ITGCs) over one of its information technology (IT) systems that is relevant to the preparation of the financial information at a substantial portion of the Company's subsidiaries throughout the year ended April 27, 2024, which resulted in ineffective business process controls (automated and IT-dependent manual controls) that could result in misstatements potentially impacting significant financial statement accounts and disclosures. Specifically, management did not design and execute program change management controls to provide reasonable assurance that IT program changes affecting financial applications are authorized, tested, and implemented appropriately. As a result, business process controls (automated and IT-dependent manual controls) that are reliant on the affected ITGCs, or that use data produced from the affected systems, were deemed ineffective at April 27, 2024.

Management also identified a material weakness associated with ineffective controls over its impairment analyses for goodwill. Specifically, management did not retain sufficient contemporaneous documentation to demonstrate the operation of sufficiently precise review controls over certain significant assumptions used in the determination of fair value of its reporting units.

Management also identified a material weakness associated with ineffective controls related to the application of GAAP to non-routine events and conditions. Specifically, we did not design and maintain controls to properly evaluate all of the events and conditions relevant to the Company's going concern evaluation, including the assessment and disclosure of management's plans in accordance with GAAP.

Because of these material weaknesses, management concluded that we did not maintain effective internal control over financial reporting as of April 27, 2024.

132. On August 28, 2024, former CEO Avula filed a complaint against Methode in the Superior Court of California, Count of San Mateo, explaining the shocking events leading up to his resignation on May 1, 2024. *See Avula v. Methode Electronics, Inc.*, 24-CIV-05348 (Sup. Ct., San Mateo Cty., Aug. 28, 2024), Doc. 1-1. Avula alleges that Methode induced him to accept employment as CEO based on false pretenses and misrepresentations about the financial health of the company.

133.    According to Mr. Avula, in or around September of 2023, Methode initiated contact with him and began to recruit him to serve as CEO.  He had several meetings with the Board of Directors (the "Board") and Spencer Stuart, its recruiting firm, about Methode and the kind and character of work that Mr. Avula would be performing as its CEO, including any potential liabilities or other material or significant issues that would adversely impact an incoming CEO's job duties or fall outside the customary scope of the job duties of a CEO managing a corporation's legitimate business activities.  While Mr. Avula sought clarity with respect to the business challenges any CEO might encounter in undertaking the leadership of a business such as Methode, his inquiries also specifically sought, but Methode's Board members deliberately withheld, information about the status of Methode's legal and regulatory compliance in order to ascertain whether non-compliance in these areas might be expected to complicate or even defeat the business optimization agenda Methode's board identified for him to accomplish should he accept the role of Methode's CEO.

134.    In response to Mr. Avula's inquiries, Methode's recruiting Board members and officers falsely assured him that there were no potential liabilities or material or significant legal or regulatory compliance deficiencies at Methode that would adversely impact Mr. Avula's duties as CEO and that his duties as CEO would be to manage and to optimize the legitimate business activities of the Company in order to deliver on its strategic growth agenda. When Mr. Avula asked board members about the key challenges facing the Company, not one shared any information about ethical, compliance, legal issues or internal investigations relating to such issues.  After Mr. Avula's onboarding, however, it became clear that the same Board members either had

actual knowledge of serious problems and deficiencies in all of these areas or would have been grossly derelict in their responsibilities as board members if they did not know of such problems and deficiencies. During his final interview with the Board, Mr. Avula again specifically asked the Board if any member was aware of any material or significant compliance issues that would interfere with his ability as an incoming CEO to manage the legitimate business activities of the company, and, in so doing, deliver on the strategic growth agenda the Board was recruiting a new CEO to implement. The Board unanimously assured him that there were no such issues.

135.    In reliance on these representations, Mr. Avula accepted Methode's offer to serve as President and CEO on December 18, 2023. His employment with Methode commenced on January 29, 2024.

136.    After Mr. Avula started employment with Methode, Defendant Duda first informed him that in early 2023 that the Board had, in fact, received reports of significant misconduct committed by Methode's then current Chief Operating Officer, which prompted the engagement of independent outside counsel to investigate the allegations, and that Mr. Duda expected litigation to be imminent. This information was responsive to questions Mr. Avula asked Duda and the Board during his recruitment, yet they never disclosed it to him.

137.    Specifically, Mr. Avula learned after accepting employment of:

(a)    Misuse of Methode funds without any or sufficient business benefit to Methode but for the personal benefit of a former Methode officer, which nevertheless received approval by only select Board members;

(b)     Extreme financial and accounting system deficiencies, including a lack of necessary controls, oversight and security measures that materially and negatively influenced the accuracy of Methode profit projections;

(c)     Potential violations of U.S. securities and other domestic and foreign laws and regulations;

(d)     Misappropriated and misallocated corporate funds in international ventures, including an undocumented but substantial "petty cash fund";

(e)     Inaccurately booking and reporting sales in a manner intended to, or which had the foreseeable effect of, distorting an accurate picture of the Company's finances and/or justifying select employees' compensation;

(f)     Inadequate record-keeping processes, including a multi-million undocumented intercompany transfer loan;

(g)     Several anticipated and/or threatened, but previously undisclosed to Mr. Avula, lawsuits against Methode; and

(h)     An ongoing decline in profitability misrepresented to shareholders.

138.    Once Mr. Avula realized the gravity of these misrepresentations to him, he had no choice but to make full disclosure to the Board of the findings he had made during his tenure as Methode's CEO (which findings should have been, but were never truthfully disclosed to him before he accepted Methode employment) and to tender his resignation from Methode at the May 1, 2024, Board meeting.

139.    Additionally, on December 5, 2024, Methode announced that it received "a subpoena from the SEC dated November 1, 2024 seeking documents and information relating to, among other things, the Company's operations in certain foreign countries,

certain financial and accounting matters relating thereto, compliance with the Foreign

Corrupt Practices Act and other anti-corruption laws, and material weaknesses in the

Company's internal control over financial reporting previously reported in its public

filings."

140. The Company's stock price has never recovered from these events, and

currently trades for approximately $5.78 per share.

## VI. ADDITIONAL FACTS PROBATIVE OF SCIENTER

141. As alleged herein, Defendants acted with scienter in that Defendants

knew, or recklessly disregarded, that the public documents and statements they issued

and disseminated during the Class Period to the investing public in the name of the

Company, or in their own name, were materially false and misleading. Defendants

knowingly and substantially participated or acquiesced in the issuance or dissemination

of such statements and documents as primary violations of the federal securities laws.

Defendants, by virtue of their receipt of information reflecting the true facts regarding

Methode, and their control over and/or receipt and/or modification of Methode's

allegedly materially misleading misstatements, were active and culpable participants in

the fraudulent scheme alleged herein.

142. Defendants knew and/or recklessly disregarded the false and misleading

nature of the information they caused to be disseminated to the investing public. The

fraudulent scheme described herein could not have been perpetrated during the Class

Period without the knowledge and complicity of, or at least the reckless disregard by,

personnel at the highest levels of the Company, including the Individual Defendants.

143. The Individual Defendants, because of their positions with Methode,

controlled the contents of Methode's public statements during the Class Period. The

Individual Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected. Because of their positions and access to material, non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, each of the Defendants is responsible for the accuracy of Methode's corporate statements and, therefore, is responsible and liable for the representations contained therein.

144. The following facts support a strong inference of scienter, when viewed holistically and in the context of this amended pleading.

### A. *Respondeat Superior* and Agency Principles Apply

145. Methode is liable for the acts of the Individual Defendants under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment or agency with the authority or apparent authority to do so. The scienter of the Individual Defendants is similarly imputed to Methode under *respondent superior* and agency principles.

### B. Individual Defendants' Admissions Demonstrate Scienter

146. The Individual Defendants have also admitted that the issues were pre-existing during the Class Period, even though they were not disclosed to investors.

147. For example, in the September 7, 2023 earnings call, Defendant Duda stated that the problems at the Monterrey facility involved "latent operating inefficiencies

that our early warning detected **but we failed to mitigate**" and "some poor decision-making that we're correcting."

148.    Defendant Duda also stated during the September 7, 2023 earnings call: "ours is an execution issue, that is internal, we did [it] to ourselves."  Defendant Duda also stated during the same earnings call: "I have been and will continue to be personally involved with the efforts to correct the situation."  When an analyst asked about what was known about the labor and vendor issues when the Company gave guidance in late June, Duda responded that "when we go back and do a post mortem on it there were issues, yes" before late June:

> **Analyst**: I want to start this morning with the labor and vendor issues in auto that you saw. What I'm just wondering is, to what extent you had a line of sight or not to when you last gave guidance in late June. And more specifically, how that lines up with what you're now anticipating in the business, especially your confidence that the corrective actions you've taken will be a sufficient offset in the second half? What would be the risk that, that is not the case or that the actions don't have the expected benefit thinking?

> **Duda**:  Okay. Through the first 2 months of the quarter, we were pretty much on track. Now when we go back and do a postmortem on it were there issues, yes. The magnitude of the inbound and outbound freight really didn't become apparent until July. And once you start to air freight product, the costs go up dramatically. And that's really -- when I look at the mist, that's the main driver of it. Confidence. We know this will go into the second quarter. We've dropped the inventory levels. We need to replenish some of that.

> So we're going to still have some premium freight more inbound than outbound this time. What's my confidence level? High. I wouldn't have said what I said in my prepared remarks, if I didn't feel confident we could fix that. It's very unMethode. It's disturbing to me, but we're a pretty seasoned management team, the plant let's call it a transition. They're going from high-volume, low-mix center consoles, which they did very well producing, to a high mix, lower volume, and they had some issues with that, coupled with employee turnover, some voluntary, some involuntary.

And some poor decision-making that we're correcting. I am confident of that, that we're known for our operational excellence. So this 1 is a little red face for me, but we will correct it. On that I'm confident. We've had some corporate people down there that are seasoned ops guys, and we know what the fix is.

149. But then, Defendant Duda admitted in the December 7, 2023 earnings call that the issues impacting the Monterrey plant "probably existed prior to this fiscal year [2024]"—in other words, anytime from March 2020 to April 29, 2023, but at the latest before April 30, 2023. Defendant Duda also admitted that Defendants "were overly optimistic with the time required to remedy this situation."

150. Defendant Tsoumas admitted during the March 7, 2024 earnings call that "our planning isn't fully vetted." *See* Mar. 7, 2024 Call ("[T]he issues that are connected are high labor turnover, planning issues, leading to inventory shortages, leading to expedited incoming freight, sometimes outgoing freight, some short shipment -- short shipping premium freight, inbound and spot purchases, where our planning isn't fully vetted and -- so all of those things collectively and launching a significant amount of programs at the same time have led to the inefficiencies that we've been experiencing."). The fact that planning was still not fully vetted years after Defendants had been assuring the market of the success of the Monterrey's transition away from traditional center consoles and that its CAGR and other financial projections were achievable supports scienter.

### C. The Fraud Implicated Methode's Core Operations

151. The fraud alleged herein implicates the core operations of Methode. Methode's Automotive Segment generates the majority of the Company's total net sales, representing 53.74% of total net sales as of 2024 fiscal year-end, 62.4% of total net sales as of 2023 fiscal year-end, approximately 67% of total net sales as of 2022 fiscal year-

end, and 69.4% of total net sales as of 2021 fiscal year-end.  The alleged misconduct directly implicated the sales and growth of Methode's Automotive Segment, Methode's lifeline.

152.    According to CW1, the contract with GM "changed the face" of Methode. Starting in 2014, the GM center console program was projected to add $100 million in revenue per year.  The award contributed to the critical importance of center console production to the Company's business, revenue, and prospects.  For example, for fiscal year 2016 (the year that the GM award achieved full production) sales to GM represented approximately 50% of the Company's consolidated net sales, which consisted primarily of sales to GM of integrated center consoles for use in trucks and SUVs.  The Company's center console production was substantially done out of its Monterrey, Mexico facility. According to CW1, over time, including in the period leading up to CW1's departure from Methode in July 2022, the GM business was "dying out."  According to CW1, Methode had "no idea what to do to stay at that level" of business that the GM console business had provided.

153.    Thus, the transition away from the Company's historic reliance on GM and toward new EV program awards was one of the Company's most important strategic initiatives on which the Individual Defendants were intensely focused.  The Individual Defendants held themselves out as persons most knowledgeable about this transition during the Class Period and repeatedly highlighted new EV program awards and a desire to diversify away from GM on earnings calls with analysts and investors.  The loss of the GM business and its purported replacement with "higher margin" EV awards was one of the most critical issues facing the Company, a fact reflected in the 80% decline in the

price of Methode stock once the problems detailed herein around the troubled transition were publicly revealed.

154.    In particular, the Individual Defendants stressed the critical importance of the very issues they failed to disclose, as detailed herein, to Methode's business, financials, and prospects, as well as their close personal attention to such issues.  For example, in the September 7, 2023 earnings call, Defendant Duda explained: "In auto, delivery in addition to quality is absolutely paramount to both maintaining and obtaining new business."  Later, during the same earnings call, Defendant Duda stated that he "ha[d] been and will continue to be personally involved with the efforts to correct the situation."  Defendant Duda further stated that this is a "red face for me, but we will correct it."  He continued on to assure investors: "My immediate focus as well as the entire management team's focus is on correcting those inefficiencies."

### D.    Suspicious Individual Defendants' Departures Evidence Scienter

155.    Defendants' scienter is bolstered by the numerous executive departures during and soon after the Class Period.  On July 14, 2023, Methode issued a release that announced that Khoury, the Company's COO, had been "placed on leave from his position" and "his powers, authority and duties as such officer of the Company were suspended."  No mention of the reasons for the abrupt suspension were given, and Khoury was fired by the Board in December 2023.  Defendant Duda resigned from his positions as President, CEO, and a Board member in January 2024 and then retired in April 2024.  His successor, Avula, started at the end of January 2024, as Methode's third CEO in its 77-year history.  Shockingly, Avula left the Company less than three months later, and sued Methode as described in ¶¶ 11-13, 132-38, *supra*.  The Company announced the retirement of Defendant Tsoumas, Methode's CFO, in April 2024.  The

exit of several high-profile executives connected to the problems unfolding at the Company's Monterrey facility further bolsters an already compelling inference of scienter.

### E.  Defendants' Financial and Business Experience

156.  Defendant Duda has over 30 years of experience in electronics manufacturing, including over 20 years with Methode.  He joined Methode in March 2000 as Vice President of Interconnect Products, then in February of 2001 became President of Methode and a member of its Board. Donald W. Duda Professional Summary, Bloomberg Terminal (last visited Mar. 14, 2025).  In May 2004, Duda was named CEO, and served as President, CEO, and a Board member until his resignation, effective January 29, 2024; Donald W. Duda Professional Summary, S&P Global Market Intelligence, https://www.capitaliq.com/CIQDotNet/Person/PersonProfile.aspx?proId=752417 (last visited Mar. 14, 2025).  Prior to Methode, Duda gained extensive experience in manufacturing, holding several positions at Amphenol Corporation, a manufacturer of electronic connectors, including General Manager of the company's Fiber Optic Product Division from 1988 to 1998.  *Id*.

157.  Defendant Tsoumas was with Methode for over 38 years and has significant experience and knowledge of corporate finance.  He started with the Company in 1986.  Ronald Tsoumas, CPA, CGMA, MBA, MSA, LinkedIn, https://www.linkedin.com/in/ronald-tsoumas-cpa-cgma-mba-msa-9274414a/details/experience/ (last visited Mar. 24, 2025) ("Tsoumas LinkedIn Profile").  In 1998, Tsoumas became Methode's Assistant Controller until he assumed the position of Corporate Controller and Treasurer in 2007.  Ronald L. G. Tsoumas Professional

Summary, S&P Global,

https://www.capitaliq.com/CIQDotNet/Person/PersonProfile.aspx?proId=37130934 (last

visited Mar. 14, 2025). Tsoumas then served as Methode's CFO from March 2018 until

he retired in July 2024. *Id*. Tsoumas holds a Master of Business Administration in

Corporate Finance, Business Strategy and Corporate Business Law from Keller Graduate

School of Management and a master's degree in Accountancy from Roosevelt University.

Tsoumas LinkedIn Profile. Tsoumas also became a Certified Public Accountant in 1995

and a Chartered Global Management Accountant in 2012. *Id*.

**F.  The Individual Defendants' Incentive Compensation Supports
Scienter**

158.  Defendants Duda and Tsoumas were part of the 2021 Long-Term

Incentive ("LTI") program during the five-year period which ends on May 3, 2025 (fiscal

2021 through fiscal 2025), which would have allowed them to receive equity-based

returns. The 2021 LTI Program consists of performance-based restricted stock awards

(''RSAs''), cash-based performance grants (''Performance Units'') and time-based

restricted stock units (''RSUs''). The terms of the program state: "[t]he target EBITDA

performance goal aligns with the Company's targeted EBITDA compound annual growth

rate of approximately 8% for the five-year program period. The Performance Units

represent an opportunity for participants to receive a cash payment based on the price of

Methode's common stock only to the extent that fiscal 2025 EBITDA exceeds target

performance for the RSAs." Thus, if the EBIDTA compound annual growth rate for the

period ending May 3, 2025 was above 8%, then the Individual Defendants would be

eligible to receive performance based compensation based on the stock price.

159. As a result, the Individual Defendants needed Methode's share price to appreciate to achieve an enormous payout opportunity worth millions of dollars in total. For example, Defendant Duda would have received $10,605,000 in RSAs and $10,605,000 in RSUs valued as of July 27, 2023 and 187,500 cash-based performance units. Defendant Tsoumas would have received $2,135,140 in RSAs and $2,135,140 in RSUs valued as of July 27, 2023 and 37,750 cash-based performance units.

160. At the very least, the promise of such compensation gave the Individual Defendants a personal financial motive to pay close attention to the stock price and keep it artificially inflated.

## VII. NO SAFE HARBOR

161. The safe harbor provisions for forward-looking statements under the Private Securities Litigation Reform Act of 1995 are applicable only under certain circumstances that do not apply to any of the materially false and misleading statements and omissions alleged in this Complaint.

162. First, many of the identified false and misleading statements and omissions herein are not forward-looking statements, but instead are statements of current of historic fact, or are actionable in context because they omit then-existing material facts.

163. Second, many of the identified false and misleading statements herein were not identified as forward-looking statements.

164. Third, to the extent there were any forward-looking statements that were identified as such at the time made, those statements also contained statements of present or past facts and so are not entitled to protection under the safe harbor.

165.     Fourth, to the extent there were any forward-looking statements that were identified as such at the time made, there were no meaningfully cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Such statements were also not accompanied by cautionary language that was meaningful because such warnings or "risk" factors contained in, or incorporated by reference in, the relevant press release, SEC filings, earnings call, or other public statements described herein were general, "boilerplate" statements of risk that would affect any solar power or renewable energy company, and misleadingly contained no factual disclosure of any of the specific details concerning its revenue, profits, cash position and capitalization or similar important factors that would give investors adequate notice of such risks.

166.     Fifth, to the extent there were any such forward-looking statements, Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, or by reason of what the speaker failed to note, was materially false and/or misleading, and/or that each statement was authorized and/or approved by an executive officer of Methode who actually knew that each such statement was false or misleading when made.

167.     For all these same reasons, the bespeaks caution doctrine likewise does not apply to shield Defendants from liability.

## VIII.    LOSS CAUSATION/ECONOMIC LOSS

168.     The market for Methode shares was open, well-developed, and efficient at all relevant times.  During the Class Period, as detailed herein, Defendants engaged in a course of conduct and a scheme to deceive the market that artificially inflated Methode's

share price and operated as a fraud or deceit on Class Period purchasers of Methode shares by misrepresenting the material facts as detailed herein. As detailed above, at the end of the Class Period, when Defendants' prior misrepresentations became known to the public, through a series of corrective disclosures, the price of Methode shares fell precipitously, as the prior artificial inflation came out. As a result of their purchases of Methode shares during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the U.S. federal securities laws.

169. During the Class Period, Defendants presented a misleading picture of Methode's financial condition, revenues, performance, and business prospects. Defendants' false and misleading statements had the intended effect and caused Methode shares to trade at artificially inflated prices throughout the Class Period and until the truth was fully revealed to the market.

170. In response to the issuance of partially corrective disclosures on March 9, 2023, June 12, 2023, June 22, 2023, July 14, 2023, September 7, 2023, December 7, 2023, and March 7, 2024, the price of Methode shares sharply dropped, on high volume, as detailed herein, thereby removing inflation from the price of Methode shares, causing real economic loss to Plaintiff and the Class Members, investors who had purchased Methode shares during the Class Period.

171. The decline was a direct and proximate result of the nature and extent of Defendants' fraud being revealed to investors and the market. The timing and magnitude of the price decline in Methode shares negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions,

macroeconomic factors or Methode-specific facts unrelated to Defendants' fraudulent
conduct.

172.    The economic loss, *i.e.*, damages, suffered by Plaintiff and other Class
members was a direct and proximate result of Defendants' fraudulent scheme to
artificially inflate Methode's share price and the subsequent significant decline in the
value of Methode shares when Defendants' prior misrepresentations and other fraudulent
conduct were revealed.

## IX.   CLASS ACTION ALLEGATIONS

173.    Plaintiff brings this action as a class action pursuant to Rules 23(a) and
23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all
those who purchased Methode's common stock during the Class Period, and who were
damaged thereby (the "Class").

174.    Excluded from the Class are Defendants, the officers and directors of
Methode at all relevant times, members and their immediate families and their legal
representatives, affiliates, heirs, successors or assigns, and any entity in which
Defendants have, or had, a controlling interest.

175.    The members of the Class are so numerous that joinder of all members is
impracticable.  Throughout the Class Period, Methode's common stock was actively
traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff
at this time and can only be ascertained through appropriate discovery, Plaintiff believes
that there are hundreds or thousands of members in the proposed Class.  Record owners
and other members of the Class may be identified from records maintained by Methode
or its transfer agent and may be notified of the pendency of this action by mail, using the
form of notice similar to that customarily used in securities class actions.

176. Plaintiff's claims are typical of the claims of the members of the Class, since all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law alleged herein.

177. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

178. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants' acts constituted violations of the federal securities laws;

(b)     whether Defendants' statements made to the investing public during the Class Period misrepresented material facts concerning Methode's business, operations, and financial condition;

(c)     whether the Individual Defendants caused Methode to issue false and misleading financial statements during the Class Period;

(d)     whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)     whether the price of Methode's common stock was artificially inflated during the Class Period because of Defendants' conduct complained of herein; and

(f)     whether members of the Class have sustained damages and, if so, what is the proper measure of damages.

71

179.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  Additionally, there will be no difficulty in the management of this action as a class action.

180.    As alleged herein, Plaintiff will rely, in part, on the presumption of reliance established by the fraud-on-the-market doctrine, inasmuch as Defendants made public misrepresentations or failed to disclose material facts during the Class Period; the misrepresentations and omissions were material and would tend to induce a reasonable investor to misjudge the value of Methode's stock; and Plaintiff and members of the Class purchased or otherwise acquired Methode stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

## X.    CONTROL PERSON LIABILITY

181.    The Individual Defendants, because of their positions with Methode, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, advertisements, promotional materials, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Each Individual Defendant possessed the power to direct or cause the direction of the management and policies of Methode.  Each Individual Defendant had a duty to promptly disseminate complete, accurate, and truthful information with respect to Methode's business, operations, and financial condition.  Each Individual Defendant was provided with copies of the Company's SEC filings and press releases alleged herein to be false or

misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, each Individual Defendant knew or recklessly disregarded that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and/or misleading.

## XI.    PRESUMPTION OF RELIANCE

182.    At all relevant times, the market for Methode shares was an efficient market, supporting a presumption of reliance under the fraud-on-the-market doctrine, for the following reasons, among others:

(a)    Methode met the requirements for listing, and was listed and actively traded on the NYSE under ticker symbol "MEI", a highly efficient and automated market;

(b)    Methode had approximately 35.39 million shares outstanding as of March 4, 2024 such that its stock was liquid.  During the Class Period, numerous shares of Methode stock were traded on a daily basis, with moderate to heavy volume, demonstrating an active and broad market for Methode stock and permitting a strong presumption of an efficient market;

(c)    As a regulated issuer, Methode filed periodic public reports with the SEC;

(d)    Methode regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)     Methode was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period; and

(f)     Unexpected material news about Methode was rapidly reflected and incorporated into Methode's stock price during the Class Period.

183.    As a result of the foregoing, the market for Methode shares promptly digested current information regarding Methode from all publicly available sources and reflected such information in the price of its stock.  Under these circumstances, all purchasers of Methode stock during the Class Period suffered similar injury through their purchase of Methode stock at artificially inflated prices and a presumption of reliance applies.

184.    Alternatively, Plaintiff and the Class members are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## XII.    CAUSES OF ACTION

### COUNT I

### Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against All Defendants

185.    Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein.

186. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

187. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Methode common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Methode stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

188. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of quarterly and annual reports, SEC filings, press releases and other documents and statements described above, including statements made to securities analysts and the media that were designed to influence the market for Methode stock. Such reports, filings, releases and statements were materially false and misleading in that they failed to

disclose material adverse information and misrepresented the truth about Methode's operations, finances and business prospects.

189.    Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein, including by virtue of their positions at Methode, and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

190.    Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Methode stock.

191.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is within Defendants' knowledge and control.  Defendants' first-hand knowledge is alleged herein.  Moreover, as senior managers and/or directors of Methode, the Individual Defendants had knowledge of the details of Methode's operations, business, and internal affairs.

192.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Methode.  As officers and/or directors of a publicly held company, the

Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Methode's businesses, operations, financial condition and prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Methode stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Methode's business, operations and financial condition concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Methode stock at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

193. During the Class Period, Methode stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Methode stock at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Methode stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Methode stock declined sharply upon public disclosure of the fraud alleged herein, to the injury of Plaintiff and Class members.

194.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

195.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of Methodes's securities during the Class Period, upon the disclosure that Methode had been disseminating material misstatements and omissions to the investing public.

## COUNT II

### Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

196.     Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein.

197.     During the Class Period, the Individual Defendants participated in the operation and management of Methode, and conducted and participated, directly and indirectly, in the conduct of Methode's business affairs.  Because of their senior positions, they knew the adverse, non-public information about Methode's business, operations, finances, and prospects.

198.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Methode's business, operations, financial condition, results of operations, and prospects and to correct promptly any public statements issued by Methode which had become materially false or misleading.

199.    Because of their positions of control and authority as senior officers and directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Methode disseminated in the marketplace during the Class Period concerning Methode's business, operations, financial condition, results of operations, and prospects.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Methode to engage in the wrongful acts complained of herein.  The Individual Defendants, therefore, were "controlling persons" of Methode within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Methode stock.

200.    Each of the Individual Defendants, therefore, acted as a controlling person of Methode.  By reason of their senior management positions and/or being directors of Methode, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Methode to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations and business of Methode and possessed the power to control the specific activities that comprise the primary violations about which Plaintiff and the other members of the Class complain.

201.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Methode.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as a Class representative;

B.      Awarding damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including prejudgment and post-judgment interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury on all triable claims.


Dated: April 4, 2025                    Respectfully submitted,

                                        **FARUQI & FARUQI, LLP**

                                        By:      */s/ James M. Wilson, Jr.*
                                                 James M. Wilson, Jr.

                                        James M. Wilson, Jr. (admitted *pro hac vice*)
                                        685 Third Avenue, 26th Floor
                                        New York, NY 10017
                                        Telephone: 212-983-9330
                                        Facsimile: 212-983-9331
                                        Email:   jwilson@faruqilaw.com

Robert W. Killorin (admitted *pro hac vice*)
**FARUQI & FARUQI, LLP**
3565 Piedmont Road NE Building Four
Suite 380
Atlanta, GA 30305
Telephone: 404-847-0617
Facsimile: 404-506-9534
Email: rkillorin@faruqilaw.com

*Attorneys for Lead Plaintiff DeKalb County*
*Pension Fund and Lead Counsel for the*
*putative Class*

Marvin A. Miller
Lori A. Fanning
**MILLER LAW LLC**
53 W. Jackson Blvd., Suite 1320
Chicago, IL 60604
Telephone: 312-332-3400
Facsimile: 312-676-2676
Email: mmiller@millerlawllc.com
          lfanning@millerlawllc.com

*Attorneys for Lead Plaintiff DeKalb County*
*Pension Fund and Liaison Counsel for the*
*putative Class*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing was filed on April 4, 2025

with the Clerk of the Court using the CM/ECF system, which will effect electronic service on all

parties and attorneys registered to receive notifications via the CM/ECF system.


By:     */s/ James M. Wilson, Jr.*
        James M. Wilson, Jr.