# EXHIBIT A

VEDDER PRICE (CA), LLP
CHERYL A. SABNIS (SBN 224323)
csabnis@vedderprice.com
PETER D. WALROD (SBN 339521)
pwalrod@vedderprice.com
1 Post Street, Suite 2400
San Francisco, California 94104
T: +1 415 749 9500
F: +1 415 749 9502

VEDDER PRICE P.C.
NICHOLAS ANACLERIO (*Pro Hac Vice* to be filed)
nanaclerio@vedderprice.com
ELLEN M. HEMMINGER (*Pro Hac Vice* to be filed)
ehemminger@vedderprice.com
222 North LaSalle Street
Chicago, Illinois 60601
T: +1 312 609 7500
F: +1 312 609 5005

Attorneys for Plaintiff
AVINASH AVULA

Electronically FILED by Superior Court of California, County of San Mateo
ON 8/28/2024
By /s/ Kimberly Claussen
Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN MATEO

| | |
|---|---|
| AVINASH AVULA,<br><br>Plaintiff,<br><br>v.<br><br>METHODE ELECTRONICS, INC.,<br><br>Defendant. | Case No. 24-CIV-05348<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 1 -

COMPLAINT
DEMAND FOR JURY TRIAL

Plaintiff AVINASH AVULA ("Plaintiff" or "Mr. Avula") brings this action against Defendant METHODE ELECTRONICS, INC. ("Defendant" or "Methode") and alleges as follows:

**PARTIES**

1. Mr. Avula is an individual who at times relevant to this lawsuit was a citizen and resident of the State of California whose home and family were located in San Carlos, California. By reason of the unlawful acts of the Defendant Methode complained of herein, Mr. Avula was induced and enticed to accept employment some duties of which were performed in the State of Illinois.

2. Methode is a Delaware corporation with its principal place of business in Chicago, Illinois. Methode describes itself on its website as "…a leading global supplier of custom-engineered solutions with sales, engineering and manufacturing locations in North America, Europe, Middle East, and Asia. We design, engineer, and produce mechatronic products for OEMs utilizing our broad range of technologies for user interface, LED lighting system, power distribution and sensor applications." *See* https://methode.com/ At all relevant times, Methode did and does substantial business in the State of California, maintaining beneficial relationships with both significant California-based customers and with various employees who live and work in California. Moreover, the causes of action alleged in this action relate to and arise out of Methode's contacts with California and its actions and communications directed to Avula when he was living and working in California.

**JURISDICTION AND VENUE**

3. This Court has jurisdiction over this matter because Mr. Avula was a resident of the State of California at the times complained of herein, and because, at all relevant times, Methode did and continues to do business in the State of California, thereby enjoying the benefits and protections of the laws and commerce of the State of California and consequently voluntarily subjecting itself to the jurisdiction of California courts. Moreover, the causes of action alleged in this action relate to and arise out of Methode's contacts with California and its actions and communications directed to Avula while he lived in California.

4. Venue is proper in San Mateo County because the causes of action alleged in this action relate to and arise out of Methode's actions and communications directed to Avula when he was living in San Mateo County, California.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### Methode's Recruitment of Mr. Avula

5. When Methode first contacted Mr. Avula, Mr. Avula was a resident of San Carlos, California, and enjoying a thriving career at DuPont, where he had worked for more than nine (9) years and risen to the position of Vice President Strategy & Commercial Excellence for DuPont Electronics and Industrial.

6. In or around September of 2023, while Mr. Avula was residing and working in California, Methode initiated contact with him and began recruiting him for the position of its Chief Executive Officer ("CEO").

7. During the recruitment process that Methode initiated, Mr. Avula had several meetings with the Board of Directors (the "Board") and Spencer Stuart, its recruiting firm, about Methode and the kind and character of work that Mr. Avula would be performing as its CEO, including any potential liabilities or other material or significant issues that would adversely impact an incoming CEO's job duties or fall outside the customary scope of the job duties of a CEO managing a corporation's legitimate business activities. While Mr. Avula sought clarity with respect to the business challenges any CEO might encounter in undertaking the leadership of a business such as Methode, his inquiries also specifically sought, but Methode's board members deliberately withheld, information about the status of Methode's legal and regulatory compliance in order to ascertain whether non-compliance in these areas might be expected to complicate or even defeat the business optimization agenda Methode's board identified for him to accomplish should he accept the role of Methode's CEO and leave behind a successful career with DuPont.

8. In response to Mr. Avula's inquiries, Methode's recruiting Board members and officers falsely assured him that there were no potential liabilities or material or significant legal or regulatory compliance deficiencies at Methode that would adversely impact Mr. Avula's duties as CEO and that his duties as CEO would be to manage and to optimize the legitimate business

activities of the Company in order to deliver on its strategic growth agenda. When Mr. Avula asked board members about the key challenges facing the Company, not one shared any information about ethical, compliance, legal issues or internal investigations relating to such issues. After Mr. Avula's onboarding, however, it became clear that the same Board members either had actual knowledge of serious problems and deficiencies in all of these areas or would have been grossly derelict in their responsibilities as board members if they did not know of such problems and deficiencies.

9. During Mr. Avula's final interview with the Board, Mr. Avula again specifically asked the Board if any member was aware of any material or significant compliance issues that would interfere with his ability as an incoming CEO to manage the legitimate business activities of the company, and, in so doing, deliver on the strategic growth agenda the Board was recruiting a new CEO to implement.

10. In response to Mr. Avula's direct and specific inquiry, the Board unanimously assured Mr. Avula that there were no such issues.

11. At all times during the course of these pre-employment representations, Mr. Avula was a resident of the State of California, though the same representations were calculated to, and indeed succeeded in, inducing Mr. Avula to perform substantial employment duties and responsibilities for Methode outside of the State of California.

**Mr. Avula's Employment Agreements with Methode**

12. In reasonable reliance upon the representations made by Methode's Board regarding the kind and character of work Mr. Avula would be doing for Methode, as well as the current status of Methode's legal and regulatory compliance, on December 18, 2023, Mr. Avula accepted Methode's offer of employment in the role of President and Chief Executive Officer. In conjunction with this acceptance, Mr. Avula signed an offer letter (the "Offer Letter"), a true and correct copy of which is attached hereto as "Exhibit A."[1]

13. The Offer Letter incorporated by reference a Proprietary Interests Protection Agreement (the "PIPA"), a true and correct copy of which is attached hereto as "Exhibit B."

---

[1] For purposes of completeness, a later signed amendment to the Offer Letter is included with Exhibit A.

Methode made Mr. Avula's employment with Methode conditional upon his acceptance of the terms of the PIPA. Mr. Avula accepted Methode employment and the terms of the PIPA in direct and reasonable reliance on the truthfulness of the representations made to him by Methode's Board and officers throughout the recruitment process as aforesaid.

**Mr. Avula Changes His Residence From San Carlos, California To Chicago, Illinois**

14. Mr. Avula's employment with Methode commenced on January 29, 2024.

15. As a condition of Mr. Avula's employment with Methode, as set forth in the Offer Letter, he was required to relocate from California to Chicago, Illinois, and to work in material part at Methode's principal offices in Chicago, Illinois, though he continued to perform significant and important employment duties to Methode while physically present in the State of California.

16. At the beginning of his employment with Methode, Mr. Avula commuted from California to Chicago during the week and lived in temporary housing provided by Methode.

17. In good faith compliance with his agreement to become Methode's CEO, Mr. Avula began relocating his and his family's residence from San Carlos, California to Chicago, Illinois.

18. On March 18, 2024. Mr. Avula purchased a house in Chicago, Illinois and made arrangements for both him and his family to permanently relocate from California to Chicago, Illinois.

19. As a direct and proximate result of having joined Methode under false pretenses and being misled by Methode about its business, legal and regulatory compliance status and being subsequently forced to resign Methode employment, Mr. Avula incurred substantial expenses and sustained corresponding significant monetary damages consisting of, among other losses, the cost of acquiring a Chicago, Illinois, residence, unreimbursed remodeling, travel, and other relocation expenses, including non-refundable tuition deposits for enrolling his children in Chicago-area schools, legal expenses, income disruption and the loss of value of unvested DuPont equity compensation.

**Mr. Avula Discovers Methode's Material Misrepresentations to Him**

20. After Mr. Avula started employment with Methode, Donald Duda, Methode's outgoing Chief Executive Officer, first informed him that in early 2023, the same Methode Board

that had falsely assured Mr. Avula Methode's legal and regulatory houses were in order had indeed received reports of significant misconduct committed by Methode's then current Chief Operating Officer ("COO"); that these allegations warranted, and had in fact prompted the engagement of independent outside counsel to investigate the allegations; and that Mr. Duda expected related litigation was imminent. This information was responsive to questions Mr. Avula asked Methode's CEO and Board during his recruitment and before he accepted Methode employment, yet at no point during Mr. Avula's recruitment, did any Board member disclose it to Mr. Avula. To the contrary, they misrepresented the absence of any such issue.

21. By way of example only, and not categorical listing, Mr. Avula learned only after accepting Methode employment, of:

a. Misuse of Methode funds without any or sufficient business benefit to Methode but for and the personal benefit of a former Methode officer, which nevertheless received approval by only select Board members;

b. Extreme financial and accounting system deficiencies, including a lack of necessary controls, oversight and security measures that materially and negatively influenced the accuracy of Methode profit projections;

c. Potential violations of U.S. securities and other domestic and foreign laws and regulations;

d. Misappropriated and misallocated corporate funds in international ventures, including an undocumented but substantial "petty cash fund";

e. Inaccurately booking and reporting sales in a manner intended to, or which had the foreseeable effect of, distorting an accurate picture of the Company's finances and/or justifying select employees' compensation;

f. Inadequate record-keeping processes, including a multi-million undocumented intercompany transfer loan;

g. Several anticipated and/or threatened, but previously undisclosed to Mr. Avula, lawsuits against Methode; and

h. An ongoing decline in profitability misrepresented to shareholders.

22. Mr. Avula never would have accepted Methode's offer of employment, foregone his DuPont career and lucrative equity and other related DuPont compensation, accepted employment outside of California or consented to relocating himself and his family outside of California (where he also had an extensive professional network and extended family), had Methode, its Board and officers been truthful and complete in their representations to him about the potential liabilities or other material or significant issues that would adversely impact an incoming CEO's job duties or fall outside the scope of the job duties of a CEO managing a legally compliant corporation's legitimate business activities.

23. Once Mr. Avula realized the gravity of these misrepresentations to him, he had no choice but to make full disclosure to the Board of the findings he had made during his tenure as Methode's CEO (which findings should have been, but were never truthfully disclosed to him before he accepted Methode employment) and to tender his resignation from Methode at the May 1, 2024, Board meeting.

## COUNT I

### Violation of California Labor Code § 970

24. Mr. Avula incorporates and re-alleges Paragraphs 1 through 23, as if fully restated herein.

25. Section 970 of the California Labor Code makes it unlawful for any person, or agent or officer thereof, directly or indirectly, to influence, persuade, or engage any person to change from any place within the State of California to any place outside the State of California, for the purpose of work, through or by means of knowingly false representations concerning either the kind or character of such work.

26. Methode directly and indirectly influenced, persuaded, and engaged Mr. Avula to relocate his residence from California to Chicago, Illinois, for the purpose of serving as its CEO, through or by means of knowingly false representations, concerning the kind and/or character of the work he would be expected to perform.

27. As a direct and proximate result of Methode's knowingly false representations to Mr. Avula, Mr. Avula has suffered general and special damages in an amount to be determine at

trial.

28. Pursuant to Section 972 of the California Labor Code, Mr. Avula is entitled to recover double damages resulting from such misrepresentations.

## COUNT II

### Intentional Misrepresentation

29. Mr. Avula incorporates and re-alleges Paragraphs 1 through 28, as if fully restated herein.

30. Intentional misrepresentation is unlawful pursuant to common law and the California Civil Code. *See, e.g.,* Cal. Civil Code §§ 1709-1710.

31. Methode, through its Board, made material and intentional and/or recklessly untruthful misrepresentations to Mr. Avula concerning the kind and character of work that Mr. Avula would be performing as CEO, including false representations that there were no liabilities or other material or significant issues that would adversely impact an incoming CEO's job duties or fall outside the scope of the job duties of a CEO managing a legally-compliant corporation's legitimate business activities.

32. Methode's representations to Mr. Avula were false.

33. Methode's Board members either knew that the representations they were making to Mr. Avula were false or made the representations recklessly and without regard for their truth.

34. Methode, through its Board, intended that Mr. Avula rely on the representations they were making.

35. Mr. Avula reasonably relied on the Board's representations.

36. Mr. Avula was harmed and has suffered general and special damages, including for emotional distress, in an amount to be proven at trial.

37. Mr. Avula's reliance on Methode's misrepresentations was a substantial factor in causing the harm he has suffered.

38. Methode's fraud warrants the imposition of exemplary damages pursuant to Cal. Civ. Code § 3294.

## COUNT III

**Negligent Misrepresentation**

39. Mr. Avula incorporates and re-alleges Paragraphs 1 through 38, as if fully restated herein.

40. Methode, through its Board, made material misrepresentations to Mr. Avula concerning the kind and character of work that Mr. Avula would be performing as CEO, including representations that there were no liabilities or other material or significant issues that would adversely impact an incoming CEO's job duties or fall outside the scope of the job duties of a CEO managing a corporation's legitimate business activities.

41. Methode's misrepresentations to Mr. Avula were not true.

42. Even if Methode's Board members believed that their misrepresentations to Mr. Avula were true, they lacked any reasonable grounds for believing such misrepresentations were true when they made them.

43. Methode, through its Board, intended that Mr. Avula rely on the representations they were making.

44. Mr. Avula reasonably relied on the Board's representations.

45. Mr. Avula was harmed and has suffered general and special damages, including for emotional distress, in an amount to be proven at trial.

46. Mr. Avula's reliance on Methode's representations was a substantial factor in causing the harm he has suffered.

**COUNT IV**

**Violation of California Business & Professions Code §§ 16600 and 17200**

47. Mr. Avula incorporates and re-alleges Paragraphs 1 through 46, as if fully restated herein.

48. The PIPA that Methode required and enticed Mr. Avula to sign as a condition of accepting Methode employment included a covenant not to compete, a customer nonsolicitation restraint, and an employee nonsolicitation promise (collectively the "Unlawful Restrictive Covenants"), which represent illegal restraints on trade and are unenforceable pursuant to California law. (*See* Exhibit B at ¶¶ E, F., and G.)

49. Methode required that Mr. Avula execute these Unlawful Restrictive Covenants before and as essential pre-conditions to his employment with Methode.

50. The Unlawful Restrictive Covenants contain wide-ranging, unnecessary and overreaching restrictions on Mr. Avula's ability to work in his chosen profession.

51. The Unlawful Restrictive Covenants do not fall within any of the exceptions to Section 16600 of the California Business & Professions Code ("Section 16600").

52. Accordingly, the Unlawful Restrictive Covenants are void as restraints on trade pursuant to Section 16600.

53. The act of asking Mr. Avula to sign the Restrictive Covenants represents unfair and unlawful conduct in violation of Section 17200 of the California Business & Professions Code ("Section 17200" or the "UCL").

54. Mr. Avula has suffered an injury in fact as a result of Methode's unfair and unlawful conduct.

55. Methode's conduct, as described herein, constitutes an unfair and unlawful business practice that should be restrained. As such, Mr. Avula seeks a determination by the Court that the use and attempted enforcement of the Restrictive Covenants, which are unlawful and void under California law, are violations of Section 17200.

56. Pursuant to §17203 of the California Business & Professions Code, Mr. Avula is entitled to preliminary and permanent injunctive relief prohibiting such unlawful actions.

## COUNT V

### Declaratory Relief

57. Mr. Avula incorporates and re-alleges Paragraphs 1 through 56, as if fully restated herein.

58. In addition to the aforesaid offending and unlawful provisions in the PIPA, Methode's Offer Letter includes an unlawful, purportedly mandatory arbitration provision (the "Arbitration Provision"), which nevertheless limits arbitrable claims to those arising from disputes relating to Mr. Avula's Methode "employment". (*See* Exhibit A, p. 5.)

59. Mr. Avula did not agree to arbitrate any "pre-employment" claims by Methode, including without limitation the fraudulent and negligent misrepresentation claims which accrued prior to the commencement of Mr. Avula's employment as previously pled herein.

60. Additionally, the Arbitration Provision is unconscionable and, thus, unenforceable, including without limitation because: (a) it is one of many unlawful provisions to which Mr. Avula was required to agree when Methode required him to sign the Offer Letter and the PIPA; (b) it was the result of grossly disparate bargaining power, Methode having had, and wielded negotiating leverage that vastly outstripped that of Mr. Avula; (c) it requires Mr. Avula to bear costs unique to arbitration as a condition of access to the arbitration forum; (d) it is one-sided in Methode's favor in that it enables Methode to seek judicial relief for those claims most advantageous to Methode, but purports to absolutely bar Mr. Avula from doing likewise; (e) it does not expressly provide for more than minimal, and very likely inadequate discovery to enable a full and just determination of the facts; and (f) it does not require a written award.

61. Mr. Avula expects Methode to maintain that Illinois, rather than California law, should apply to its Arbitration Provision pursuant to its choice-of-law clause (Methode's "Choice-of-Law Clause"). In practical effect, Methode will likely assert that it should doubly benefit, and Mr. Avula should be doubly prejudiced, from Methode having falsely induced an employment relationship to be performed outside of California the lawfulness of which, according to Methode and the agreements it required Mr. Avula to sign, should be tested by the laws of the same foreign jurisdiction wherein Methode wrongfully enticed Mr. Avula to work for it.

62. Mr. Avula contends that the Arbitration Provision and Choice-of-Law Clause, if enforced in the manner he expects Methode to insist, would strip Mr. Avula of the protections of California law.

63. This Court should refuse to enforce the Arbitration Provision and Choice-of-Law Clause because enforcing them would strip a California resident of his protections under a fundamental public policy of this State. *See, e.g.*, *Verdugo v. Alliantgroup, L.P.*, 237 Cal. App. 4th 141, 152 (2015).

64. Methode's Arbitration Provision and Choice-of-Law Clause are, and should be adjudicated, unenforceable, void, and unlawful.

65. An actual, present, and justiciable controversy exists between Mr. Avula and Methode with respect to the scope and enforceability of the Arbitration Provision and the Choice-of-Law Clause.

66. Indeed, on or about July 16, 2024, Methode purported to initiate an arbitration demand against Mr. Avula with the AAA in Chicago, Cook County, Illinois (the "Arbitration Demand," a true and correct copy of which is attached hereto as "Exhibit C"). Through its Arbitration Demand, Methode has (a) invoked the Arbitration Provision; (b) asserted the Choice-of-Law Clause to claim that Illinois law governs disputes with Mr. Avula; (c) pressed for the enforcement of an Illinois arbitration venue designation; and (d) alleged baseless claims for breach of contract against Mr. Avula.

67. Significantly, concurrent with its Arbitration Demand, Methode also filed an "Objection to Application of AAA Employment Workplace Fee Schedule" (the "Objection," a true and correct copy of which without its attached exhibits is attached hereto as "Exhibit D"). In that Objection (p. 7), Methode seeks to repudiate the "provision in the AAA Employment Arbitration Rules requiring the employer to pay the entire cost of the arbitration," and seeks an arbitral order requiring "[Mr.] Avula to pay his half of all arbitration costs," and "reimburse[] any costs Methode paid that exceed its equal share of the arbitration costs" pursuant to the Arbitration Provision. The Arbitration Provision's arbitration costs splitting requirement, which Methode's Objection makes clear it intends to insist the AAA enforce, is among its unlawful and unenforceable requirements under the California law that Mr. Avula requests this Court apply.

68. No adequate remedy other than that prayed for herein exists by which the parties' rights may be determined.

69. Accordingly, Mr. Avula prays for a declaration of his rights as follows:

    a) The Arbitration Provision does not apply to the claims alleged in this Complaint;

  b) California law governs the Arbitration Provision and Methode's Unlawful Restrictive Covenants;

  c) The Choice-of-Law Clause is unenforceable; pursuant to California law and therefore unenforceable;

  d) The Arbitration Provision is unenforceable pursuant to California law and therefore, unenforceable;

  e) California law governs Methode's Unlawful Restrictive Covenants;

  f) Methode's Unlawful Restrictive Covenants are unenforceable;

  g) AAA proceedings initiated by Methode against Mr. Avula in Chicago, Cook County, Illinois, are unlawful, pursuant to California law, such that the same should be stayed and/or enjoined in deference to the instant proceedings.

70. Additionally, Mr. Avula seeks preliminary and permanent injunctive relief enjoining Methode from enforcing the Arbitration Provision and all parts thereof, including without limitation the Choice-of-Law Clause and Illinois arbitral venue designation, and further enjoining and/or staying Methode's AAA arbitration proceedings.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff specifically requests that the Court enter an order granting judgment in favor of Plaintiff and against the Defendant and order the following relief:

(a) For general and special damages;

(b) For double damages pursuant to Cal. Lab. Code § 972;

(c) For declaratory relief;

(d) For injunctive relief;

(e) For restitution and other equitable relief;

(f) For exemplary damages pursuant to Cal. Civ. Code § 3294;

(g) Reasonable attorneys' fees and costs; and

(h) Such other relief as the Court deems just and proper.

Dated: August 27, 2024

VEDDER PRICE (CA), LLP

By: _____
CHERYL A. SABNIS

Attorneys for Plaintiff
AVINASH AVULA

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial for his claims by jury to the extent authorized by law.

Dated: August 27, 2024

VEDDER PRICE (CA), LLP

By: _____
Cheryl A. Sabnis

Attorneys for Plaintiff
AVINASH AVULA