**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| DEKALB COUNTY PENSION FUND, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:24-cv-07696 |
| | District Judge Sara L. Ellis |
| Plaintiff, | Magistrate Judge M. David Weisman |
| vs. | |
| METHODE ELECTRONICS, INC. DONALD W. DUDA, and RONALD L.G. TSOUMAS, | |
| Defendants. | |

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**
**PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT**

Zachary Fardon (IL Bar No. 6292156)
**KING & SPALDING LLP**
110 N Wacker Drive
Suite 3800
Chicago, Illinois 60606
Telephone: (312) 995-6333
Facsimile: (312) 995-6330
zfardon@kslaw.com

Jessica P. Corley (*pro hac vice*)
Brandon R. Keel (IL Bar No. 6300165)
**KING & SPALDING LLP**
1180 Peachtree Street, N.E.
Atlanta, Georgia 30309
Telephone: (404) 572-4600
Facsimile: (404) 572-5100
jpcorley@kslaw.com
bkeel@kslaw.com

*Counsel for Defendants Methode Electronics, Inc.,*
*Donald W. Duda, and Ronald L.G. Tsoumas*

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ............................................................................................................. 1

BACKGROUND .............................................................................................................. 2

ARGUMENT .................................................................................................................... 6

I.      THE SAFE HARBOR PROTECTS THE CHALLENGED FORWARD-LOOKING
        STATEMENTS............................................................................................................. 7

        A.      Plaintiff Challenges Numerous Forward-Looking Statements. ........................................8

        B.      Meaningful Cautionary Language Accompanied Each Statement. ..................................9

        C.      The Second And Third Prongs Of The Safe Harbor Also Apply. ...................................10

II.     THE CHALLENGED PUFFERY AND OPINIONS ARE NOT ACTIONABLE. ......... 11

III.    PLAINTIFF FAILS TO PLEAD FALSITY WITH PARTICULARITY......................... 13

IV.     PLAINTIFF FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER. ............... 18

        A.      Plaintiff's Scienter Allegations Are Deficient..................................................................19

        B.      The Non-Fraudulent Inference Is More Compelling.........................................................22

V.      PLAINTIFF FAILS TO ADEQUATELY ALLEGE LOSS CAUSATION..................... 24

VI.     PLAINTIFF FAILS TO ADEQUATELY ALLEGE SCHEME LIABILITY. ................ 24

CONCLUSION.................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Abbott Labs.*,
  140 F. Supp. 2d 894 (N.D. Ill. 2001) .................................................................................9, 11

*Arazie v. Mullane*,
  2 F.3d 1456 (7th Cir. 1993) .............................................................................................7

*In re Baxter Int'l Inc. Sec. Litig.*,
  2021 WL 100457 (N.D. Ill. Jan. 12, 2021) .................................................................. *passim*

*Benzon v. Morgan Stanley Distribs., Inc.*,
  420 F.3d 598 (6th Cir. 2005) ..........................................................................................25

*In re BISYS Sec. Litig.*,
  397 F. Supp. 2d 430 (S.D.N.Y. 2005) ...........................................................................21

*Cal. Pub. Emp. Ret. Sys. v. Chubb Corp.*,
  394 F.3d 126 (3d Cir. 2004) ...........................................................................................19

*Chandler v. Ulta Beauty, Inc.*,
  2022 WL 952441 (N.D. Ill. Mar. 30, 2022) ....................................................................8

*Chu v. Sabratek Corp.*,
  100 F. Supp. 2d 827 (N.D. Ill. 2000) .............................................................................21

*City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*,
  8 F.4th 592 (7th Cir. 2021) .........................................................................................7, 11

*In re Coca-Cola Enters. Inc. Sec. Litig.*,
  510 F. Supp. 2d 1187 (N.D. Ga. 2007) ..........................................................................15

*Conlee v. WMS Indus., Inc.*,
  2012 WL 3042498 (N.D. Ill. July 25, 2012) ..................................................................13

*Cozzarelli v. Inspire Pharm. Inc.*,
  549 F.3d 618 (4th Cir. 2008) ..........................................................................................19

*Davis v. SPSS, Inc.*,
  385 F. Supp. 2d 697 (N.D. Ill. 2005) .............................................................................11

*Desai v. Gen. Growth Props., Inc.*,
  654 F. Supp. 2d 836 (N.D. Ill. 2009) ..............................................................................9

*DiLeo v. Ernst & Young*,
 901 F.2d 624 (7th Cir. 1990) ........................................................................1

*Dura Pharms., Inc. v. Broudo*,
 544 U.S. 336 (2005)..............................................................................6, 24

*Eisenstadt v. Centel Corp.*,
 113 F.3d 738 (7th Cir. 1997) ........................................................................2

*Frankfurt-Tr. Inv. Lux. AG v. United Techs. Corp.*,
 336 F. Supp. 3d 196 (S.D.N.Y. 2018)..........................................................22

*Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.*,
 2011 WL 1303387 (N.D. Ill. Mar. 31, 2011)..................................15, 17, 18, 19

*Harris v. Ivax Corp.*,
 182 F.3d 799 (11th Cir. 1999) ....................................................................10

*Higginbotham v. Baxter Int'l Inc.*,
 495 F.3d 753 (7th Cir. 2007) ................................................................17, 19

*In re Initial Pub. Offering Sec. Litig.*,
 399 F. Supp. 2d 261 (S.D.N.Y. 2005)..........................................................24

*Johnson v. Tellabs, Inc.*,
 262 F. Supp. 2d 937 (N.D. Ill. 2003) ..........................................................11

*KBC Asset Mgmt. NV v. Discover Fin. Servs.*,
 2025 WL 976120 (N.D. Ill. Mar. 31, 2025)..................................................8, 9

*Maguire Fin., LP v. PowerSecure Int'l, Inc.*,
 876 F.3d 541 (4th Cir. 2017) ......................................................................19

*Marquez v. Bright Health Grp., Inc.*,
 755 F. Supp. 3d 266 (E.D.N.Y. 2024) ..........................................................21

*In re Midway Games, Inc. Sec. Litig.*,
 332 F. Supp. 2d 1152 (N.D. Ill. 2004) ........................................................11

*Omnicare v. Laborers Dist. Council Const. Ind. Pension Fund*,
 575 U.S. 175 (2015)....................................................................................12

*Patten v. N. Tr. Co.*,
 703 F. Supp. 2d 799 (N.D. Ill. 2010) ............................................................2

*Phoenix Ins. Co. v. ATI Physical Therapy, Inc.*,
 690 F. Supp. 3d 862 (N.D. Ill. 2023) ..........................................................12

*Pipefitters Local No. 636 Defined Benefit Plan v. Tekelec*,
   2013 WL 1192004 (E.D.N.C. Mar. 22, 2013) ........................................................19

*Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v.*
   *Allscripts-Misys Healthcare Sols., Inc.*,
   778 F. Supp. 2d 858 (N.D. Ill. 2011) ........................................................9

*Plumbers and Pipefitters Local Union v. Zimmer*,
   673 F. Supp. 2d 718 (S.D. Ind. 2009) ........................................................20, 22

*Pugh v. Tribune Co.*,
   521 F.3d 686 (7th Cir. 2008) ........................................................6, 22, 25

*Rossy v. Merge Healthcare Inc.*,
   169 F. Supp. 3d 774 (N.D. Ill. 2015) ........................................................17, 18

*Searls v. Glasser*,
   64 F.3d 1061 (7th Cir. 1995) ........................................................11

*SEC v. Lee*,
   720 F. Supp. 2d 305 (S.D.N.Y. 2010) ........................................................25

*SEC v. Rio Tinto plc*,
   41 F.4th 47 (2d Cir. 2022) ........................................................25

*Société Générale Secs. Servs., GbmH v. Caterpillar, Inc.*,
   2018 WL 4616356 (N.D. Ill. Sept. 26, 2018) ........................................................20, 21

*Stavros v. Exelon Corp.*,
   266 F. Supp. 2d 833 (N.D. Ill. 2003) ........................................................8, 9

*Teamsters Local 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*,
   83 F.4th 514 (6th Cir. 2003) ........................................................25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ........................................................2, 18, 22

*Van Noppen v. InnerWorkings, Inc.*,
   136 F. Supp. 3d 922 (N.D. Ill. 2015) ........................................................11

*Washtenaw Cnty. Emps.' Ret. Sys. v. Walgreen Co.*,
   2022 WL 614925 (N.D. Ill. Mar. 2, 2022) ........................................................9

*W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*,
   495 F. Supp. 3d 622 (N.D. Ill. 2020) ........................................................7, 12, 22

## Statutes/Regulations

15 U.S.C. § 78u-4 ........................................................1, 7, 13

15 U.S.C. § 78u-5 ................................................................................................................7, 8, 11

17 C.F.R. § 240.10b-5.................................................................................................................25

## INTRODUCTION

This is a classic case of fraud by hindsight that is all too "familiar in securities litigation." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). Plaintiff's Amended Complaint ("AC") tells a typical story of Defendants issuing optimistic statements concerning future operations, followed by earnings results that were below expectations, and then a predictable securities lawsuit claiming the difference "must be attributable to fraud." *Id.* Worse than most, this case is predicated almost entirely on challenging forward-looking statements, including financial guidance, which Plaintiff alleges were misleading due to vague operational challenges that purportedly "plagued" a strategic transition in the business of Defendant Methode Electronics, Inc. ("Methode" or the "Company"), the risks of which were fully disclosed to the market. Plaintiff contends that Methode and two of its former executives, Donald W. Duda ("Duda") and Ronald L.G. Tsoumas ("Tsoumas") (collectively, "Defendants"), "***assured*** the market that [] lost sales [from the transition] would be offset by higher margins" in the new strategic direction, AC ¶ 5 (emphasis added), but Defendants did no such thing. They issued forecasts—not guarantees—and the market knew that future results could differ materially from the projections.

The Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, was enacted to curb meritless stock-drop lawsuits like this one. Among other protections, the PSLRA provides a "safe harbor" protecting forward-looking statements where, as here, they were identified as forward-looking and accompanied by meaningful cautionary language. Even setting aside the safe harbor, the AC does not come close to meeting the PSLRA's heightened pleading requirements as to any challenged statement. Rather than plead with particularity the reasons why each challenged statement was materially false or misleading when made, as the PSLRA requires, the AC merely lists numerous challenged statements followed by a boilerplate paragraph describing vague "problems" or challenges that supposedly conflict with the challenged

statements—without providing any detail as to who knew what when, or how those purported problems show that the statements were false **when made**. *See, e.g.*, AC ¶¶ 50–54. The AC also falls well short pleading a "strong inference" that Defendants issued the statements with scienter.

Although Plaintiff attempts to bolster its deficient claims by referencing (i) an employment lawsuit filed by Mr. Duda's replacement, who served in his role as CEO for merely four months, and (ii) an SEC subpoena Methode received long after the putative class period, *see id.* ¶¶ 11–14, neither of these events cures Plaintiff's pleading deficiencies. In fact, Plaintiff makes no effort to plead how either event is remotely tied to any challenged statement, let alone how these post-class period events could possibly show that the challenged statements were false or misleading when made, and issued by Defendants with scienter at that time. As the Seventh Circuit has long held, "[h]indsight is not the test for securities fraud." *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 746 (7th Cir. 1997). The Court should apply the PSLRA's heightened standards and dismiss the AC.

## BACKGROUND

Methode "design[s], engineer[s] and produce[s]" mechatronic products "for Original Equipment Manufacturers ('OEMs') utilizing [a] broad range of technologies for user interface, light-emitting diode ('LED') lighting system, power distribution and sensor applications." AC ¶ 2; 2023 Form 10-K (Ex. 22) at 2.[1] Methode's business is organized in four segments: Automotive, Industrial, Interface, and Medical. AC ¶ 28. Methode's Automative Segment, traditionally its largest by percentage of net sales, "supplies electronic and electro-mechanical devices and related products to automobile OEMs[.]" AC ¶¶ 28–29; Ex. 22 at 2. The Automative Segment's "[p]roducts include integrated overhead and center consoles, hidden and ergonomic switches,

---

[1] In ruling on a motion to dismiss, the Court "must consider . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). This includes stock prices and SEC filings. *See, e.g., Patten v. N. Tr. Co.*, 703 F. Supp. 2d 799, 803 n.2 (N.D. Ill. 2010) (citation omitted).

transmission lead-frames, insert molded components, [and] LED-based lighting and sensors[.]" 2024 Form 10-K (Ex. 35) at 2. Methode manufactures these products in nine facilities across six countries, including a facility near Monterrey, Mexico. *Id*. at 16.

Methode built a successful track record that was driven, in part, by a contract it entered into with General Motors ("GM") in 2010, pursuant to which Methode designed and manufactured "integrated center stack" consoles for GM vehicles. AC ¶ 29. The GM contract was expected to represent over $100 million in revenue per year starting in fiscal year 2014, *id.* ¶ 30, but quickly exceeded those expectations. By the end of fiscal year 2016, Methode's shipments to GM represented 49.5% (or $400.5 million) of Methode's consolidated net sales. *See id*. Methode's business with GM continued to account for more than 40% of net sales in 2017 and 2018 but then declined to account for only 26.8% of net sales by 2020. *See id*.

The reason for the decline was a change in the automotive environment. "Specifically, car manufacturers had begun using fewer designs featuring traditional buttons and knobs and instead [began using] displays with control functions integrated into the display itself, such as touchscreen infotainment applications." *Id.* ¶ 31. In the face of this transition in the automotive industry it serves, Methode took action to retool its Automotive Segment, "shift[ing] . . . production away from a relatively low mix, high volume production of relatively standardized center consoles for a few vehicle manufacturers such as GM, to a high mix, low volume production of more specialized components" designed "for a wider variety of vehicle manufacturers, in particular manufacturers of electric vehicles, or EV." *Id.* That included "retooling [Methode's] Monterrey facility" to "service new EV program awards." *Id.* ¶ 35.

The Company understood that this transition in the industry and, by extension, in its Automotive Segment came with significant risk. For this reason, throughout the putative class

period, Methode worked to keep investors apprised of its progress as well as the risks involved. For example, Methode regularly provided investors with updates regarding the diversification of its customer base, detailing new business awards and its progress in advancing in the EV space. *See*, *e.g.*, AC ¶¶ 51, 52, 55, 59, 64. At the same time, however, Methode cautioned investors that its new business awards were not guarantees of future performance. To the contrary, the Company explained that "the full launch timing of most of these programs could be anywhere in the range of 1 to 3 years" from the announcements. *See*, *e.g.*, June 23, 2022, Earnings Call (Ex. 11) at 5.[2] And even then, the contracts with customers did not assure future revenue: "We generally receive volume estimates, but not firm commitments from our customers, and may experience reduced or extended lead times in customer orders. Customers may cancel orders, change production quantities and delay production for a number of reasons." 2022 Form 10-K (Ex. 9) at 9.

Those were just some of the risks. The Company also regularly disclosed that:

- "Our inability, or our customers' inability, to effectively manage the timing, quality and cost of new program launches could adversely affect our financial performance." *Id*. at 8;

- "Our businesses and the markets in which we operate are highly competitive and constantly evolving. If we are unable to compete effectively, our sales and profitability could decline." *Id.* at 8;

- "Our ability to market our automotive and commercial vehicle products is subject to a lengthy sales cycle, which requires significant investment prior to reporting significant sales revenues, and there is no assurance that our products will be implemented in any particular vehicle." *Id.*;

- "We manage our business based on projected future sales volume, which is highly dependent on information received from customers and general market data, and any inaccuracies or changes in such information could adversely affect our business, results of operations and financial condition." Ex. 22 at 10;

- "The rate of adoption of EV's will have a significant impact on our business and

---

[2] *Accord* Sept. 7, 2023, Earnings Call (Ex. 29) at 5; June 22, 2023, Earnings Call (Ex. 25) at 5; Mar. 9, 2023, Earnings Call (Ex. 21) at 5; Dec. 1, 2022, Earnings Call (Ex. 18) at 5; Sept. 1, 2022, Earnings Call (Ex. 15) at 5; Mar. 3, 2022, Earnings Call (Ex. 8) at 5.

the adoption cadence will inject additional variability to our forecasts." *Id.* at 11; and

- ▪ "Our inability to attract or retain key employees and a highly skilled workforce may have an adverse effect on our business, financial condition and results of operations." Ex. 9 at 7.

*See also id.* at 1, 5–13.[3] These execution risks, moreover, were compounded by the risks attendant to the COVID-19 pandemic, which Methode also disclosed throughout the class period. *See* 2021 Form 10-K (Ex. 3) at 6; Ex. 9 at 6; Ex. 22 at 6.

Despite the significant transition in the Company's Automotive Segment and the uncertainty associated with the pandemic, the Company continued to provide certain forward-looking forecasts to investors, including projected financial guidance for 2022 and 2023, *see*, *e.g.*, AC ¶¶ 50, 55, 58, and a three-year organic Compound Annual Growth Rate ("CAGR") target of 6% that was initially set in June 2022, *see id.* ¶¶ 38, 58. This forward-looking guidance was, of course, subject to the significant risk factors highlighted by the Company. And, as Defendants made clear, the guidance was "based on management's best estimates" at the time it was given and "[e]xternal events and the related potential impact on [the Company's] financial results remain[ed] an ongoing challenge." *See*, *e.g.*, Dec. 2, 2021, Earnings Call (Ex. 5) at 6–7.[4]

As the Company proceeded through the transition in its Automotive Segment, certain risks of which it had previously warned investors materialized, including an "unexpected early sunsetting of an EV program in fiscal 2024 due to a change in technology by the customer" (AC ¶ 88), a softening of near-term market demand and timing for the adoption of EVs (Dec. 7, 2023, Earnings Call (Ex. 32) at 5), and operational issues, including labor and vendor challenges (AC ¶¶

---

[3] *Accord* 2021 Form 10-K (Ex. 3) at 1, 6–13; Ex. 9 at 1, 5–13; Dec. 7, 2023, Form 10-Q (Ex. 30) at 25; Sept. 7, 2023, Form 10-Q (Ex. 26) at 22; Mar. 9, 2023, Form 10-Q (Ex. 19) at 24; Dec. 1, 2022, Form 10-Q (Ex. 16) at 22; Sept. 1, 2022, Form 10-Q (Ex. 13) at 20; Mar. 3, 2022, Form 10-Q (Ex. 6) at 23.

[4] *Accord* Mar. 3, 2022, Earnings Call (Ex. 8) at 7; Sept. 7, 2023, Earnings Call (Ex. 29) at 7.

103, 115). The Company took steps to revise its forward-looking guidance to account for the changing circumstances and their anticipated future impacts along the way. *See, e.g., id.* ¶¶ 81, 88, 91, 103, 115. On March 7, 2024, however, based on continued "operational challenges, the evolving market headwinds and [the] recent appointment" of a new CEO, Methode made the decision to suspend its forward-looking financial guidance, including the three-year 6% CAGR target. *See* Mar. 7, 2024, Earnings Call (Ex. 34) at 5; *see also* AC ¶¶ 8, 122–25.

Methode's stock price decreased following the March 7, 2024, announcement, and this putative securities class action predictably followed, with Plaintiff alleging that the announcement revealed that Defendants' prior statements concerning the transition were false or misleading. *See, e.g.,* AC ¶ 170. Plaintiff alleges that, during the class period of December 2, 2021, to March 6, 2024, Defendants made false or misleading statements in violation of Section 10(b) and 20(a) of the Securities Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## ARGUMENT

A claim under Section 10(b) and Rule 10b-5 has six elements: (1) a material misrepresentation or omission of a material fact; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005). A Section 20(a) control person claim likewise requires Plaintiff to first plead a predicate Section 10(b) violation. *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008).

As the Court is aware, Plaintiff's claims are subject to a heightened pleading standard under Rule 9(b) and the PSLRA. *See In re Baxter Int'l Inc. Sec. Litig.*, 2021 WL 100457, at *10 (N.D. Ill. Jan. 12, 2021). To satisfy the PSLRA, Plaintiff must: "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity

all facts on which that belief is formed," 15 U.S.C. § 78u-4(b)(1); and "state with particularity facts giving rise to a strong inference" that each defendant acted with scienter, *id.* § 78u-4(b)(2)(A), defined as intent to defraud or severe recklessness. *Baxter*, 2021 WL 100457, at *10.[5] Plaintiff fails to meet those requirements here.[6]

## I.   THE SAFE HARBOR PROTECTS THE CHALLENGED FORWARD-LOOKING STATEMENTS.

The "[s]ecurities laws encourage companies to make public predictions of future performance to assist investors in estimating a firm's future value." *City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*, 8 F.4th 592, 595 (7th Cir. 2021). The "Exchange Act does not demand perfection from forecasts, which are inevitably inaccurate." *Id.* Indeed, even "[i]f all estimates are made carefully and honestly, half will turn out too favorable to the firm and the other half too pessimistic." *Arazie v. Mullane*, 2 F.3d 1456, 1466 (7th Cir. 1993). Either way, "the difference may disappoint investors, who can later say that they bought for too much (if the projection was optimistic) or sold for too little (if the projection turns out to be too pessimistic)." *Id.* To prevent plaintiffs from asserting securities claims whenever a forward-looking statement does not pan out, the PSLRA provides a safe harbor that insulates such statements from liability. Specifically, the PSLRA protects Defendants from claims based on forward-looking statements where the challenged statements: (i) were identified as forward looking and accompanied by meaningful cautionary language; (ii) are immaterial; **or** (iii) were not made with actual knowledge of falsity. *See* 15 U.S.C. § 78u-5(c).[7] Those protections apply here.

---

[5] Unless otherwise indicated, internal citations and quotations are omitted and any emphasis is added.

[6] For the Court's convenience, attached as Exhibit 1 is a chart that lists the challenged statements and Defendants' grounds for dismissal as to each.

[7] The safe harbor "is disjunctive" in that it provides three independent, alternative means of inoculating forward-looking statements. *See W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 654 (N.D. Ill. 2020).

## A.    Plaintiff Challenges Numerous Forward-Looking Statements.

The PSLRA defines "forward-looking statements" to include, *inter alia*, "a statement of the plans and objectives of management for future operations," "a statement of future economic performance," and "any statement of the assumptions underlying or relating to" any such statement. 15 U.S.C. § 78u–5(i)(1). Tense is not dispositive; "a statement phrased in the present tense can still be forward-looking if it conveys a prediction." *KBC Asset Mgmt. NV v. Discover Fin. Servs.*, 2025 WL 976120, at *12 (N.D. Ill. Mar. 31, 2025).

Here, many of the statements Plaintiff challenges fall squarely within that definition. For example, Plaintiff challenges financial projections issued by the Company, including its annual financial guidance (*see, e.g.*, AC ¶¶ 58, 63, 71, 76, 81, 88), and its projected three-year CAGR target. *See, e.g., id.* ¶¶ 60, 63, 73, 77, 78, 82. Plaintiff also challenges certain accompanying forward-looking commentary, including statements supporting and explaining the Company's projections,[8] growth prospects,[9] future business initiatives,[10] and outlook for operations.[11]

These statements are all forward looking under the safe harbor. *See, e.g., Chandler v. Ulta Beauty, Inc.*, 2022 WL 952441, at *9 (N.D. Ill. Mar. 30, 2022) (verb "expects" renders a statement "forward-looking and aspirational"); *Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 843 (N.D. Ill.

---

[8] *E.g.*, AC ¶ 61 ("[T]he [CAGR target] was "based on the strong bookings we have realized over the past 2 fiscal years . . . ."); *id.* ¶ 82 (the Company's "path to [CAGR] target will not be linear").

[9] *E.g.*, AC ¶ 58 ("[W]e expect continued sales growth as well as renewed earnings growth in fiscal 2023."); *id.* ¶ 52 (similar); *id.* ¶ 59 ("The EV market growth trend and our exposure continues to be robust."); *id.* ¶ 72 ("[I]t was a very successful quarter for awards that will drive organic sales growth in future years."); *id.* ¶ 73 (similar); *id.* ¶ 78 (similar); *id.* ¶ 82 (Company had "a very strong pipeline in front of us").

[10] *E.g.*, AC ¶ 66 ("We were investing a lot of capital to increase our capabilities and capacity . . . ."); *id.* ¶ 83 ("[W]e will be making investments and launching . . . new programs in fiscal 2024"); *id.* ¶ 91 (similar); *id.* ¶ 93 (similar).

[11] *E.g.*, AC ¶ 60 ("[W]e are confident in our strategy and our award pipeline continues to be robust"); *id.* ¶ 77 ("[T]he pipeline of future awards remains robust."); *id.* ¶ 108 ("very confident that they're going to see an uptick in their business"); *id.* ¶ 85 (similar); *id.* ¶ 117 ("firmly believe that our business model is healthy and is positioned to prosper from the strategic direction that we have taken.").

8

2003) ("statements . . . regarding [a company's] ability to meet its . . . EPS target squarely f[e]ll into the PSLRA's definition of forward-looking statements"); *Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894, 902, 906 (N.D. Ill. 2001), *aff'd*, 269 F.3d 806 (7th Cir. 2001) (use of "expect" resulted in "a clearly forward-looking statement").

### B. Meaningful Cautionary Language Accompanied Each Statement.

Each challenged forward-looking statement also was identified as such and accompanied by meaningful cautionary language. To be sure, "[t]he PSLRA does not require the *most* helpful caution, nor does it require a company to reveal in detail what could go wrong." *Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.*, 778 F. Supp. 2d 858, 874 (N.D. Ill. 2011). "In fact, the language need not explicitly refer to the risk that ultimately caused the projection to differ from the actual results[.]" *Stavros*, 266 F. Supp. 2d at 843. Cautionary statements only need "to point to the principal contingencies that could cause actual results to depart from projections." *Plumbers*, 778 F. Supp. 2d at 874.

When "determin[ing] whether the [challenged] statements were accompanied by meaningful cautionary language," courts "consider statements made in SEC filings." *Washtenaw Cnty. Emps.' Ret. Sys. v. Walgreen Co.*, 2022 WL 614925, at *2 (N.D. Ill. Mar. 2, 2022). That is because cautionary statements within SEC filings are part of the total mix of information informing the market and "must be treated as if attached to every one of [defendants'] oral and written statements[,]" particularly where, as here, the Company specifically referred to those risks in its public filings and earnings calls. *See KBC Asset Mgmt.*, 2025 WL 976120 at *14; *see also Desai v. Gen. Growth Props., Inc.*, 654 F. Supp. 2d 836, 844 (N.D. Ill. 2009).

Applying these principles to this case, the challenged forward-looking statements were accompanied by meaningful cautionary language. Methode disclosed extensive risk factors concerning the inherent uncertainty associated with: (1) its financial projections; (2) the "[i]mpact

9

[of] the COVID-19 pandemic"; (3) the Company's "[d]ependence on a small number of large customers, including one large automotive customer"; (4) the "[t]iming, quality, and cost of new program launches"; (5) the risks associated with the "[f]ailure to attract and retain qualified personnel"; (6) the "[a]bility to keep pace with rapid technological changes"; (7) the "[a]bility to compete effectively"; and a litany of other factors that could cause results to materially differ from the forward-looking statements. *See* Ex. 3 at 1, 6–13.[12]

The Company further disclosed numerous other risks associated with its strategic business transition, including cautioning that "new program launches require a significant ramp up of costs," yet "sales related to these new programs generally are dependent upon the timing and success of [the] customers' introduction of new products[,]" that financial results could be materially impacted if Methode was "unable to launch new products in a timely and cost-effective manner," or if "EV adoption rates in general and the take rate experienced by each of [its] OEM customers" varied from the assumptions in the Company's forecasts. Ex. 22 at 8, 11. In fact, although unnecessary to invoke the safe harbor, Methode warned of precisely the risks that Plaintiff alleges came to pass and that caused the decline in Methode's stock price, including the risk of labor shortages and the uncertainty with meeting financial projections. *See id.* That requires dismissal of the challenged forward-looking statements. *See Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999) ("When an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward.").

## C.   The Second And Third Prongs Of The Safe Harbor Also Apply.

Even if the forward-looking statements were not accompanied by meaningful cautionary

---

[12] *Accord* Ex. 9 at 1, 5–13; Ex. 22 at 1, 5–15; Ex. 30 at 25; Ex. 26 at 22; Ex. 19 at 24; Ex. 16 at 22; Ex. 13 at 20; Ex. 6 at 23.

language, they would be protected under the second and third prongs of the safe harbor. Many of the forward-looking statements are immaterial, 15 U.S.C. § 78u-5(c)(1)(A)(ii), as explained in Section II. And Plaintiff fails to plead facts showing that any Defendant had actual knowledge that any statement was false when made, *id.* 78u-5(c)(1)(B)(i), as explained in Section IV.

## II.    THE CHALLENGED PUFFERY AND OPINIONS ARE NOT ACTIONABLE.

A number of the challenged statements are inactionable because they amount to no more than corporate puffery. "[P]utting a 'rosy face on an inherently uncertain process' is not actionable [securities] fraud and, in fact, investors expect no less from a publicly-held company." *Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 711 (N.D. Ill. 2005) (citation omitted). "Courts [therefore] consistently hold that mere puffery and glowing representations of expected boom are not enough to state claims under the Exchange Act." *Johnson v. Tellabs, Inc.*, 262 F. Supp. 2d 937, 951 (N.D. Ill. 2003) (quotation omitted); *see also City of Taylor Police & Fire Ret. Sys.*, 8 F.4th at 595.

Puffery refers to "loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1164 (N.D. Ill. 2004); *see also Searls v. Glasser*, 64 F.3d 1061, 1066–67 (7th Cir. 1995) (use of phrase "recession-resistant" and promises of "high" level of "disposition gains" constituted puffery); *Abbott Labs.*, 140 F. Supp. 2d at 902 (suggestions that company was an industry leader and had grown in certain market segments constituted puffery). And, while it can take many forms, "four categories of puffery [are particularly] relevant here: (1) indefinite predictions of growth; (2) optimistic rhetoric and hype; (3) subjective statements; and (4) vague statements." *Van Noppen v. InnerWorkings, Inc.*, 136 F. Supp. 3d 922, 940 (N.D. Ill. 2015).

The AC challenges numerous such statements, including those touting Methode's "solid sales" or "strong performance." AC ¶ 50; *see also id.* ¶ 51 ("another solid quarter of business

11

awards"); *id.* ¶ 53 (Methode "pleased with the bookings"); *id.* ¶ 55 (emphasizing "solid sales" and "strong award bookings"); *id.* ¶ 56 (vaunting "a very strong quarter"); *id.* ¶ 59 (similar); *id.* ¶¶ 61, 65, 72–73, 76, 78, 92 (referring to "strong bookings" and "strong quarter[s]"). Other puffing statements abound. *See id.* ¶ 60 (Methode's "business model . . . not just healthy, but . . . prospering"); *id.* ¶¶ 77, 92, 117 (same); *id.* ¶ 79 (Methode "has done a great job," is "in a good spot," and was "getting some good looks"); *id.* ¶¶ 60, 77, 82, 85, 91, 93 (touting "strong pipeline"). These "adjective-laden statements are too vague and unverifiable" to be misleading. *See Phoenix Ins. Co. v. ATI Physical Therapy, Inc.*, 690 F. Supp. 3d 862, 877–78 (N.D. Ill. 2023) (noting that "intrinsically vague terms" describing the company's compensation model as "competitive," "superior," and "favorable" "would alert any reasonable investor that puffery is at play"); *see also Conagra*, 495 F. Supp. 3d at 653 (boasting about "robust innovation" was vague and inactionable).

Other statements challenged by Plaintiff are inactionable for a different-but-related reason: they are opinions. Opinions are only actionable where they are not sincerely held, or where they "omit[] material facts about [Defendant's] inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself." *Phoenix Ins.*, 690 F. Supp. 3d at 882–83. Still, "[n]ot *every* fact contradicting an opinion must be disclosed," *id.*, because "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts; indeed, the presence of such facts is one reason why an issuer may frame a statement as an opinion, thus conveying uncertainty." *Omnicare v. Laborers Dist. Council Const. Ind. Pension Fund*, 575 U.S. 175, 189–90 (2015).

Here, Plaintiff challenges a host of opinions that cannot form the basis of any claim. *See, e.g.*, AC ¶¶ 50, 52 67–68, 74, 79, 107–08. Plaintiff alleges no particular facts to support an inference that the speakers did not honestly hold their professed beliefs. And, with respect to any

alleged omission, all of these opinions must be understood within the context of contemporaneous SEC filings that provided a slew of risk factors no reasonable investor would ignore. *See supra* at 4–5, 9–10. These opinions are not actionable under the Exchange Act or Rule 10b-5.

## III.    PLAINTIFF FAILS TO PLEAD FALSITY WITH PARTICULARITY.

The AC also fails for the independent reason that Plaintiff does not plead *with particularity* facts showing that any challenged statement was false or misleading *at the time it was made*, as the PSLRA requires. Fed. R. Civ. P. 9(b); 15 U.S.C. § 78u-4(b)(1). Rather than abide by the statutory mandate, the AC recites a litany of statements and then repeats one omnibus paragraph alleging that the "statements referenced in [several paragraphs before] were materially false and misleading when made" for a list of equally generic reasons. *See, e.g.*, AC ¶¶ 54, 57, 62, 70, 75, 80, 87, 97, 99. Because this approach makes it virtually impossible to know which allegations of fact are intended to support which claim(s) for relief, the AC can and should be dismissed on this ground alone. *See Conlee v. WMS Indus., Inc.*, 2012 WL 3042498, at *4 (N.D. Ill. July 25, 2012) ("A puzzle pleading, courts have stated, improperly place[s] the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts.").

Puzzle pleading aside, at its core, Plaintiff's verbose 201-paragraph AC boils down to four theories that the challenged statements were false because: (1) "the Company had lost highly skilled and experienced employees . . . who were necessary to successfully complete the Company's transition"; (2) "the Company's attempts to replace its GM center console production with more diversified, specialized products for a wider array of vehicle manufacturers and OEMs . . . had been plagued by production planning deficiencies, inventory shortages, vendor and supplier problems"; (3) "the Company's manufacturing systems at its critical Monterrey facility suffered from a variety of logistical defects"; and (4) "Methode had fallen substantially behind on the launch of new EV programs out of its Monterrey facility, preventing the Company from timely

13

receiving revenue from new EV program awards." *See*, *e.g.*, AC ¶ 99.

As an initial matter, Plaintiff fails to allege how the challenged statements could possibly have been rendered false or misleading under any of these theories. For example, Plaintiff challenges a number of statements that merely report financial results or the amount of new programs awarded during a particular quarter, none of which is alleged to be false. *See*, *e.g.*, AC ¶ 55 ("Company was awarded new programs with expected annual sales of over $100 million."); *see also id.* ¶¶ 56, 58–59, 91. Plaintiff also challenges statements reporting management's identification of a material weakness in its control environment. *See id.* ¶ 98. And Plaintiff challenges statements concerning how the new business awards (exceeding $600 million) were expected to offset the loss of GM business (estimated at $150M). *See id.* ¶ 91; *see also* Ex. 25 at 5 ("Since the beginning of fiscal year 2021, we have won approximately $600 million in EV awards"); *id*. at 10 ("So the program roll-offs, in total, we would expect around $150 million"). Yet Plaintiff never explains how these statements were false—and a review of Plaintiff's boilerplate paragraph of "omissions" provides no answer.

Moreover, Plaintiff alleges no contemporaneous facts demonstrating with particularity why any challenged statement was false or misleading ***at the time it was made***. Precisely when did the Company lose "highly skilled and experienced employees"? AC ¶ 99(a). Precisely when did the Company experience "production planning deficiencies, inventory shortages, vendor and supplier problems"? *Id.* ¶ 99(b). Precisely when did the Monterrey facility suffer from "logistical defects"? *Id.* ¶ 99(c). Precisely when did the Company "fall[] substantially behind on the launch of new EV programs"? *Id.* ¶ 99(d). The AC provides no such details, without which the Court cannot possibly find that the challenged statements were false at the time they were made.

Also missing from the AC are ***any*** facts regarding what was known by Defendants about

these alleged issues, how the alleged issues became known by Defendants, or when. Completely absent from Plaintiff's allegations is any reference to any internal documents, reports, meetings, conversations, tips, emails, or other information that was provided to or known by Defendants about the alleged operational issues. Without alleging such contemporaneous facts, Plaintiff cannot demonstrate that the challenged statements were false at the time they were made. *See*, *e.g.*, *Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.*, 2011 WL 1303387, at *21 (N.D. Ill. Mar. 31, 2011) (plaintiff failed to "identify any information known to [the defendant] . . . that suggests that he knew that his statement . . . was untrue at the time that he made it"); *In re Coca-Cola Enters. Inc. Sec. Litig.*, 510 F. Supp. 2d 1187, 1195 (N.D. Ga. 2007) (must plead like "a newspaper story: 'the who, what, when, where and how'").

Realizing it cannot point to any contemporaneous facts demonstrating that the challenged statements were false at the time they were made, Plaintiff attempts to rely on fraud by hindsight by pointing to after-the-fact statements containing the Company's retrospective analyses of issues experienced by the Company during its business transformation. *See*, *e.g.*, AC ¶¶ 8, 116, 146–50. But, contrary to Plaintiff's assertions, the so-called "admissions" do not demonstrate that the challenged statements were false when made. Plaintiff highlights Mr. Duda's September 7, 2023, statement that problems at the Monterrey facility involved "latent operating inefficiencies that our early warning detected ***but we failed to mitigate***." *Id.* ¶ 147. According to Plaintiff, this *must* mean that the earlier challenged statements were false and misleading because the problems at the Monterrey facility were not disclosed sooner. But Plaintiff's strained interpretation of Mr. Duda's statement is simply not viable, particularly when the statement is considered in its proper context.

Plaintiff conveniently omits that Mr. Duda noted ***in the very next sentence*** that the Company experienced certain issues due to "a delay in visibility of a problem." *See* Ex. 29 at 5;

15

*see also* AC ¶ 104. Even worse, Plaintiff quotes Mr. Duda's response to an analyst question during that same earnings call regarding whether the Company had visibility about these issues "when [it] last gave guidance in late June." AC ¶ 148. As Plaintiff acknowledges, Mr. Duda made clear that "[t]he magnitude" of the issues "didn't become apparent until July" 2023 and that it was only when the Company went "back and [did] a postmortem on it" that they determined that "there [were] issues." *Id.* Consistent with Mr. Duda's statement, the Company's related disclosures concerning the operating inefficiencies Plaintiff relies upon show that these issues were ***not*** identified until the quarters in which they were timely disclosed and thus cannot show any earlier misstatement. *See, e.g.*, Dec. 7, 2023, Form 8-K (Ex. 31), Exhibit 99.1 at 1 ("In addition to the lower sales, operational inefficiencies in our North American Auto operations, ***that were identified last quarter***, continued to drive higher premium freight, labor, and material costs."); *see also id.* at 2 ("The higher freight and labor costs resulted from the operational inefficiencies in North America that ***arose in the fiscal first quarter and carried over to the second fiscal quarter*** as previously communicated by the company."); Mar. 7, 2024 Form 8-K (Ex. 33), Exhibit 99.1 at 2–3 (loss was "primarily due to lower sales volume and costs resulting from the operational inefficiencies . . . that ***occurred in the first and second fiscal quarters and continued in the third fiscal quarter***").

Plaintiff's citation to Mr. Duda's December 7, 2023, statement that the issues impacting the Monterrey plant "probably existed prior to this fiscal year [2024]," AC ¶ 149, fares no better. Not only does this statement represent *nothing* more than Mr. Duda's retrospective analysis, but there is no detail by which the Court can infer either *when* the problems began or surfaced to Defendants. As with the prior statement, context matters. Mr. Duda explained during the same call that while "these issues probably existed prior to this fiscal year, . . . ***they were masked by very***

*high inventory in certain areas*." *Id.* ¶ 116 (emphasis added). As Mr. Duda further explained, these previously "masked" issues were only later identified when Methode "tr[ied] to lean out [its] operations, [and] brought inventory down"; "sometimes [when] you lower the pond, you find the rocks, but we found boulders." *Id.* Mr. Duda was clear that these operational inefficiencies were not identified until the Company's fiscal Q1 2024, after which they were timely disclosed. *See* Ex. 32 at 3 ("Also in the quarter, we continued to experience operational inefficiencies in our North American Auto operations *that manifested in the first quarter*."). In short, there were no "admissions" that Defendants knew of the alleged operational inefficiencies earlier but failed to disclose them.

But even if such admissions did exist, Plaintiff cannot rely on after-the-fact statements to *infer* that earlier statements were false or misleading at the time they were made; rather, Plaintiff must point to particularized, contemporaneous facts showing Defendants knew the challenged statements were false when made. *See Anixter*, 2011 WL 1303387, at *22 ("It is not apparent to the Court that [the] later statement is an 'admission' that [the company] was aware (yet failed to disclose) [the problems]. Regardless, post-class period allegations are no substitute for facts showing contemporaneous knowledge of a statement's falsity."); *see also Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 759–60 (7th Cir. 2007) ("no fraud by hindsight").

Nor do the statements allegedly made by two confidential witnesses[13] demonstrate the falsity of the challenged statements. As an initial matter, it is unclear what, if anything, "CW2" adds given that CW2 was "not in the Automotive Segment." AC ¶ 46. That CW2 believed there

---

[13] "[A]s the Seventh Circuit has repeatedly admonished, information obtained from confidential witnesses is generally subject to a 'discount' that it has alternately characterized as 'steep' and 'heavy.' . . . As the court explained in *Higginbotham*, '[i]t is hard to see how information from anonymous sources could be deemed "compelling" or how we could take account of plausible opposing inferences. Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist.'" *Rossy v. Merge Healthcare Inc.*, 169 F. Supp. 3d 774, 782 (N.D. Ill. 2015) (quoting *Higginbotham*, 495 F.3d at 757).

was "turnover and short-staffing in the PSG segment" (*id.*), reveals nothing about the falsity of the challenged statements, all of which relate to the Automotive Segment. And CW1's allegation that "there were high levels of turnover amongst leadership at the Monterrey facility" is vague and anecdotal at best. Perhaps most significantly, however, the confidential witness allegations "reveal nothing about any defendant's knowledge or state of mind." *Rossy*, 169 F. Supp. 3d at 782.

Finally, Plaintiff points to certain post-class period events in an attempt to allege falsity, including Mr. Tsoumas's departure from the Company; the Company's July 11, 2024, announcement of a material weakness in its internal controls over financial reporting; the departure of Mr. Duda's successor and allegations in a subsequent lawsuit he filed against the Company alleging that he was "induced . . . to accept employment as CEO based on . . . misrepresentations about the financial health of the [C]ompany"; and the Company's announcement that it had received a subpoena from the SEC. AC ¶¶ 127, 131–32, 139. But Plaintiff fails to connect these post-class period events to the alleged fraud. For example, Plaintiff alleges that Mr. Tsoumas "retired" from the Company, but fails to allege any facts explaining how his retirement shows that any statement was false or misleading when made. AC ¶ 127. None of these post-class period developments can make up for the complete lack of "facts showing contemporaneous knowledge of a statement's falsity" in the AC. *Anixter*, 2011 WL 1303387, at *22.

## IV.    PLAINTIFF FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER.

The AC is further subject to dismissal because Plaintiff has not alleged facts giving rise to a strong inference of scienter that is "more than merely plausible or reasonable," but rather is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 309. "Alleging that a defendant *should have known* about fraud is not enough to show that the defendant was reckless." *Baxter*, 2021 WL 100457, at *11. Rather, the PSLRA requires Plaintiff to "satisfy a heightened standard of plausibility in pleading scienter." *Id.* To meet this

standard, "the Court must account for plausible, nonculpable explanations for the defendant's conduct and weigh them against the strength of the inferences in favor or scienter." *Id.* "Cobbling together a litany of inadequate allegations does not render those allegations particularized in accordance with Rule 9(b) or the PSLRA." *Cal. Pub. Emp. Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 155 (3d Cir. 2004).

Nowhere in its 81-page complaint does Plaintiff connect the dots and plead with any degree of particularity what Defendants knew, when they knew it, and why they should have disclosed it. Instead, Plaintiff's theory depends on drawing inferences the AC's allegations do not warrant, and then inferring scienter based on these unfounded inferences. Courts have rejected just this sort of circular logic, which amounts to nothing more than fraud by hindsight. *See, e.g., Pipefitters Local No. 636 Defined Benefit Plan v. Tekelec*, 2013 WL 1192004, at *13 (E.D.N.C. Mar. 22, 2013) (rejecting "'circular logic' that because a company later disclosed adverse news, executives must have known about the adverse news before it was disclosed"); *Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 550 (4th Cir. 2017) ("That the . . . contract eventually did reduce. . . profitability is not evidence that the risk of diminished profitability was known beforehand."); *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 627 (4th Cir. 2008) ("Speculation by investors and subsequent buyers' remorse cannot support an Exchange Act suit alone.").

## A.     Plaintiff's Scienter Allegations Are Deficient.

Plaintiff contends that scienter can be inferred here for five reasons. It is wrong as to each. *First*, Plaintiff attempts to rely on so-called "admissions" by the Defendants that the "issues were pre-existing during the Class Period," but "not disclosed to investors." AC ¶¶ 146–50. But, as discussed above, the "admissions" highlighted by Plaintiff establish no such thing. And there is no securities fraud by hindsight, in any event. *See, e.g., Higginbotham*, 495 F.3d at 759–60; *see also Anixter*, 2011 WL 1303387, at *30 ("If Plaintiff[] could identify contemporaneous information

known to Defendants that showed that [the company's] current financial health or future prospects was poorer than what Defendants disclosed . . ., such post-class period statements may be relevant to corroborate and build on the inference of scienter raised by the possession of that contemporaneous information. . . . But on their own, the post-class period statements . . . do not help establish a 'strong' or 'cogent' inference of scienter.").

*Second*, Plaintiff attempts to rely on the "core operations" doctrine. AC ¶¶ 151–54. Under that doctrine, "officers of a company can be assumed to know of facts critical to a business's core operations or to an important transaction that would affect a company's performance." *Baxter*, 2021 WL 100457, at *13 ("'core operations' inference generally will not establish a strong inference of scienter by itself"). But even assuming Defendants were "intensely focused" on the "Company's historic reliance on GM and toward new EV program awards" (AC ¶ 153), "it does not necessarily follow that they disbelieved their statements or sought to deceive investors with their statements." *Société Générale Secs. Servs., GbmH v. Caterpillar, Inc.*, 2018 WL 4616356, at *8 (N.D. Ill. Sept. 26, 2018). Nor can Plaintiff rely on its CWs. AC ¶ 152. "Plaintiff must allege actual knowledge by the defendant, not some second-hand belief that such knowledge existed." *Plumbers and Pipefitters Local Union v. Zimmer*, 673 F. Supp. 2d 718, 747 (S.D. Ind. 2009) (noting lack of "any contact or communication between [the CW] and . . . [d]efendants").

*Third*, Plaintiff points to so-called "suspicious" executive departures "during and soon after the Class Period," including Messrs. Khoury, Duda, Avula, and Tsoumas, and then alleges in conclusory terms that these executives were "connected to the problems unfolding at the Company's Monterrey facility." AC ¶ 155. But Plaintiff does not plead ***any*** specific facts demonstrating how Defendants' departures were connected to the alleged fraudulent statements. Indeed, all Plaintiff alleges is that Mr. Tsoumas "retired" from the Company and that Mr. Duda

20

"resigned . . . and subsequently retired" (after serving as CEO for twenty years and when his expected retirement had already been announced). AC ¶ 10; *see also* Aug. 31, 2023, Form 8-K (Ex. 27). There are any number of reasons why an executive might resign, most of which are not related to fraud. *See*, *e.g.*, *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 446 (S.D.N.Y. 2005) (resignations did not support inference of scienter). Where, as here, Plaintiff fails to allege any connection between Defendants' departures and the alleged fraud, such allegations cannot support scienter. *See*, *e.g.*, *Marquez v. Bright Health Grp., Inc.*, 755 F. Supp. 3d 266 (E.D.N.Y. 2024).

*Fourth*, Plaintiff highlights Defendants' financial and business experience. *See* AC ¶¶ 156–57. Plaintiff fails to allege how this experience establishes scienter, and instead simply states that the Defendants are experienced executives with long tenures at the Company. But these "senior positions . . . do not suggest scienter without additional support from internal documents or communications." *Société Générale*, 2018 WL 4616356, at *8; *see also Chu v. Sabratek Corp.*, 100 F. Supp. 2d 827, 837 (N.D. Ill. 2000) ("status as an officer. . ., without more, does not give rise to a strong inference" of scienter). Otherwise, the PSLRA would be useless, as scienter would be easily established in every case.

*Finally*, Plaintiff argues that "the promise of [incentive] compensation gave Defendants a personal financial motive to pay close attention to the stock price and keep it artificially inflated." AC ¶¶ 158–60. But the "incentive programs under which [Defendants] received their compensation appear to be performance-based compensation plans that 'are typical of nearly every corporation,'" and "that [Defendants] were compensated more under such plans if the [C]ompany performed better establishes little, if anything, in the way of scienter." *Baxter*, 2021 WL 100457, at *16. "The desire to increase the value of a company and attain the benefits that results . . . are basic motivations not only of fraud, but of running a successful corporation." *Id.* "[I]f courts

accepted the motive to reap higher compensation as sufficient to establish *scienter*, most corporate executives would be subject to such allegations, and the heightened pleading requirements . . . would be meaningless." *Id.*

Here, "Plaintiff has not alleged that Defendants were, in fact, motivated by their compensation structure to obfuscate; neither was there anything 'unusual' about Defendants' situations that would give rise to a finding that they had a heightened motive to act with scienter in their public statements." *Zimmer*, 673 F. Supp. 2d at 748. And, notably, Plaintiff does not allege that Defendants sold any stock at the allegedly artificially inflated prices, which "further weighs against a finding of scienter." *Baxter*, 2021 WL 100457, at *16; *see also Pugh*, 521 F.3d at 695; *Conagra*, 495 F. Supp. 3d at 667–68. In fact, undermining Plaintiff's theory of scienter is the reality that the Company bought back more than $100 million of its own stock during the class period, Ex. 16 at 16, which would make no sense if Defendants believed the stock price was inflated by fraud. *See, e.g., Frankfurt-Tr. Inv. Lux. AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 225 (S.D.N.Y. 2018), *aff'd sub nom. Kapitalforeningen Lægernes Inv. v. United Techs. Corp.*, 779 F. App'x 69 (2d Cir. 2019) ("[S]ubstantial share repurchases tend to negate a finding of scienter because it would make no economic sense for a company to buy back its stock at a price it knows to be inflated.").

## B. The Non-Fraudulent Inference Is More Compelling.

Plaintiff's theory of scienter rests on nothing more than hindsight and speculation, which is reason enough to dismiss the AC. But, under the PSLRA, the Court also must consider "plausible opposing inferences," including inferences of non-fraudulent intent. *See Tellabs*, 551 U.S. at 323 Here, the reality is that the challenged statements—including forward-looking guidance and commentary regarding the Company's prospects—were issued during an inherently unpredictable time for the Company. By Plaintiff's own admission, beginning in 2020, Methode was in the midst

of a "critical . . . transition" in its Automotive Segment. AC ¶ 34. This transition was significant, involving, *inter alia*, a shift in the products designed and produced by Methode's Automotive Segment and an overhaul of the Company's Monterrey facility. *See*, *e.g.*, AC ¶¶ 4, 6. And, as Plaintiff reminds us, this significant transition was taking place "in the wake of the COVID-19 . . . pandemic," the most turbulent time in modern corporate history. *Id.* ¶ 43.

Plaintiff nevertheless seeks to spin a hindsight theory of fraud that claims Defendants knew—but failed to disclose—that the Company would face roadblocks in the major overhaul of its Automotive Segment that would make it impossible for the Company to meet its forward-looking guidance. But, as discussed herein, Defendants disclosed the risks and challenges associated with this transition. *See supra* at 4–5, 10. And, as Plaintiff itself alleges, the Company regularly revised its financial guidance throughout the class period and made adjustments where necessary based on the best information available to it at the time. *See*, *e.g.*, AC ¶¶ 76, 81.

Plaintiff's vague and conclusory assertions that Defendants were knowingly defrauding investors are far outweighed by a more compelling inference of non-fraudulent intent: Defendants were working through—in real-time—issues that arose during the significant transition in the Company's business with the good-faith belief that the issues would not ultimately impact the Company's ability to achieve its previously-disclosed financial guidance. That is, Defendants simply did not foresee that a number of issues would coalesce and require the Company to abandon its previously issued guidance. Plaintiff itself acknowledges that the evolution of the Company's business strategy—necessitated by external changes in the automobile industry—occurred over time. The fact that the evolution of the Company's business strategy turned out to be less successful than hoped does not suggest Defendants believed that the strategy would be anything other than successful at the time the challenged statements were made.

## V.    PLAINTIFF FAILS TO ADEQUATELY ALLEGE LOSS CAUSATION.

To adequately plead loss causation, Plaintiff may not simply allege a price decline following an announcement of negative information. Rather, Plaintiff must plead facts demonstrating that the price decline immediately followed a "corrective disclosure" that revealed the "truth" about a previous misstatement and was responsible for a "substantial" amount of the price drop. *Dura*, 544 U.S. at 345–48. Here, Plaintiff alleges that the "truth" was revealed through a series of partially corrective disclosures, where the Company announced lower-than-anticipated financial results and lowered or withdrew its financial guidance. AC ¶¶ 81, 88, 90, 100, 103, 114–15, 122. But, as a matter of law, these announcements—without more—cannot support allegations of loss causation. Although disappointing results and lowered guidance may have had a downward effect on the Company's stock price, such announcements did not—and cannot—have the requisite corrective effect in revealing any fraud. *See*, *e.g.*, *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266 (S.D.N.Y. 2005) ("The fact that an event-in this case, a failure to meet earnings forecasts or a statement foreshadowing such a failure-disabused the market of that belief does not mean that the event disclosed the alleged scheme to the market. In other words, a failure to meet earnings forecasts has a negative effect on stock prices, but not a corrective effect.").

## VI.    PLAINTIFF FAILS TO ADEQUATELY ALLEGE SCHEME LIABILITY.

To the extent Plaintiff is attempting to plead a "scheme" claim under Rule 10b-5(a) or (c), that claim fails too. Rule 10b-5 makes it unlawful, in connection with the purchase or sale of any security: "(a) To employ any devise, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a

fraud or deceit upon any person." 17 C.F.R. § 240.10b-5.[14] While Plaintiff appears to be traveling under subsection (b), *see* AC ¶¶ 185–95, Plaintiff makes vague references to "a plan, scheme, conspiracy" in the AC. *See id.* ¶¶ 187–88. But Plaintiff fails to allege any basis of such a scheme other than the alleged misstatements, which cannot support a scheme liability claim. *See SEC v. Rio Tinto plc*, 41 F.4th 47, 53–54 (2d Cir. 2022) ("misstatements and omissions cannot form the *sole* basis for liability under the scheme subsections"); *Teamsters Local 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*, 83 F.4th 514, 525 (6th Cir. 2003) (citing *Rio Tinto* and holding "[a] scheme-liability claim is therefore different and separate from a nondisclosure claim"). [15]

## CONCLUSION

Defendants respectfully request that the Court dismiss the AC with prejudice.

Respectfully submitted this 3rd day of June 2025.

**KING & SPALDING LLP**

*/s/ Zachary Fardon*
By: Zachary Fardon (IL Bar #6292156)
110 N Wacker Drive, Suite 3800
Chicago, Illinois 60606
Telephone: (312) 995-6333
Facsimile: (312) 995-6330
zfardon@kslaw.com

Jessica P. Corley (*pro hac vice*)
Brandon R. Keel (IL Bar #6300165)
1180 Peachtree Street, NE
35Atlanta, Georgia 30309
Telephone: (404) 572-4600
Facsimile: (404) 572-5100
jpcorley@kslaw.com
bkeel@kslaw.com

---

[14] Whereas subsection (b) imposes liability for making misstatements or omissions, scheme liability "encompass[es] conduct beyond disclosure violations," *Benzon v. Morgan Stanley Distribs., Inc.*, 420 F.3d 598, 610 (6th Cir. 2005), such as executing manipulative or deceptive stock trades, or pump-and-dump schemes. *See, e.g.*, *SEC v. Lee*, 720 F. Supp. 2d 305, 334 (S.D.N.Y. 2010) (providing examples).

[15] Because Plaintiff has not pled a predicate violation of Section 10(b), its Section 20(a) claim also fails. *See Pugh*, 521 F.3d at 693; *Baxter*, 2021 WL 100457, at *21.

*Counsel for Methode Electronics, Inc.,*
*Donald W. Duda, and Ronald L.G. Tsoumas*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 3, 2025, I electronically filed the foregoing with the Clerk of

the Court using the CM/ECF system.

By: <u>/s/ *Zachary Fardon*</u>
Zachary Fardon