**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| DEKALB COUNTY PENSION FUND, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> METHODE ELECTRONICS, INC., DONALD W. DUDA, and RONALD L.G. TSOUMAS, <br><br> Defendants. | Case No. 1:24-cv-07696 <br><br> District Judge Sara L. Ellis <br><br> Magistrate Judge M. David Weisman |

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**
**PLAINTIFF'S SECOND AMENDED CLASS ACTION COMPLAINT**

Zachary Fardon (IL Bar No. 6292156)
**KING & SPALDING LLP**
110 N Wacker Drive
Suite 3800
Chicago, Illinois 60606
Telephone: (312) 995-6333
Facsimile: (312) 995-6330
zfardon@kslaw.com

Jessica P. Corley (*pro hac vice*)
Brandon R. Keel (IL Bar No. 6300165)
**KING & SPALDING LLP**
1180 Peachtree Street, N.E.
Atlanta, Georgia 30309
Telephone: (404) 572-4600
Facsimile: (404) 572-5100
jpcorley@kslaw.com
bkeel@kslaw.com

*Counsel for Defendants Methode Electronics, Inc.,*
*Donald W. Duda, and Ronald L.G. Tsoumas*

**TABLE OF CONTENTS**

Page

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 1

ARGUMENT .................................................................................................................... 5

I.       PLAINTIFF STILL FAILS TO PLEAD FALSITY WITH PARTICULARITY............... 5

      A.     Plaintiff Fails To Allege Falsity Of The Roll-Off Statements, EV Awards And Business Performance Statements, CAGR Statements, And EPS Statements. ...............6

            1.     Alleged Employee Turnover And Operational Problems At The Monterrey Facility Cannot Render Company-Wide Statements False........................................................................................................ 7

            2.     Defendants' Post-Hoc Statements Are Not Falsity Admissions. ............... 9

            3.     Avula's Post-Class Period Allegations Fail To Show Falsity. ...................11

      B.     Plaintiff Fails To Allege Falsity Of The Material Weakness Statement. .......................12

      C.     Plaintiff Cannot Rely On Post-Class Period Events To Allege Falsity. ..........................12

II.     PLAINTIFF FAILS TO PLEAD ANY ACTIONABLE CLAIM. ................................... 13

      A.     The Safe Harbor Bars The Challenged Forward-Looking Statements..........................13

            1.     Plaintiff Challenges Numerous Forward-Looking Statements. ................ 14

            2.     Meaningful Cautionary Language Accompanied Each Statement. .......... 15

      B.     The Challenged Puffery And Opinions Are Not Actionable...........................................17

      C.     Plaintiff Fails To Plead A Strong Inference Of Scienter.................................................19

            1.     Plaintiff's Scienter Allegations Are Deficient........................................... 20

            2.     The Non-Fraudulent Inference Is More Compelling. ............................... 23

      D.     Plaintiff Fails To Adequately Allege Loss Causation. ...................................................24

CONCLUSION.................................................................................................................. 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Acuity Brands, Inc. Sec. Litig.*,
2019 WL 10246166 (N.D. Ga. Aug. 12, 2019) ...........................................................................8

*Anderson v. Abbott Labs.*,
140 F. Supp. 2d 894 (N.D. Ill. 2001) ......................................................................................18

*Arazie v. Mullane*,
2 F.3d 1456 (7th Cir. 1993) .....................................................................................................13

*In re Baxter Int'l Inc. Sec. Litig.*,
2021 WL 100457 (N.D. Ill. Jan. 12, 2021) ....................................................5, 12, 19, 21, 23

*In re BISYS Sec. Litig.*,
397 F. Supp. 2d 430 (S.D.N.Y. 2005)......................................................................................21

*Cal. Pub. Emp. Ret. Sys. v. Chubb Corp.*,
394 F.3d 126 (3d Cir. 2004)....................................................................................................20

*Carpenter v. Oscar Health, Inc.*,
2025 WL 722729 (S.D.N.Y. Mar. 6, 2025) ............................................................................12

*Chandler v. Ulta Beauty, Inc.*,
2022 WL 952441 (N.D. Ill. Mar. 30, 2022)......................................................................15, 22

*Chew v. Moneygram Int'l, Inc.*,
2024 WL 4346522 (N.D. Ill. Sept. 30, 2024) .....................................................................11, 19

*Chu v. Sabratek Corp.*,
100 F. Supp. 2d 827 (N.D. Ill. 2000) ......................................................................................22

*City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*,
8 F.4th 592 (7th Cir. 2021) ...............................................................................................13, 17

*City Pension Fund for Firefighters & Police Officers in City of Tampa Bay v.
Generac Holdings Inc.*,
765 F. Supp. 3d 775 (E.D. Wis. 2025)..................................................................................6, 11

*Coll. Ret. Equities Fund v. Boeing Co.*,
2026 WL 891657 (N.D. Ill. Mar. 31, 2026)............................................................................17

*Davis v. SPSS, Inc.*,
385 F. Supp. 2d 697 (N.D. Ill. 2005) ......................................................................................17

ii

*Desai v. Gen. Growth Props., Inc.*,
654 F. Supp. 2d 836 (N.D. Ill. 2009) ...................................................................................15

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ..........................................................................................................5, 25

*Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*,
336 F. Supp. 3d 196 (S.D.N.Y. 2018) ...............................................................................8, 23

*Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.*,
2011 WL 1303387 (N.D. Ill. Mar. 31, 2011) ...........................................................7, 9, 13, 20

*In re Harley-Davidson, Inc. Sec. Litig.*,
660 F. Supp. 2d 969 (E.D. Wis. 2009) ...................................................................................6

*Higginbotham v. Baxter Int'l, Inc.*,
495 F.3d 753 (7th Cir. 2007) ..................................................................................10, 12, 20, 22

*Hill v. The Tribune Co.*,
2006 WL 2861016 (N.D. Ill. Sept. 29, 2006) .......................................................................22

*In re Initial Pub. Offering Sec. Litig.*,
399 F. Supp. 2d 261 (S.D.N.Y. 2005) ..................................................................................25

*Johnson v. Tellabs, Inc.*,
262 F. Supp. 2d 937 (N.D. Ill. 2003) ...................................................................................17

*KBC Asset Mgmt. NV v. Discover Fin. Servs.*,
2025 WL 976120 (N.D. Ill. Mar. 31, 2025) .....................................................................14, 15

*M & M Hart Living Tr. v. Glob. Eagle Ent., Inc.*,
2017 WL 5635424 (C.D. Cal. Aug. 20, 2017) ........................................................................7

*Marquez v. Bright Health Grp., Inc.*,
755 F. Supp. 3d 266 (E.D.N.Y. 2024) ..................................................................................22

*In re Midway Games, Inc. Sec. Litig.*,
332 F. Supp. 2d 1152 (N.D. Ill. 2004) ............................................................................15, 18

*Omnicare v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015) ............................................................................................................19

*Pension Tr. Fund for Operating Eng'rs v. DeVry Educ. Grp., Inc.*,
2017 WL 6039926 (N.D. Ill. Dec. 6, 2017) ..........................................................................11

*Phoenix Ins. Co. v. ATI Physical Therapy, Inc.*,
690 F. Supp. 3d 862 (N.D. Ill. 2023) ..............................................................................18, 19

*Pipefitters Loc. No. 636 Defined Benefit Plan v. Tekelec*,
    2013 WL 1192004 (E.D.N.C. Mar. 22, 2013) ................................................................20

*Plumbers & Pipefitters Loc. Union v. Zimmer*,
    673 F. Supp. 2d 718 (S.D. Ind. 2009) ......................................................10, 21, 23

*Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v.*
    *Allscripts-Misys Healthcare Sols., Inc.*,
    778 F. Supp. 2d 858 (N.D. Ill. 2011) ......................................................15, 17

*Pugh v. Tribune Co.*,
    521 F.3d 686 (7th Cir. 2008) ................................................................5, 12

*Riggs Partners, LLC v. Hub Grp., Inc.*,
    2002 WL 31415721 (N.D. Ill. Oct. 25, 2002)................................................22

*Rossy v. Merge Healthcare Inc.*,
    169 F. Supp. 3d 774 (N.D. Ill. 2015) .........................................................8

*Roth v. OfficeMax, Inc.*,
    527 F. Supp. 2d 791 (N.D. Ill. 2007) .......................................................22

*Searls v. Glasser*,
    64 F.3d 1061 (7th Cir. 1995) ................................................................18

*S.E.C. v. Rio Tinto plc*,
    41 F.4th 47, 53–54 (2d Cir. 2022) ..........................................................25

*Société Générale Secs. Servs., GbmH v. Caterpillar, Inc.*,
    2018 WL 4616356 (N.D. Ill. Sept. 26, 2018) ...........................................21, 22

*Stavros v. Exelon Corp.*,
    266 F. Supp. 2d 833 (N.D. Ill. 2003) .......................................................15

*Sutton v. Bernard*,
    2001 WL 897593 (N.D. Ill. Aug. 9, 2001) ..................................................10

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)........................................................................19, 23

*Van Noppen v. InnerWorkings, Inc.*,
    136 F. Supp. 3d 922 (N.D. Ill. 2015) .......................................................18

*Washtenaw Cnty. Emps.' Ret. Sys. v. Walgreen Co.*,
    2022 WL 614925 (N.D. Ill. Mar. 2, 2022)...................................................15

*W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*,
    495 F. Supp. 3d 622 (N.D. Ill. 2020) .....................................................15, 18

iv

**Statutes**

15 U.S.C. § 78u-4(b)........................................................................................................................5

15 U.S.C. § 78u–5..................................................................................................................13, 14, 17

**INTRODUCTION**

Plaintiff's Second Amended Complaint ("SAC") is the third attempt at pleading in this matter. The Court granted Defendants' Motion to Dismiss the First Amended Complaint ("FAC"), noting a number of fundamental defects that warranted dismissal. *See* ECF 73. Rather than address those fatal flaws, however, Plaintiff confuses quantity for quality. Despite nearly doubling the length of the FAC (mostly through the addition of duplicative allegations repeated ad nauseam), Plaintiff still failed to address the fatal defects in its allegations that warrant dismissal again.

The fundamental flaw with Plaintiff's claims—that they are based on nothing more than unpermitted fraud by hindsight—remains. Plaintiff still challenges prospective financial guidance and other forward-looking statements that it claims were false and misleading based solely on its allegation that Defendants ***must have known*** (but failed to disclose) that Methode Electronics, Inc. ("Methode" or the "Company") was experiencing vague "operational" or "accounting" issues that rendered impossible the Company's ability to achieve those projections. But entirely absent from the SAC—just like the FAC—are any contemporaneous, particularized allegations specifying what Defendants knew about these purported issues, how they knew it, when they knew it, or how they should have known from those issues that it would be impossible for Methode to achieve its financial projections. Without such allegations, Plaintiff's claims cannot proceed.

The Private Securities Litigation Reform Act of 1995 ("PSLRA") imposes heightened pleading standards designed to bar suits like this one that are based on nothing more than hindsight and conjecture. Plaintiff fails to meet these stringent standards for multiple independent reasons as set forth herein. The Court should dismiss the SAC with prejudice.

**BACKGROUND**

The factual background of the allegations is discussed in the Court's Order granting Defendants' Motion to Dismiss the FAC. *See* ECF 73 at 2–5. The background underlying the SAC

1

is largely the same. *Compare*, *e.g.*, ECF 53 ¶¶ 27–49, *with* SAC ¶¶ 29–52. Defendants thus do not repeat the background from the Court's prior Order but rather provide the following abbreviated summary of the claims and what Plaintiff changed in the SAC.

Methode "design[s], engineers, and manufactures custom-engineered solutions for original equipment manufacturers ('OEMs'), automobile manufacturers and other companies." SAC ¶ 2; ECF 61-22 at 2.[1] As of the class period, Methode's business was organized in four segments: Automotive, Industrial, Interface, and Medical. SAC ¶ 30. Methode's Automotive Segment is traditionally its largest by percentage of net sales. *Id*. ¶¶ 30–31; ECF 61-22 at 2.

The allegations in this case concern a strategic transition in Methode's Automotive Segment that began in 2020. SAC ¶ 33. Prior to that time, Methode's Automotive Segment had experienced great success, due at least in part to a 2010 contract with General Motors ("GM") pursuant to which Methode designed and manufactured "integrated center stack" consoles for GM vehicles, but the automotive industry was changing. *Id.* ¶¶ 31–33. "Specifically, car manufacturers [began] using fewer designs featuring traditional buttons and knobs and instead [began using] displays with control functions integrated into the display itself [e.g., touch screens]. . . ." *Id.* ¶ 33. In an effort to keep pace with the industry, Methode retooled its Automotive Segment by "shift[ing] . . . production away from a relatively low mix, high volume production of relatively standardized center consoles for a few vehicle manufacturers such as GM, to a high mix, low volume production of more specialized components" designed "for a wider variety of vehicle manufacturers, in particular manufacturers of electric vehicles, or EV." *Id.*

Methode understood that its Automotive Segment faced significant risks in connection with this strategic transition, so it kept investors apprised of its progress as well as the risks. For

---

[1] As the Court previously recognized, it "may consider documents that are central to the complaint and are referred to in it." ECF 73 at 2 (citation omitted).

2

example, Methode regularly provided investors with updates regarding new business awards. *See, e.g.*, SAC ¶¶ 53, 55, 57, 61, 66. But, at the same time, Methode cautioned investors that these awards were not guarantees of future performance. Methode warned that "the full launch timing of most of these programs could be anywhere in the range of 1 to 3 years" from the announcements. *See, e.g.*, ECF 61-11 at 5. Even then, the awards did not guarantee future revenue—they were subject to various uncertainties. ECF 61-9 at 9. Methode nonetheless continued to provide forward-looking forecasts to investors, including estimates of projected financial guidance for 2022 and 2023, *see, e.g.*, ECF 61-4, Ex. 99.1 at 2; ECF 61-7, Ex. 99.1 at 3; SAC ¶ 122, and a three-year organic Compound Annual Growth Rate ("CAGR") target, *see id.* ¶¶ 40, 90, 92, while explaining that these estimates were subject to risks that could cause actual performance to deviate from the projections. *See, e.g.*, ECF 61-3 at 1, 6–13; ECF 61-9 at 1, 5–13; ECF 61-22 at 1, 5–15.

As Methode proceeded through the transition in its Automotive Segment, certain risks that it had warned investors about began to materialize, including an "unexpected early sunsetting of an EV program in fiscal 2024 due to a change in technology by the customer" (SAC ¶ 118), a softening of near-term market demand and timing for the adoption of EVs (ECF 61-32 at 5), and operational issues, including labor shortages and vendor challenges (SAC ¶¶ 139, 145). Methode therefore began revising its forward-looking guidance to account for the changing circumstances and their anticipated future impacts. *See, e.g., id.* ¶¶ 128, 130, 133, 139, 145. On March 7, 2024, however, based on continued "operational challenges, the evolving market headwinds and [the] recent appointment" of a new CEO, Methode suspended its forward-looking financial guidance. *See* ECF 61-34 at 5; *see also* SAC ¶¶ 9, 149–52. Methode's stock price decreased, and this putative securities class action predictably followed, with Plaintiff alleging that the announcements revealed Defendants' prior statements to be false or misleading.

3

On February 3, 2026, this Court granted Defendants' Motion to Dismiss the FAC. ECF 73. The Court held that Plaintiff failed to "identif[y] with specificity which statements it alleges are false and/or misleading" and failed to "sufficiently explain[] the reasons why it believes each individual statement is false and/or misleading." *Id.* at 11. The Court found that the FAC employed an impermissible "puzzle pleading" approach, listing the allegedly false or misleading statements chronologically, followed by a "boilerplate paragraph" at the end of each section providing various reasons why the statements were purportedly false or misleading without linking those reasons to any specific statement. *Id.* at 8, 11. As the Court explained, this "le[ft] the Court and Defendants guessing as to why each specific statement is false or misleading." *Id.* at 9. Although the Court did not reach Defendants' remaining arguments for dismissal, it "caution[ed] [Plaintiff] to be cognizant of these arguments in amending the complaint." *Id.* at 11.

Plaintiff did not heed that advice. ECF 74. Although the SAC is longer than the FAC, Plaintiff largely paid lip service to the Court's directive. Plaintiff made very few substantive revisions, with the extra length mostly due to another boilerplate list of vague and conclusory reasons as to why the challenged statements were false and/or misleading, which is now repeated after each challenged statement. The crux of Plaintiff's claims is the same: Plaintiff continues to allege that various financial projections and related statements were false or misleading because the Company was experiencing vague "operational" issues that Defendants must have known meant that the guidance could not be achieved. *See*, *e.g.*, SAC ¶ 54. The only arguably "new" theory is Plaintiff's allegation that the challenged statements also must have been false because the Company's CEO at the end of the class period, Avinash Avula—who only joined Methode for about a month before the end of the class period—alleged in a separate employment lawsuit that the Company "had been experiencing extreme financial and accounting system deficiencies." *Id.*

4

Those allegations parroted from Avula's lawsuit were also in the FAC, *see* ECF 53 ¶¶ 12, 137, but Plaintiff repeats them in more places in the SAC, trying (unsuccessfully) to build those into its claims. Plaintiff has done nothing to cure the deficiencies that necessitated dismissal.

## ARGUMENT

A claim under Section 10(b) and Rule 10b-5 has six elements: (1) a material misrepresentation or omission of a material fact; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005).[2] Plaintiff's claims are subject to heightened pleading standards under Rule 9(b) and the PSLRA. *See In re Baxter Int'l Inc. Sec. Litig.*, 2021 WL 100457, at *10 (N.D. Ill. Jan. 12, 2021). To satisfy the PSLRA, Plaintiff must: (1) "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed," 15 U.S.C. § 78u-4(b)(1), and (2) "state with particularity facts giving rise to a strong inference" that each Defendant acted with scienter, *id.* § 78u-4(b)(2)(A), i.e., severe recklessness or intent to defraud. *Baxter*, 2021 WL 100457, at *10.[3] Once again, Plaintiff fails to meet those requirements.[4]

## I.      PLAINTIFF STILL FAILS TO PLEAD FALSITY WITH PARTICULARITY.

This Court dismissed the FAC because Plaintiff employed a "puzzle pleading" approach: it "detail[ed] the allegedly false or misleading statements throughout 71 paragraphs," organized them "in ten chronological sections," and then "include[d] a boilerplate paragraph providing various reasons why the statements were false or misleading" without "link[ing] those reasons to

---

[2] A Section 20(a) control person claim likewise requires Plaintiff to first plead a predicate Section 10(b) violation. *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008).

[3] Unless otherwise indicated, internal citations and quotations are omitted and any emphasis is added.

[4] Attached as Exhibit 1 is a chart that lists the challenged statements and grounds for dismissal as to each.

any specific statement." ECF 73 at 7–8. Although the SAC has ballooned to 228 paragraphs, with the challenged statements organized topically rather than chronologically, the deficiencies remain.

Plaintiff still fails to allege with particularity why each challenged statement was false or misleading when it was made. Rather, Plaintiff continues to rely on nearly identical "boilerplate paragraph[s]," *id.* at 8, now repeated ad nauseam after each challenged statement (instead of at the end of each section), which purport to explain why the challenged statements were false when made. This wholesale repetition does not satisfy the PSLRA's requirement of pleading falsity *with particularity*. *See City Pension Fund for Firefighters & Police Officers in City of Tampa Bay v. Generac Holdings Inc.*, 765 F. Supp. 3d 775, 797 (E.D. Wis. 2025) ("Plaintiffs repeat the[] same falsity theories multiple times, with only minor variations. . . . They do not gain in specificity or plausibility by their repetition."). The PSLRA does not merely require that each challenged statement be followed by *some* allegation of falsity. Plaintiff must provide *specific, particularized facts* demonstrating *why* each statement was false or misleading *when it was made*. ECF 73 at 7. The SAC's approach of mechanically appending the same checklist of alleged problems to every challenged statement, regardless of the statement's content, timing, or context, fails to establish the requisite "fact-based connections between a speaker, a statement, and specific, contradictory information." *In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 1000 (E.D. Wis. 2009).

### A. Plaintiff Fails To Allege Falsity Of The Roll-Off Statements, EV Awards And Business Performance Statements, CAGR Statements, And EPS Statements.

The SAC boils down to three theories of falsity: that the challenged statements were false or misleading because (1) "Methode experienced significant personnel turnover"; (2) Defendants later "admitted" that the alleged "turnover, along with 'operational decisions and vendor issues' led to 'subsequent production planning deficiencies,' including inventory shortages and late shipments" that caused "substantial additional costs"; and (3) "as CEO Avula would later observe,

6

the Company had been experiencing extreme financial and accounting system deficiencies, including a lack of necessary controls, oversight, and security measures." *See*, *e.g.*, SAC ¶¶ 54, 56, 58, 60, 62, 64, 67, 69, 71, 73, 75, 77, 79, 81, 83, 87, 89, 91, 93, 95, 97, 99, 102, 104, 106, 108, 110, 112, 115, 117, 119, 123, 125. Even taking the SAC's repetitive allegations at face value, the fundamental problem is that the SAC still lacks any particularized allegations regarding *when* the alleged problems arose, *what* specifically Defendants knew about them and how they knew it, or *how* that knowledge rendered any particular statement false when it was made.[5]

### 1. Alleged Employee Turnover And Operational Problems At The Monterrey Facility Cannot Render Company-Wide Statements False.

As in the FAC, Plaintiff continues to allege that the challenged statements were false and misleading because Methode would need to "retool its Monterrey facility" in order to "roll-off the center console program into the new EV program," "produce specialized components efficiently and cost-effectively," "achieve the stated CAGR target," and "achieve the updated diluted EPS guidance." *See*, *e.g.*, SAC ¶¶ 54, 60, 91, 123. According to Plaintiff, Methode lacked the ability to do so because it "experienced significant personnel turnover." *Id.* That does not state a claim.

Plaintiff relies exclusively on two confidential witnesses—alleged former employees of

---

[5] Completely absent from the SAC is any reference to any internal documents, reports, meetings, conversations, tips, emails, or other information that was provided to, or known by, Defendants about the alleged operational or accounting issues. Without alleging such contemporaneous facts, Plaintiff cannot demonstrate that the challenged statements were false when made. *See Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.*, 2011 WL 1303387, at *21 (N.D. Ill. Mar. 31, 2011) (plaintiff failed to "identify any information known to [the defendant] . . . that suggests that he knew that his statement . . . was untrue at the time that he made it"); *M & M Hart Living Tr. v. Glob. Eagle Ent., Inc.*, 2017 WL 5635424, at *9 (C.D. Cal. Aug. 20, 2017) ("Because Plaintiff does not state with particularity that Defendants knew of the information contained in the later disclosures at the time the certifications were made, Plaintiff has failed to allege that these statements contained omissions or were otherwise false").

Plaintiff also fails to allege how certain of the challenged statements could possibly have been rendered false or misleading under any of these theories. For example, Plaintiff challenges several statements that merely report financial results or the amount of new program awards during a particular quarter, none of which is alleged to be false. *See*, *e.g.*, SAC ¶ 61 ("Company was awarded new programs with expected annual sales of over $100 million."); *see also id.* ¶¶ 63, 65–66.

7

Methode—to support its allegations of alleged "significant personnel turnover." *See, e.g., id.* ¶ 60.[6]

But, as in the FAC, these allegations remain insufficiently particularized. First, it is unclear what, if anything, "CW2" adds given that CW2 was "not in the Automotive Segment." *Id.* ¶ 49. That CW2 believed there was "turnover and short-staffing in the PSG segment" (*id.*), reveals nothing about the falsity of the challenged statements, all of which relate to the Automotive Segment. Second, CW1's allegation that "there were high levels of turnover amongst leadership at the Monterrey facility," *id.* ¶ 48, is vague and anecdotal at best. There are no allegations identifying with any specificity how this "high turnover" rendered any specific statement false or misleading when made. Perhaps most significantly, the confidential witness allegations "reveal nothing about any defendant's knowledge or state of mind." *Rossy*, 169 F. Supp. 3d at 782. Indeed, Plaintiff fails to allege that either CW ever even interacted with the Individual Defendants (regarding personnel turnover or otherwise) or had reason to know Company-wide employment levels or how those Company-wide employment levels impacted Methode's ability to "roll-off the center console program into the new EV program," "produce specialized components efficiently and cost-effectively," "achieve the stated CAGR target," or "achieve the updated diluted EPS guidance." *See, e.g.*, SAC ¶¶ 54, 91, 123; *see also In re Acuity Brands, Inc. Sec. Litig.*, 2019 WL 10246166, at *13 n.6 (N.D. Ga. Aug. 12, 2019) (absence of allegations demonstrating CW's "access to company-wide information" renders "inference that [their] estimate is accurate implausible"); *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 223 (S.D.N.Y. 2018) (disregarding statements of CWs because they "worked mainly within a single . . . unit, so

---

[6] "[I]nformation obtained from confidential witnesses is generally subject to a discount that it has alternately characterized as steep and heavy. . . . [I]t is hard to see how information from anonymous sources could be deemed compelling or how we could take account of plausible opposing inferences. Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist." *Rossy v. Merge Healthcare Inc.*, 169 F. Supp. 3d 774, 782 (N.D. Ill. 2015).

they had no insight on how other . . . units, let alone other . . . divisions, projected . . . sales").

Moreover, Plaintiff's attempt to use alleged operational issues at a single facility (the Monterrey plant) in a single business segment (Automotive) to show the falsity of company-wide statements about Methode's overall business and prospects fails. The Monterrey plant is one of Methode's nine manufacturing facilities across six countries, and Automotive is just one of Methode's four business segments. SAC ¶¶ 30; ECF 61-35 at 16. "[E]vents at one specific plant or with one individual customer are not enough to meet the PSLRA's heightened standard." *Anixter Int'l*, 2011 WL 1303387, at *23. That is, "[w]eaknesses in one . . . part of [Methode's] business would not necessarily render untrue positive statements about the company as a whole." *Id.* The SAC does not explain how compartmentalized conditions in one facility contradicted or even undermined statements regarding Methode's projected overall performance.

### 2. Defendants' Post-Hoc Statements Are Not Falsity Admissions.

Just as in the FAC, Plaintiff again attempts to rely on fraud by hindsight, pointing to after-the-fact statements containing the Company's retrospective analyses of issues experienced by the Company during its business transformation to establish that the challenged statements regarding the center console roll-off, EV awards and business performance, and financial projections were false. *See*, *e.g.*, SAC ¶¶ 54, 60, 91, 123. Plaintiff highlights statements made by Duda on September 7, 2023, and December 7, 2023, in which he acknowledged "latent operating inefficiencies" at the Monterrey facility. *Id.* Plaintiff characterizes these as "admissions" of the alleged fraud. *Id.* ¶¶ 173–77. But, as Defendants explained in their prior briefing, these retrospective statements do not demonstrate that the challenged statements were false or misleading when made.

To the contrary, as Duda explained during the September 7, 2023, earnings call, "[t]he magnitude" of the issues "didn't become apparent until July" 2023 and that it was only when the Company went "back and [did] a postmortem" that it determined "there [were these operational]

issues." *Id.* ¶ 175.[7] A retrospective acknowledgment that problems surfaced in July 2023 cannot demonstrate that statements made in 2021 and 2022 were false at the time. *See Sutton v. Bernard*, 2001 WL 897593, at *4 (N.D. Ill. Aug. 9, 2001) ("[S]tatements made at or after the end of the class period cannot be used to show that what was said earlier was false or misleading"); *Plumbers & Pipefitters Loc. Union v. Zimmer*, 673 F. Supp. 2d 718, 740 (S.D. Ind. 2009) ("no reason to assume that what is true at the moment plaintiff discovers it was also true at the moment of the alleged misrepresentation"), *aff'd*, 679 F.3d 952 (7th Cir. 2012).

With respect to Duda's December 7, 2023, statement that problems "probably existed prior to this fiscal year [2024]," this too represents nothing more than Duda's retrospective analysis that was enhanced with the benefit of hindsight. As Duda explained, the issues were "masked by very high inventory" and there was "a delay in visibility of a problem." SAC ¶¶ 140, 146. And those "masked" issues were only later identified when Methode "tr[ied] to lean out [its] operations, [and] brought inventory down[,]" because sometimes when "you lower the pond, you find the rocks, but we found boulders." *Id.* ¶ 146. There is no detail from which the Court can infer when the problems began or when they surfaced to Defendants, let alone that they were known to Defendants at the time each challenged statement was made. This is the sort of "fraud by hindsight" the PSLRA was enacted to prevent. *See Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 759–60 (7th Cir. 2007).

---

[7] The Company's related disclosures concerning the operating inefficiencies Plaintiff relies upon likewise show that these issues were not identified until the quarters in which they were timely disclosed. *See*, *e.g.*, ECF 61-31, Ex. 99.1 at 1 ("In addition to the lower sales, operational inefficiencies in our North American Auto operations, that were identified last quarter, continued to drive higher premium freight, labor, and material costs."); *see also id.* at 2 ("The higher freight and labor costs resulted from the operational inefficiencies in North America that arose in the fiscal first quarter and carried over to the second fiscal quarter as previously communicated by the company."); ECF 61-33, Ex. 99.1 at 2–3 (loss was "primarily due to lower sales volume and costs resulting from the operational inefficiencies . . . that occurred in the first and second fiscal quarters and continued in the third fiscal quarter").

### 3. Avula's Post-Class Period Allegations Fail To Show Falsity.

Plaintiff's attempt to rely on Avula's post-class period allegations similarly fails. Avula did not even join Methode until January 29, 2024, *i.e.*, just over a month before the end of the class period. SAC ¶ 12. The SAC provides no explanation as to what, if anything, Avula knows (or could know) about Defendants' knowledge of the alleged misstatements or these so-called "accounting system deficiencies," including what they knew and when, prior to his joining Methode. *See*, *e.g.*, *Generac*, 765 F. Supp. 3d at 798 (holding that a plaintiff's falsity and scienter allegations "suggest[ed] at most only that [the defendant] knew, at some point," of the alleged issues, and that the allegation did "not support a strong inference that [the defendant] was aware (or even should have been aware) [of the alleged issues] at the time he made any specific statement"); *Pension Tr. Fund for Operating Eng'rs v. DeVry Educ. Grp., Inc.*, 2017 WL 6039926, at *13 (N.D. Ill. Dec. 6, 2017) (noting in scienter analysis: "The [SAC] does not identify specific facts that should have put defendants on notice of misclassification problems so dire as to affect nationwide statistics. At most, the [SAC] gestures in vague terms at internal information to that effect, without describing it in sufficient detail to permit the Court to determine whether it supports a strong inference that defendants would have been able to put the puzzle pieces together.").

Moreover, Avula's unproven allegations in his separate employment lawsuit do not provide any basis to assess whether the challenged statements were false and misleading at the time they were made. Most, if not all, of the allegations Plaintiff references from Avula's complaint, such as "[i]naccurately booking and reporting sales," "misuse of funds . . . for the personal benefit of a former [Company] officer," and "[an] undocumented intercompany transfer loan," *see id.* ¶ 164, do not even relate to Plaintiff's allegations of fraud. *See*, *e.g.*, *Chew v. Moneygram Int'l, Inc.*, 2024 WL 4346522, at *20 (N.D. Ill. Sept. 30, 2024) ("[Section] 10(b) and Rule 10b-5 do not impose liability for mere corporate mismanagement; they impose liability for securities fraud.").

11

**B.      Plaintiff Fails To Allege Falsity Of The Material Weakness Statement.**

Plaintiff also challenges the Company's June 27, 2023, statement reporting management's identification of a material weakness in its control environment as false and misleading. *See* SAC ¶ 126. According to Plaintiff, Defendants *must have known* "the material weaknesses listed were far from the only ones the Company faced" because Avula alleged (more than a year later) that "after he started at the Company" in 2024 "he uncovered" that Methode had "extreme financial and accounting system deficiencies, including a lack of necessary controls, oversight, and security measures[.]" *Id.* ¶ 127. As set forth above, however, those allegations do nothing to show that any challenged statement was false when made. *Id.* ¶ 12. Relying on Avula's post-class period allegations to show that Defendants knew, as of June 27, 2023, that there were additional material weaknesses is impermissible fraud by hindsight. *See Higginbotham*, 495 F.3d at 759. Plaintiff's theory "is akin to a backward-looking assessment of internal controls, which is not permitted." *Carpenter v. Oscar Health, Inc.*, 2025 WL 722729, at *6 (S.D.N.Y. Mar. 6, 2025) (cleaned up); *see also Baxter*, 2021 WL 100457, at *15 ("that a company discovered or reported weaknesses in its internal controls . . . after its officers made certifications regarding those controls does not give rise to a strong inference that the certifications were knowingly false when made") (cleaned up).

**C.      Plaintiff Cannot Rely On Post-Class Period Events To Allege Falsity.**

In addition to Avula's lawsuit, Plaintiff points to other post-class period events to allege falsity, including Mr. Tsoumas's departure from the Company; the Company's July 11, 2024, announcement of a material weakness in its internal controls; and the Company's announcement that it had received a subpoena from the SEC. SAC ¶¶ 154, 158–59, 166.[8] But Plaintiff fails to

---

[8] The SEC investigation Plaintiff relies on, moreover, has now concluded, with the SEC recommending no enforcement action. *See* May 15, 2026 Form 8-K (attached as Ex. 2) at 3. If anything, the closure of the SEC's investigation gives rise to a competing nonculpable inference of scienter. *See Pugh*, 521 F.3d at 693.

connect these post-class period events to the alleged fraud. Plaintiff, for example, alleges that Mr. Duda and Mr. Tsoumas "retired" from the Company but fails to allege any facts explaining how their retirements show that any statement was false or misleading when made. *Id*. ¶¶ 182, 184. None of these post-class period developments can make up for the complete lack of "facts showing contemporaneous knowledge of a statement's falsity." *Anixter*, 2011 WL 1303387, at *22.

## II.    PLAINTIFF FAILS TO PLEAD ANY ACTIONABLE CLAIM.

Although the Court can and should dismiss the SAC for the same reasons it dismissed the FAC, the SAC is further deficient for all the additional reasons Defendants previously raised that the Court did not reach in its ruling. *See* ECF 73 at 7. Although the Court "caution[ed] [Plaintiff] to be cognizant of these arguments in amending the complaint so as to allow this litigation to move forward as expeditiously as possible," *id.* at 11, Plaintiff made no substantive changes to address the other bases for dismissal. *Compare* ECF 53 ¶¶ 141–60 (scienter), 161–67 (safe harbor), 168–72 (loss causation), *with* SAC ¶¶ 168–87 (scienter), 188–94 (safe harbor), 195–99 (loss causation).

### A.    The Safe Harbor Bars The Challenged Forward-Looking Statements.

"[S]ecurities laws encourage companies to make public predictions of future performance to assist investors in estimating a firm's future value." *City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*, 8 F.4th 592, 595 (7th Cir. 2021). The "Exchange Act does not demand perfection from forecasts, which are inevitably inaccurate." *Id*. Indeed, even "[i]f all estimates are made carefully and honestly, half will turn out too favorable to the firm and the other half too pessimistic." *Arazie v. Mullane*, 2 F.3d 1456, 1466 (7th Cir. 1993). To prevent plaintiffs from asserting claims whenever a forward-looking statement does not pan out, the PSLRA provides a safe harbor that insulates such statements from liability where they: (i) were identified as forward looking and accompanied by meaningful cautionary language; (ii) are immaterial; **or** (iii) were not made with actual knowledge of falsity. *See* 15 U.S.C. § 78u-5(c). Those protections apply here.

13

### 1. Plaintiff Challenges Numerous Forward-Looking Statements.

Pursuant to the PSLRA, "forward-looking statements" include, *inter alia*, "a statement of the plans and objectives of management for future operations," "a statement of future economic performance," and "any statement of the assumptions underlying or relating to" any such statement. 15 U.S.C. § 78u–5(i)(1). Tense is not dispositive; "a statement phrased in the present tense can still be forward-looking if it conveys a prediction." *KBC Asset Mgmt. NV v. Discover Fin. Servs.*, 2025 WL 976120, at *12 (N.D. Ill. Mar. 31, 2025).[9]

Here, as in the FAC, Plaintiff challenges numerous forward-looking statements. For example, Plaintiff challenges financial projections issued by the Company, including its annual financial guidance (*see*, *e.g.*, SAC ¶¶ 78, 118, 120–22, 124), and its projected CAGR target. *See*, *e.g.*, *id.* ¶¶ 90, 92, 94, 96, 98, 100–01, 103, 105, 107, 109, 111, 116. Plaintiff also challenges accompanying commentary, including statements explaining the Company's projections,[10] growth prospects,[11] future business initiatives,[12] and outlook for operations.[13] These statements are all forward looking under the safe harbor. *See*, *e.g.*, *KBC Asset Mgmt.*, 2025 WL 976120, at *12

---

[9] To the extent Plaintiff asserts that the safe harbor does not apply because the challenged statements convey a mix of present and future information, Plaintiff is wrong. As Plaintiff makes clear in the SAC, it is only challenging the forward-looking portions of the challenged statements. *See*, *e.g.*, SAC ¶¶ 5–6.

[10] *E.g.*, SAC ¶ 53 (Company "on track in aggregate to replace the sales from the roll off of [its] truck program"); *id.* ¶ 94 ("[The] CAGR [target] was "***based on the strong bookings we have realized over the past 2 fiscal years*** . . . ."); *id.* ¶ 109 (Company's "path to [the 6% sales CAGR] target will not be linear"); *id.* ¶ 121 (Company "remain[ed] on track to deliver [its] sales and earnings guidance for fiscal 2023").

[11] *E.g.*, SAC ¶ 90 ("[W]e expect continued sales growth as well as renewed earnings growth in fiscal 2023."); *id.* ¶ 55 (similar); *id.* ¶ 66 ("The EV market growth trend and our exposure to [it] continues to be robust"); *id.* ¶ 72 ("[I]t was a very successful quarter for awards that will drive organic sales growth in future years."); *id.* ¶¶ 94, 100–01, 105 (similar); *id.* ¶ 107 (Company had "a very strong pipeline" and was "on track to organically grow the business").

[12] *E.g.*, SAC ¶ 113 ("[W]e will be making investments and launching . . . new programs in fiscal 2024"); *id.* ¶¶ 78, 82, 85, 91 (similar).

[13] *E.g.*, SAC ¶ 92 ("[W]e are confident in our strategy and our award pipeline continues to be robust"); *id.* ¶ 86 ("very confident that they're going to see an uptick in their business"); *id.* ¶ 88 (we "firmly believe that our business model is healthy and is positioned to prosper from the strategic direction that we have taken."); *id.* ¶ 105 ("[T]he pipeline of future awards remains robust.").

("statement that [company] is on track to achieve projections [is] a forward-looking statement"); *Chandler v. Ulta Beauty, Inc.*, 2022 WL 952441, at *9 (N.D. Ill. Mar. 30, 2022) (verb "expects" renders a statement "forward-looking and aspirational"); *W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 651 (N.D. Ill. 2020) ("discussion of growth is plainly by way of loose prediction") (cleaned up); *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1166 (N.D. Ill. 2004) ("statements regarding . . . projected sales and earnings are forward-looking"); *Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 843 (N.D. Ill. 2003) (statements about "ability to meet its . . . EPS target squarely f[e]ll into the . . . definition of forward-looking").

### 2. Meaningful Cautionary Language Accompanied Each Statement.

Each challenged forward-looking statement also was identified as such and accompanied by meaningful cautionary language. To be sure, "[t]he PSLRA does not require the *most* helpful caution, nor does it require a company to reveal in detail what could go wrong." *Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.*, 778 F. Supp. 2d 858, 874 (N.D. Ill. 2011). "In fact, the language need not explicitly refer to the risk that ultimately caused the projection to differ from the actual results[.]" *Stavros*, 266 F. Supp. 2d at 843. Cautionary statements only need "to point to the principal contingencies that could cause actual results to depart from projections." *Plumbers*, 778 F. Supp. 2d at 874.

When "determin[ing] whether the [challenged] statements were accompanied by meaningful cautionary language," courts "consider statements made in SEC filings." *Washtenaw Cnty. Emps.' Ret. Sys. v. Walgreen Co.*, 2022 WL 614925, at *2 (N.D. Ill. Mar. 2, 2022). That is because cautionary statements within SEC filings are part of the total mix of information informing the market and "must be treated as if attached to every one of [defendants'] oral and written statements[,]" particularly where, as here, the Company specifically referred to those risks in its public filings and earnings calls. *See KBC Asset Mgmt.*, 2025 WL 976120, at *14; *see also Desai*

15

*v. Gen. Growth Props., Inc.*, 654 F. Supp. 2d 836, 844 (N.D. Ill. 2009).

Methode disclosed extensive risk factors concerning the inherent uncertainty associated with: (1) its financial projections; (2) the "[i]mpact [of] the COVID-19 pandemic"; (3) the Company's "[d]ependence on a small number of large customers, including one large automotive customer"; (4) the "[t]iming, quality, and cost of new program launches"; (5) the risks associated with the "[f]ailure to attract and retain qualified personnel"; (6) the "[a]bility to keep pace with rapid technological changes"; (7) the "[a]bility to compete effectively"; and a litany of other factors that could cause results to materially differ from the forward-looking statements. *See* ECF 61-3 at 1, 6–13.[14] Methode also emphasized that it did "not expect that . . . [its] internal control over financial reporting [would] prevent all errors" because "any system of controls . . . is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions." 2021 Form 10-K (Ex. 3) at 26. So, Methode could provide "only reasonable, not absolute, assurance that the objectives of [its] control system [were] met." *Id.*

The Company further disclosed numerous other risks associated with its strategic business transition, including cautioning that "new program launches require a significant ramp up of costs," yet "sales related to these new programs generally are dependent upon the timing and success of [the] customers' introduction of new products[,]" that financial results could be materially impacted if Methode was "unable to launch new products in a timely and cost-effective manner," or if "EV adoption rates in general and the take rate experienced by each of [its] OEM customers" varied from the assumptions in the Company's forecasts. ECF 61-22 at 8, 11. In fact, although unnecessary to invoke the safe harbor, Methode warned of precisely the risks that

---

[14] *Accord* ECF 61-6 at 23; ECF 61-9 at 1, 5–13; ECF 61-13 at 20; ECF 61-16 at 22; ECF 61-19 at 24; ECF 61-22 at 1, 5–15; ECF 61-26 at 22; ECF 61-30 at 25.

Plaintiff alleges came to pass and that caused the decline in Methode's stock price, including the risk of labor shortages, the uncertainty with meeting financial projections, and the risk of internal control failures. *See id.*; *see also* Ex. 3 at 26 ("Because of the inherent limitations in a cost-effective control system, misstatements due to . . . fraud may occur and not be detected"). "[N]ot only do these cautionary statements highlight numerous business-specific risk factors, but they also identify the very risk[s] Plaintiff[] allege[s] led to [Methode's] underperformance." *Plumbers*, 778 F. Supp. 2d at 875. And because "[r]isk disclosure statements in SEC filings are inherently forward-looking," such "statements are not actionable to the extent plaintiffs contend defendants should have disclosed risk factors are affecting financial results rather than may affect financial results." *Coll. Ret. Equities Fund v. Boeing Co.*, 2026 WL 891657, at *14 (N.D. Ill. Mar. 31, 2026) (cleaned up); *see also Plumbers*, 778 F. Supp. 2d at 877.[15]

### B.  The Challenged Puffery And Opinions Are Not Actionable.

Many of the challenged statements are also inactionable because they amount to no more than corporate puffery. "[P]utting a 'rosy face on an inherently uncertain process' is not actionable [securities] fraud and, in fact, investors expect no less from a publicly-held company." *Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 711 (N.D. Ill. 2005). "Courts [therefore] consistently hold that mere puffery and glowing representations of expected boom are not enough to state claims under the Exchange Act." *Johnson v. Tellabs, Inc.*, 262 F. Supp. 2d 937, 951 (N.D. Ill. 2003); *see also Zebra Techs.*, 8 F.4th at 595.

Puffery refers to "loosely optimistic statements that are so vague, so lacking in specificity,

---

[15] Even if the forward-looking statements were not accompanied by meaningful cautionary language, they would be protected under the second and third prongs of the safe harbor. Many of the forward-looking statements are immaterial, 15 U.S.C. § 78u-5(c)(1)(A)(ii), as explained in Section II(B). And Plaintiff fails to plead facts showing that any Defendant had actual knowledge that any statement was false when made, *id.* § 78u-5(c)(1)(B)(i), as explained in Sections I and II(C).

or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." *Midway Games*, 332 F. Supp. 2d at 1164; *see also Searls v. Glasser*, 64 F.3d 1061, 1066–67 (7th Cir. 1995) ("recession-resistant" and promises of "high" level of "disposition gains" constituted puffery); *Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894, 902 (N.D. Ill. 2001), *aff'd*, 269 F.3d 806 (7th Cir. 2001) (suggestions that company was an industry leader and grew in certain segments constituted puffery). And, while it can take many forms, "four categories of puffery [are particularly] relevant here: (1) indefinite predictions of growth; (2) optimistic rhetoric and hype; (3) subjective statements; and (4) vague statements." *Van Noppen v. InnerWorkings, Inc.*, 136 F. Supp. 3d 922, 940 (N.D. Ill. 2015).

The SAC, like the FAC, challenges numerous such statements, including those touting Methode's "solid sales" or "strong performance." SAC ¶¶ 59, 101; *see also id.* ¶¶ 53, 74 ("another strong quarter of EV program awards" and "another solid quarter of business awards"); *id.* ¶ 61 ("solid sales," "strong performance," and "strong award bookings"); *id.* ¶¶ 94, 98, 100–01, 103, 105 (similar); *id.* ¶¶ 82, 107, 116 ("strong award pipeline"); *id.* ¶ 63 ("a very strong quarter"); *id.* ¶¶ 66, 72, 76 (similar); *id.* ¶¶ 78, 90 ("multiple years of strong awards" and a "strong run of program awards"). Other puffing statements abound. *See id.* ¶ 92 (Methode's "business model . . . not just healthy, but . . . prospering"); *id.* ¶¶ 76, 88, 105 (same); *id.* ¶ 63 ("[w]e have worked relentlessly"); *id.* ¶ 70 ("we really feel good about our geographic footprint"); *id.* ¶¶ 78, 82, 85 (Methode was "making significant investments"); *id.* ¶ 85 (expressing "extreme[ ] confiden[ce] that the company [would] continue to flourish"); *id.* ¶¶ 86, 92 (similar). These "adjective-laden statements are too vague and unverifiable" to be misleading. *See Phoenix Ins. Co. v. ATI Physical Therapy, Inc.*, 690 F. Supp. 3d 862, 877–78 (N.D. Ill. 2023); *see also Conagra*, 495 F. Supp. 3d at 653.

18

Other statements challenged by Plaintiff are inactionable for a different-but-related reason: they are opinions. Opinions are only actionable where they are not sincerely held, or where they "omit[] material facts about [Defendant's] inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself." *Phoenix Ins.*, 690 F. Supp. 3d at 882–83. Still, "[n]ot *every* fact contradicting an opinion must be disclosed," *id.*, because "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts; indeed, the presence of such facts is one reason why an issuer may frame a statement as an opinion, thus conveying uncertainty." *Omnicare v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 189–90 (2015).

Plaintiff challenges a number of opinions that cannot form the basis of any claims, *see*, *e.g.*, SAC ¶¶ 59, 68, 70, 85–86, 92, 98, 175, because the SAC "contains no particularized allegation that the speakers did not honestly hold the opinions they expressed." *Chew*, 2024 WL 4346522, at *12. And, with respect to any alleged omission, all these opinions must be understood within the context of contemporaneous SEC filings that provided a slew of risk factors no reasonable investor would ignore. *See supra* at Section II.A. These opinions are not actionable.

## C. Plaintiff Fails To Plead A Strong Inference Of Scienter.

The SAC is further subject to dismissal because Plaintiff has not alleged facts giving rise to a strong inference of scienter that is "more than merely plausible or reasonable," but rather is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 309 (2007). "Alleging that a defendant *should have known* about fraud is not enough to show that the defendant was reckless." *Baxter*, 2021 WL 100457, at *11. Rather, the PSLRA requires Plaintiff to "satisfy a heightened standard of plausibility in pleading scienter." *Id.* (cleaned up). To meet this standard, "the Court must account for plausible, nonculpable explanations for the defendant's conduct and weigh them against the

19

strength of the inferences in favor of scienter." *Id.* (cleaned up). "Cobbling together a litany of inadequate allegations does not render those allegations particularized in accordance with Rule 9(b) or the PSLRA." *Cal. Pub. Emp. Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 155 (3d Cir. 2004).

Although the Court did not reach scienter in dismissing the FAC, Plaintiff was on notice of the significant deficiencies in its scienter allegations. Nonetheless, Plaintiff failed to make even a ***single*** substantive change to its scienter allegations. *Compare* FAC ¶¶ 141–72, *with* SAC ¶¶ 168–87. Just as in the FAC, Plaintiff fails to connect the dots and plead with any degree of particularity what Defendants knew, when they knew it, and why they should have disclosed it. Instead, Plaintiff's theory depends on drawing inferences the SAC's allegations do not warrant, and then inferring scienter based on these unfounded inferences. Courts have rejected just this sort of circular logic, which amounts to nothing more than fraud by hindsight. *See*, *e.g.*, *Pipefitters Loc. No. 636 Defined Benefit Plan v. Tekelec*, 2013 WL 1192004, at *13 (E.D.N.C. Mar. 22, 2013).

### 1. Plaintiff's Scienter Allegations Are Deficient.

Plaintiff contends that scienter can be inferred here for six reasons. It is wrong as to each. *First*, Plaintiff attempts to rely on so-called "admissions" by the Defendants that the "issues were pre-existing during the Class Period," but "not disclosed to investors." SAC ¶¶ 173–77. But, as discussed above, the "admissions" highlighted by Plaintiff establish no such thing. And there is no securities fraud by hindsight, in any event. *See*, *e.g.*, *Higginbotham*, 495 F.3d at 759–60; *see also Anixter*, 2011 WL 1303387, at *30 ("If Plaintiff[] could identify contemporaneous information known to Defendants that showed that [the company's] current financial health or future prospects was poorer than what Defendants disclosed . . . , such post-class period statements may be relevant to corroborate and build on the inference of scienter raised by the possession of that contemporaneous information. . . . But on their own, the post-class period statements . . . do not

20

help establish a 'strong' or 'cogent' inference of scienter.").

*Second*, Plaintiff attempts to rely on the "core operations" doctrine. SAC ¶¶ 178–81. Under that doctrine, "officers of a company can be assumed to know of facts critical to a business's core operations or to an important transaction that would affect a company's performance." *Baxter*, 2021 WL 100457, at *13 ("'core operations' inference generally will not establish a strong inference of scienter by itself"). But even assuming Defendants were "intensely focused" on the "Company's historic reliance on GM and toward new EV program awards" (SAC ¶ 180), "it does not necessarily follow that they disbelieved their statements or sought to deceive investors with their statements." *Société Générale Secs. Servs., GbmH v. Caterpillar, Inc.*, 2018 WL 4616356, at *8 (N.D. Ill. Sept. 26, 2018). Nor can Plaintiff rely on its CWs. SAC ¶ 179. "Plaintiff must allege actual knowledge by the defendant, not some second-hand belief that such knowledge existed." *Zimmer*, 673 F. Supp. 2d at 747 (noting no communication between CW and defendants).

*Third*, Plaintiff points to so-called "suspicious" executive departures "during and soon after the Class Period," including Messrs. Khoury, Duda, Avula, and Tsoumas, and then alleges in conclusory terms that these departures were "connected to the problems unfolding at the Company's Monterrey facility." SAC ¶ 182. But Plaintiff does not plead **any** specific facts demonstrating how Defendants' departures were connected to the alleged fraud. Indeed, all Plaintiff alleges is that Mr. Tsoumas "retired" from the Company and that Mr. Duda "resigned . . . and subsequently retired" (after serving as CEO for twenty years and when his retirement had already been announced). SAC ¶ 11; *see also* ECF 61-27. There are any number of reasons why an executive might resign, most of which are not related to fraud. *See*, *e.g.*, *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 446 (S.D.N.Y. 2005). Where, as here, Plaintiff fails to allege any connection between the departures and the alleged fraud, such allegations cannot support scienter. *See*, *e.g.*,

21

*Marquez v. Bright Health Grp., Inc.*, 755 F. Supp. 3d 266, 284 (E.D.N.Y. 2024).

*Fourth*, Plaintiff highlights Defendants' financial and business experience. *See* SAC ¶¶ 183–84. Plaintiff simply states that the Defendants are experienced executives with long tenures at the Company. But these "senior positions . . . do not suggest scienter without additional support from internal documents or communications." *Société Générale*, 2018 WL 4616356, at *8; *see also Chu v. Sabratek Corp.*, 100 F. Supp. 2d 827, 837 (N.D. Ill. 2000) ("status as an officer. . ., without more, does not give rise to a strong inference" of scienter). Otherwise, the PSLRA would be useless, as scienter would be easily established in every case.

*Fifth*, Plaintiff maintains that "Defendants knew . . . the material weaknesses listed [in the 2023 10-K] were far from the only ones the Company faced with respect to its internal controls." SAC ¶¶ 126–27. Again, however, Plaintiff nowhere explains "what controls were actually in place and what controls should have been in place." *Hill v. The Tribune Co.*, 2006 WL 2861016, at *9 (N.D. Ill. Sept. 29, 2006). Beyond that omission, Plaintiff "does not allege any facts showing that they did not believe [Methode's] controls were adequate or effective." *Chandler*, 2022 WL 952441, at *21. And allegations "that defendants should have known about internal control deficiencies based on nothing more than later acknowledgment of such weaknesses amounts to pleading fraud by hindsight." *Roth v. OfficeMax, Inc.*, 527 F. Supp. 2d 791, 801 (N.D. Ill. 2007) (citing *Higginbotham*, 495 F.3d 753, 759). Here, "the vagueness of [Plaintiff's] allegations regarding the individual defendants' knowledge of inadequate internal controls, does not establish a strong inference of scienter and therefore does not state a claim under Rule 10b–5." *Riggs Partners, LLC v. Hub Grp., Inc.*, 2002 WL 31415721, at *5 (N.D. Ill. Oct. 25, 2002).

*Finally*, Plaintiff argues that "the promise of [incentive] compensation gave the Individual Defendants a personal financial motive to pay close attention to the stock price and keep it

22

artificially inflated." SAC ¶¶ 185–87. But the "incentive programs under which [Defendants] received their compensation appear to be performance-based compensation plans that 'are typical of nearly every corporation,'" and "that [Defendants] were compensated more under such plans if the [C]ompany performed better establishes little, if anything, in the way of scienter." *Baxter*, 2021 WL 100457, at \*16. "[I]f courts accepted the motive to reap higher compensation 'as sufficient to establish *scienter*, most corporate executives would be subject to such allegations, and the heightened pleading requirements . . . would be meaningless.'" *Id.*

Here, "Plaintiff has not alleged that Defendants were, in fact, motivated by their compensation structure to obfuscate; neither was there anything 'unusual' about Defendants' situations that would give rise to a finding that they had a heightened motive to act with scienter in their public statements." *Zimmer*, 673 F. Supp. 2d at 748. And, notably, Plaintiff does not allege that Defendants sold any stock at the allegedly artificially inflated prices, which "further weighs against a finding of scienter." *Baxter*, 2021 WL 100457, at \*16.[16]

### 2. The Non-Fraudulent Inference Is More Compelling.

Plaintiff's theory of scienter rests on nothing more than hindsight and speculation, which is reason enough to dismiss the SAC. But, under the PSLRA, the Court also must consider "plausible opposing inferences," including inferences of non-fraudulent intent. *See Tellabs*, 551 U.S. at 323. Here, the reality is that the challenged statements—including forward-looking guidance and commentary regarding the Company's prospects—were issued during an inherently unpredictable time for the Company. By Plaintiff's own admission, beginning in 2020, Methode's Automotive Segment was in transition. SAC ¶¶ 33, 54. This transition was significant, involving,

---

[16] Further undermining Plaintiff's theory of scienter is Methode's repurchase of more than $100 million of its own stock during the class period, ECF 61-16 at 16, which would make no sense if Defendants believed the stock price was inflated by fraud. *See, e.g.*, *Frankfurt-Tr.*, 336 F. Supp. 3d at 225.

*inter alia*, a shift in the products designed and produced by Methode's Automotive Segment and "the retooling of [the Company's] Monterrey facility to build new, more specialized components." *Id.* ¶¶ 4, 6, 37, 56. Moreover, this significant transition was taking place in the wake of the COVID-19 pandemic, the most turbulent time in modern corporate history. *Id.* ¶¶ 47, 146.

Plaintiff nevertheless seeks to spin a hindsight theory of fraud that claims Defendants knew—but failed to disclose—Methode would face roadblocks in the major overhaul of its Automotive Segment that would make it impossible for the Company to meet its forward-looking guidance. But, as discussed herein, Defendants disclosed the risks and challenges associated with this transition. *See supra* at Section II.A. And Methode regularly revised its financial guidance based on the best information available at the time. *See, e.g.*, SAC ¶¶ 122, 128.

Plaintiff's vague and conclusory assertions that Defendants were knowingly defrauding investors are far outweighed by a more compelling inference of non-fraudulent intent: Defendants were working through—in real-time—issues that arose during a significant transition in the midst of COVID-19 with the good-faith belief that the issues would not ultimately impact the Company's ability to achieve its financial guidance. That is, Defendants simply did not foresee that a number of issues would coalesce and require Methode to abandon its previously issued guidance. Plaintiff itself acknowledges that the evolution of Methode's business strategy—necessitated by external changes in the automobile industry and the global economy—occurred over time. That Methode's business strategy turned out to be less successful than hoped does not suggest Defendants believed that the strategy would be anything other than successful when making the challenged statements.

### D. Plaintiff Fails To Adequately Allege Loss Causation.

To adequately plead loss causation, Plaintiff may not simply allege a price decline following an announcement of negative information. Rather, Plaintiff must plead facts demonstrating that the price decline immediately followed a "corrective disclosure" that revealed

24

the "truth" about a previous misstatement and was responsible for a "substantial" amount of the price drop. *Dura*, 544 U.S. at 344–48. Here, Plaintiff alleges that the "truth" was revealed through a series of partially corrective disclosures, where Methode announced lower-than-anticipated financial results and lowered or withdrew its financial guidance. SAC ¶¶ 119, 128, 130, 132, 139–41, 144–46, 149–50. But, as a matter of law, these announcements—without more—cannot support allegations of loss causation. Although disappointing results and lowered guidance may have had a downward effect on Methode's stock price, such announcements did not—and cannot—have the requisite corrective effect in revealing any fraud. *See, e.g., In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266 (S.D.N.Y. 2005).[17]

## CONCLUSION

Defendants respectfully request that the Court dismiss the SAC with prejudice.

Respectfully submitted this 20th day of May 2026.

**KING & SPALDING LLP**

*/s/ Zachary Fardon*
By: Zachary Fardon (IL Bar #6292156)
110 N Wacker Drive, Suite 3800
Chicago, Illinois 60606
Telephone: (312) 995-6333
Facsimile: (312) 995-6330
zfardon@kslaw.com

Jessica P. Corley (*pro hac vice*)
Brandon R. Keel (IL Bar #6300165)
1180 Peachtree Street, NE
Atlanta, Georgia 30309
Telephone: (404) 572-4600
Facsimile: (404) 572-5100
jpcorley@kslaw.com

---

[17] Plaintiff previously conceded that it asserts no "scheme" liability claim under Rule 10b-5(a) or (c), ECF 66 at 15, and made no changes in the SAC to assert any such claim now. Even if Plaintiff were to backtrack, the SAC fails to assert any such theory of liability. *See S.E.C. v. Rio Tinto plc*, 41 F.4th 47, 53–54 (2d Cir. 2022) ("misstatements and omissions cannot form the 'sole basis' for liability under the scheme subsections").

bkeel@kslaw.com

*Counsel for Methode Electronics, Inc.,*
*Donald W. Duda, and Ronald L.G. Tsoumas*

## CERTIFICATE OF SERVICE

I hereby certify that on May 20, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system.

By: /s/ *Zachary Fardon*
Zachary Fardon